## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NORMAN HOLLETT, derivatively on behalf of FIRST AMERICAN FINANCIAL CORPORATION, | **C.A. No.** |
| Plaintiff, | |
| vs. | **DEMAND FOR JURY TRIAL** |
| DENNIS J. GILMORE, MARK E. SEATON, PARKER S. KENNEDY, JAMES L. DOTI, REGINALD H. GILYARD, MARGARET M. MCCARTHY, MICHAEL D. MCKEE, THOMAS V. MCKERNAN, MARK C. OMAN, MARTHA B. WYRSCH, | |
| Defendants, | |
| and | |
| FIRST AMERICAN FINANCIAL CORPORATION, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Norman Hollett ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant First American Financial Corporation ("First American" or the "Company"),[1] files this Verified Shareholder Derivative Complaint against Individual Defendants Dennis J. Gilmore ("Gilmore"), Mark E. Seaton ("Seaton"), Parker S. Kennedy ("Kennedy"), James L. Doti ("Doti"), Reginald H. Gilyard ("Gilyard"), Margaret M. McCarthy ("McCarthy"),

---

[1] References herein to First American refer to the Company together with its wholly-owned subsidiaries.

Michael D. McKee ("McKee"), Thomas V. McKernan ("McKernan"), Mark C. Oman ("Oman"), Martha B. Wyrsch ("Wyrsch") (collectively, the "Individual Defendants," and together with First American, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of First American, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding First American, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by First American's directors and officers from February 17, 2017 through October 22, 2020, both dates inclusive (the "Relevant Period").

2.      Based in Santa Ana, California, First American is engaged in the business of providing financial services through its title insurance and services segment and its specialty insurance segment. The Company operates through its subsidiaries. The title insurance and services segment provide title insurance, closing and/or escrow services, and similar or related services domestically and internationally in connection with residential and commercial real estate

transactions. The Company, among other things, maintains, manages, and provides access to title

plant data and records. First American is the second largest title insurance provider in the United

States with revenue for the fiscal year ended December 31, 2019 totaling approximately $6.2

billion, most of which was substantially derived from its title insurance and services segment.

3.      In the regular course of providing customers with title insurance, First American

compiles highly sensitive and personal information including, but not limited to, names, email

addresses, mailing addresses, dates of birth, social security numbers, bank accounts numbers,

lender details, mortgage and tax records, driver's license images, and other highly sensitive,

nonpublic, and/or confidential, personal information ("Personally Identifiable Information").

4.      In recent years, the Company began to embark on automation initiatives to speed

the delivery of its products, increase efficiency, improve customer experience, and decrease risk.

In doing so, the Company collected, stored, and transmitted millions of documents, many of which

contained Personally Identifiable Information, on a document repository known as FAST image

repository ("FAST"). Moreover, First American created and maintained an application

("EaglePro"), which enabled Company employees to send out documents that were stored within

FAST to external users via email. However, from at least October 2014 through May 2019, these

records were available to anyone with a web browser due to a cybersecurity vulnerability on First

America's public-facing website. Astonishingly, even after the cybersecurity defect was detected

during a penetration test[2] in December 2018, the Company failed to correct the issue until after the

cybersecurity vulnerability was exposed upon publication of the May 2019 Article (defined

below). Instead, First American permitted unrestricted access to the Personally Identifiable

---

[2] A penetration test is an authorized simulated cyberattack on a computer system, performed to evaluate the security system, including the potential for unauthorized parties to gain access to the system's features and data.

Information of millions of its customers and subjected those victims to an increased risk of cybercrime including acts of cyber-fraud and identity theft for about six additional months.

5.      Throughout the Relevant Period, the Individual Defendants touted the Company's focus on its "data and process advantages" by purportedly increasing efficiency, reducing risk, and investing in unique customer-facing technology to streamline the title insurance process for First American's customers all while causing the Company to: (1) fail to implement basic security protocols to protect its customers' Personally Identifiable Information; (2) as a result of the foregoing, expose millions of First American customers to an increased risk of cyber-fraud and identity theft; (3) consequently, breach the privacy terms of First American's agreement with customers; and (4) as a result of the foregoing, violate state privacy laws (collectively, the "Privacy Breach").

6.      In breach of their fiduciary duties, the Individual Defendants permitted the Privacy Breach, engaged and caused the Company to engage in the Privacy Breach, and failed to maintain adequate controls.

7.      Nonetheless, throughout the Relevant Period, several of the Company's annual and quarterly financial reports filed with the SEC on Form 10-Ks and 10-Qs failed to disclose the Privacy Breach and therefore contained serious errors that rendered them unreliable. The Individual Defendants further released letters to Company stockholders touting First American's commitment to "operating efficiency" and safeguarding customer information. The Company's SEC filings issued throughout the Relevant Period also asserted, *inter alia*, that First American maintained adequate control over its financial reporting.

8.      The Company's Privacy Breach was initially revealed to the public on May 24, 2019, when KrebsOnSecurity.com ("KrebsOnSecurity"), a nationally recognized cybersecurity

blog, published an article (the "May 2019 Article") which reported that the Company had leaked 885 million real estate documents in connection to real estate transactions going back to 2003.

9.      On this news, the price of the Company's stock fell $3.46 per share, or over 6.2%, from $55.26 per share at the close of trading on May 24, 2019, to $51.80 per share at the close of the next trading day, on May 28, 2019.

10.     In connection to the massive data breach, the SEC opened an investigation on August 7, 2019 to determine whether federal securities laws had been violated with respect to the adequacy of the disclosures that the Company had made at the time of the incident and the adequacy of its disclosure controls. Moreover, the New York State Department of Financial Services (the "NYSDFS") commenced an enforcement action (the "NYSDFS Enforcement Action") against the Company on July 21, 2020.

11.     On October 22, 2020, First American filed its quarterly report with the SEC for the fiscal quarter ended September 30, 2020 on Form 10-Q (the "3Q20 10-Q"), which revealed that the Company had recently received a Wells Notice from the SEC that informed the Company that the SEC's enforcement staff had preliminary determined that it would recommend an enforcement action be filed against First American.

12.     On this news, the price of the Company's stock fell $4.83 per share, or over 9.3%, from $51.58 per share at the close of trading on October 21, 2020, to $46.75 per share at the close of trading on October 22, 2020.

13.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading

statements that failed to disclose, *inter alia*: (1) the Privacy Breach; (2) as a result of the Company's increased reliance on advanced technologies to automate various processes and improve efficiency, First American was subjected to an increased threat of a cybersecurity breakdown; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

14.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

15.     Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

16.     In light of the Individual Defendants' misconduct, which has subjected First American to being named as a respondent in the NYSDFS Enforcement Action, to being named as a defendant in federal consumer class action lawsuits pending in the United States District Court for the Central District of California (the "Consumer Class Actions"), and to being named, along with the Company's Chief Executive Officer ("CEO") and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of First American's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District because First American is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of First American. Plaintiff has continuously held First American common stock since before the beginning of the Relevant Period.

### Nominal Defendant First American

23.     First American is a Delaware corporation with its principal executive offices at 1 First American Way, Santa Ana, California 92707-5913. First American's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "FAF."

### Defendant Gilmore

24.     Defendant Gilmore has served as the Company's CEO and as a Company director since June 2010. He also serves as a member of the Executive Committee. He previously served in various managerial roles with The First American Corporation ("TFAC") beginning in 1993, including CEO of TFAC's financial services group and TFAC's Chief Operating Officer ("COO"). According to the Company's Schedule 14A filed with the SEC on March 31, 2020 (the "2020 Proxy Statement"), as of March 18, 2020, Defendant Gilmore beneficially owned 373,100 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 18, 2020 was $33.16, Defendant Gilmore owned nearly $12.4 million worth of First American stock.

25.     For the fiscal year ended December 31, 2019, Defendant Gilmore received $10,367,225 in compensation from the Company. This included $1,000,000 in salary, $5,120,280 in stock awards, $2,907,000 in non-equity incentive plan compensation, $1,323,541 in change in pension value and nonqualified deferred compensation earnings, and $16,404 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Gilmore received $8,403,146 in compensation from the Company. This included $999,039 in salary, $5,390,730 in

stock awards, $2,000,700 in non-equity incentive plan compensation, and $12,677 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Gilmore received $8,330,344 in compensation from the Company. This included $950,000 in salary, $4,348,262 in stock awards, $2,365,200 in non-equity incentive plan compensation, $654,480 in change in pension value and nonqualified deferred compensation earnings, and $12,402 in all other compensation.

26.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Gilmore made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 11/8/2017 | 100,000 | $54.97 | $5,497,000 |

27.     His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

28.     The Company's 2020 Proxy Statement stated the following about Defendant Gilmore:

> Mr. Gilmore has been our chief executive officer and a director since 2010. From 1993 to 2010, he served in various managerial roles with The First American Corporation, including as the chief executive officer of its financial services group and as its chief operating officer. As the Company's chief executive officer, Mr. Gilmore provides our Board of Directors in-depth insight into the Company's businesses, challenges and opportunities, as well as significant experience in the real estate settlement services industry.

**Defendant Seaton**

29.     Defendant Seaton has served as the Company's Executive Vice President and CFO since March 2013. Previously, he served as the Company's Senior Vice President of Finance from

2010 until 2013 and as Director of Investor Relations from 2006 until 2010. According to the 2020 Proxy Statement, as of March 18, 2020, Defendant Seaton beneficially owned 58,672 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2020 was $33.16, Defendant Seaton owned over $1.9 million worth of First American stock.

30.     For the fiscal year ended December 31, 2019, Defendant Seaton received $3,500,921 in compensation from the Company. This included $650,000 in salary, $1,730,431 in stock awards, $1,105,000 in non-equity incentive plan compensation, and $15,490 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Seaton received $3,160,840 in compensation from the Company. This included $649,038 in salary, $1,739,437 in stock awards, $760,500 in non-equity incentive plan compensation, and $11,865 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Seaton received $2,830,668 in compensation from the Company. This included $599,519 in salary, $1,379,971 in stock awards, $839,500 in non-equity incentive plan compensation, and $11,678 in all other compensation.

31.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Seaton made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 8/18/2017 | 7,000 | $48.33 | $338,310.00 |
| 11/8/2017 | 9,981 | $54.87 | $547,657.47 |
| 11/1/2019 | 8,069 | $61.92 | $499,632.48 |

32.     Thus, in total before the fraud was exposed, he sold 25,050 Company shares on inside information, for which he received nearly $1.4 million. His insider sales, made with

knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

33.     The Company's 2020 Proxy Statement stated the following about Defendant Seaton:

> Mark E. Seaton has served as our executive vice president, chief financial officer since 2013. From 2010 until 2013, he served as our senior vice president, finance, in which capacity he oversaw the Company's investment management, investor relations, treasury and financial planning activities. Mr. Seaton joined The First American Corporation in 2006 and served as director of investor relations until 2010.

**Defendant Kennedy**

34.     Defendant Kennedy has served as the Company's Chairman of the Board and as a Company director since June 2010. Previously, he served as the Company's Executive Chairman from 2010 until he retired in February 2012 and as the Chairman and CEO of the Company's former parent company, TFAC, from 2003 until 2010. He also served as TFAC's President from 1993 until 2004. According to the 2020 Proxy Statement, as of March 18, 2020, Defendant Kennedy beneficially owned 2,655,031 shares of the Company's common stock, which represented 2.4% of the Company's outstanding shares as of that date.  Given that the price per share of the Company's common stock at the close of trading on March 18, 2020 was $33.16, Defendant Kennedy owned over $88.0 million worth of First American stock.

35.     For the fiscal year ended December 31, 2019, Defendant Kennedy received $399,999 in compensation from the Company. This included $255,000 in fees earned or paid in cash, $124,999 in stock awards, and $20,000 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Kennedy received $369,978 in compensation from the Company. This included $250,000 in fees earned or paid in cash, $99,978 in stock awards, and $20,000 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Kennedy received

$366,487 in compensation from the Company. This included $246,493 in fees earned or paid in cash, $99,994 in stock awards, and $20,000 in all other compensation.

36.     The Company's 2020 Proxy Statement stated the following about Defendant Kennedy:

> Mr. Kennedy has served as chairman of the Board and as a director of the Company since 2010. Mr. Kennedy served as executive chairman of the Company from 2010 until his retirement as an employee in February 2012. From 2003 to 2010, he served as The First American Corporation's chairman and chief executive officer. He also served as The First American Corporation's president from 1993 to 2004. He served as a director of The First American Corporation and its successor entity, CoreLogic, Inc., from 1987 to 2011, and was CoreLogic, Inc.'s executive chairman from 2010 to 2011. He is a director of the Automobile Club of Southern California. We believe that Mr. Kennedy, who has worked with us in various capacities for over 40 years, has unparalleled executive experience in our industry. He also brings to the Company an incomparable understanding of our history and culture.

**Defendant Doti**

37.     Defendant Doti has served as a Company director since June 2010. He also serves as the Chair of the Audit Committee and as a member of the Executive Committee. According to the 2020 Proxy Statement, as of March 18, 2020, Defendant Doti beneficially owned 61,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2020 was $33.16, Defendant Doti owned over $2.0 million worth of First American stock.

38.     For the fiscal year ended December 31, 2019, Defendant Doti received $281,999 in compensation from the Company. This included $157,000 in fees earned or paid in cash and $124,999 in stock awards. For the fiscal year ended December 31, 2018, Defendant Doti received $263,978 in compensation from the Company. This included $164,000 in fees earned or paid in cash and $99,978 in stock awards. For the fiscal year ended December 31, 2017, Defendant Doti received $239,994 in compensation from the Company. This included $140,000 in fees earned or paid in cash and $99,994 in stock awards.

39.     The Company's 2020 Proxy Statement stated the following about Defendant Doti:

Mr. Doti is president emeritus and professor of economics at Chapman University and served as Chapman University's president from 1991 to 2016. He has been a director since 2010, and he served as a director of The First American Corporation from 1993 until 2010. He previously served on the boards of Standard Pacific Corp. and Fleetwood Enterprises, Inc. Given his experience as president of Chapman University and with a doctorate in economics from the University of Chicago, Dr. Doti gives our Company insight into the organizational challenges that large companies face and the impact of the economic environment on the Company.

**Defendant Gilyard**

40.     Defendant Gilyard has served as a Company director since May 2017. He also serves as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 18, 2020, Defendant Gilyard beneficially owned 5,787 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2020 was $33.16, Defendant Gilyard owned nearly $191,897 worth of First American stock.

41.     For the fiscal year ended December 31, 2019, Defendant Gilyard received $227,999 in compensation from the Company. This included $103,000 in fees earned or paid in cash and $124,999 in stock awards. For the fiscal year ended December 31, 2018, Defendant Gilyard received $197,978 in compensation from the Company. This included $98,000 in fees earned or paid in cash and $99,978 in stock awards. For the fiscal year ended December 31, 2017, Defendant Gilyard received $126,381 in compensation from the Company. This included $61,463 in fees earned or paid in cash and $64,918 in stock awards.

42.     The Company's 2020 Proxy Statement stated the following about Defendant Gilyard:

Mr. Gilyard has been a senior advisor with The Boston Consulting Group, a global management consulting company, since 2012. From 2012 to 2017, he was dean of the Argyros School of Business and Economics at Chapman University. From 1996 to 2012, he held various other positions with The Boston Consulting Group,

including as a partner and managing director. He is a director of CBRE Group, Inc. (NYSE: CBRE), a commercial real estate services and investment firm, and Realty Income Corporation (NYSE: O), a real estate investment trust. He began his career serving in the United States Air Force. With his in-depth understanding of the complexities of large businesses and keen grasp of customer needs across a variety of industry sectors, Mr. Gilyard brings to the Board a unique perspective on how we can make our operations more efficient and serve our customers better.

**Defendant McCarthy**

43.     Defendant McCarthy has served as a Company director since July 2015. She also serves as the Chair of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 18, 2020, Defendant McCarthy beneficially owned 16,422 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2020 was $33.16, Defendant McCarthy owned nearly $544,554 worth of First American stock.

44.     For the fiscal year ended December 31, 2019, Defendant McCarthy received $241,122 in compensation from the Company. This included $116,123 in fees earned or paid in cash and $124,999 in stock awards. For the fiscal year ended December 31, 2018, Defendant McCarthy received $204,499 in compensation from the Company. This included $104,521 in fees earned or paid in cash and $99,978 in stock awards. For the fiscal year ended December 31, 2017, Defendant McCarthy received $197,994 in compensation from the Company. This included $98,000 in fees earned or paid in cash and $99,994 in stock awards.

45.     The Company's 2020 Proxy Statement stated the following about Defendant McCarthy:

Ms. McCarthy retired in June 2019 as executive vice president of CVS Health Corporation, a health innovation company (NYSE: CVS), supporting the technology integration following the completion of CVS Health's acquisition of Aetna, Inc. in 2018. She served as executive vice president of operations and technology for Aetna, Inc., a diversified healthcare benefits company, from 2010 until 2018, where she was responsible for innovation, technology, data security, procurement, real estate and service operations. Prior to joining Aetna in 2003, she

served in information technology-related roles at CIGNA Healthcare and Catholic Health Initiatives, among others. Ms. McCarthy also worked in technology consulting at Accenture and was a consulting partner at Ernst & Young. She is a director of Brighthouse Financial, Inc. (NASDAQ GS: BHF), a life and annuity insurance company; Marriott International, Inc. (NASDAQ: MAR), an operator, franchisor, and licensor of hotel, residential, and timeshare properties worldwide; and American Electric Power (NYSE: AEP), an electrical energy company. She also serves on various advisory boards, councils and private-company boards. Given her extensive experience managing large groups of employees, complex processes and enterprise-critical technology, Ms. McCarthy brings to the Board valuable insights into areas of critical import to the operations of the Company.

**Defendant McKee**

46.     Defendant McKee has served as a Company director since March 2011. He also serves as the Chair of the Compensation Committee. According to the 2020 Proxy Statement, as of March 18, 2020, Defendant McKee beneficially owned 38,789 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2020 was $33.16, Defendant McKee owned nearly $1.3 million worth of First American stock.

47.     For the fiscal year ended December 31, 2019, Defendant McKee received $244,999 in compensation from the Company. This included $120,000 in fees earned or paid in cash and $124,999 in stock awards. For the fiscal year ended December 31, 2018, Defendant McKee received $224,978 in compensation from the Company. This included $125,000 in fees earned or paid in cash and $99,978 in stock awards. For the fiscal year ended December 31, 2017, Defendant McKee received $204,994 in compensation from the Company. This included $105,000 in fees earned or paid in cash and $99,994 in stock awards.

48.     The Company's 2020 Proxy Statement stated the following about Defendant McKee:

> Mr. McKee has served as a principal of The Contrarian Group, a private equity firm, since 2018. He is the Chairman of Realty Income Corporation (NYSE: O), a real estate investment trust, and the Tiger Woods Foundation. He served as a

director of HCP, Inc. (NYSE: HCP), a publicly traded real estate investment trust, from 1989 to 2018, as executive chairman of HCP from 2016 to 2018 and, during 2016, he also served as interim chief executive officer and president of HCP. From 2010 to 2016, Mr. McKee was chief executive officer of Bentall Kennedy (U.S.), a registered real estate investment advisor. He also served as the chief executive officer of The Irvine Company, a privately-held real estate development and investment company, from 2007 to 2008, as vice chairman of its board of directors from 1999 to 2008 and as an executive officer of that company since 1994. Prior to that, he was a partner with the law firm of Latham & Watkins LLP from 1986 to 1994. He previously served as a director of Mandalay Resort Group, Irvine Apartment Communities, Inc. and Oasis Residential Inc. Mr. McKee brings to the Board significant operating and executive management experience. This experience, combined with Mr. McKee's extensive background in the real estate industry, facilitates the Board's oversight of the Company's operations and enhances its ability to assess strategic opportunities.

**Defendant McKernan**

49.     Defendant McKernan has served as a Company director since March 2011. He also serves as a member of the Audit Committee and as a member of the Executive Committee. According to the 2020 Proxy Statement, as of March 18, 2020, Defendant McKernan beneficially owned 46,079 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2020 was $33.16, Defendant McKernan owned over $1.5 million worth of First American stock.

50.     For the fiscal year ended December 31, 2019, Defendant McKernan received $235,122 in compensation from the Company. This included $110,123 in fees earned or paid in cash and $124,999 in stock awards. For the fiscal year ended December 31, 2018, Defendant McKernan received $201,978 in compensation from the Company. This included $102,000 in fees earned or paid in cash and $99,978 in stock awards. For the fiscal year ended December 31, 2017, Defendant McKernan received $201,994 in compensation from the Company. This included $102,000 in fees earned or paid in cash and $99,994 in stock awards.

51.     The Company's 2020 Proxy Statement stated the following about Defendant McKernan:

Mr. McKernan has served as vice-chair of the board of AAA—Auto Club Enterprises and the Automobile Club of Southern California (the "Auto Club") since 2018 and from 2012 to 2018 he served as its chairman. Mr. McKernan served as chief executive officer of the Auto Club from 1991 until his retirement in 2012. Mr. McKernan also serves as a director of Payden & Rygel Investment Group and as a trustee of certain funds associated therewith. Other positions held by Mr. McKernan include directorships with various private companies and membership on various advisory councils. In addition, he served as vice chairman of the board of California Physicians Service, Inc., which operates as Blue Shield of California, and its subsidiary, Blue Shield of California Life & Health Insurance Company, until September 2009. Through his operating, information technology and executive management experience, much of it gained in the process of transforming the Auto Club into a leader in the California insurance industry, Mr. McKernan brings to the Company valuable insight into the challenges facing an insurance company that is executing on a strategic growth plan. His extensive experience participating in the management of insurance company investment portfolios also has been of significant value to the Company.

**Defendant Oman**

52.     Defendant Oman has served as a Company director since March 2013. He also serves as a member of the Audit Committee and as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of March 18, 2020, Defendant Oman beneficially owned 32,120 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2020 was $33.16, Defendant Oman owned nearly $1.1 million worth of First American stock.

53.     For the fiscal year ended December 31, 2019, Defendant Oman received $241,999 in compensation from the Company. This included $117,000 in fees earned or paid in cash and $124,999 in stock awards. For the fiscal year ended December 31, 2018, Defendant Oman received $211,978 in compensation from the Company. This included $112,000 in fees earned or paid in cash and $99,978 in stock awards. For the fiscal year ended December 31, 2017, Defendant Oman received $211,994 in compensation from the Company. This included $112,000 in fees earned or paid in cash and $99,994 in stock awards.

54.     The Company's 2020 Proxy Statement stated the following about Defendant Oman:

Mr. Oman retired from Wells Fargo & Company in 2011, after serving it or its predecessors since 1979. He held numerous positions at Wells Fargo, including senior executive vice president (home and consumer finance) from 2005 until his retirement and group executive vice president (home and consumer finance) from 2002 to 2005. Mr. Oman also served as a director and the chief executive officer of Wachovia Preferred Funding Corp. from 2009 to 2011 and as a director of American Caresource Holdings, Inc. from 2013 to 2017. He is currently involved with several private ventures and serves on a variety of private-company and non-profit boards. Mr. Oman brings to the Board important insights into the mortgage market and working with large mortgage lenders.

**Defendant Wyrsch**

55.    Defendant Wyrsch has served as a Company director since May 2018. She also serves as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 18, 2020, Defendant Wyrsch beneficially owned 3,832 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2020 was $33.16, Defendant Wyrsch owned over $127,069 worth of First American stock.

56.    For the fiscal year ended December 31, 2019, Defendant Wyrsch received $227,999 in compensation from the Company. This included $103,000 in fees earned or paid in cash and $124,999 in stock awards. For the fiscal year ended December 31, 2018, Defendant Wyrsch received $126,945 in compensation from the Company. This included $61,753 in fees earned or paid in cash and $65,192 in stock awards.

57.    The Company's 2020 Proxy Statement stated the following about Defendant Wyrsch:

Ms. Wyrsch retired in March 2019 as executive vice president and general counsel for Sempra Energy, a leading energy services company, where she oversaw the company's legal affairs and compliance initiatives. Prior to joining Sempra Energy in 2013, Ms. Wyrsch served as the president of Vestas American Wind Technology from 2009 to 2012, where she had direct responsibility for all North American sales, construction, service and maintenance. In addition to her executive leadership roles, she has served as a member of the board of directors of Spectra Energy Corporation and SPX Corporation. She currently serves on the board of directors of Spectris plc,

a publicly traded company listed on the London Stock Exchange, Noble Energy, Inc. (NYSE: NBL), an energy exploration and production company, and Quanta Services, Inc. (NYSE: PWR), a specialized contracting services company. As an accomplished director for publicly-traded companies, and with deep experience leading intricate businesses, Ms. Wyrsch provides valuable insight into how we can enhance our operations and ability to serve our customers.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

58.    By reason of their positions as officers, directors, and/or fiduciaries of First American and because of their ability to control the business and corporate affairs of First American, the Individual Defendants owed First American and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage First American in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of First American and its shareholders so as to benefit all shareholders equally.

59.    Each director and officer of the Company owes to First American and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

60.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of First American, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

61.    To discharge their duties, the officers and directors of First American were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

62.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good

faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of First American, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised First American's Board at all relevant times.

63.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

64.     To discharge their duties, the officers and directors of First American were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of First American were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to First American's own Code of Ethics and Conduct (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how First American conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of First American and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that First American's operations would comply with all applicable laws and First American's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

65.      Each of the Individual Defendants further owed to First American and the shareholders the duty of loyalty requiring that each favor First American's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

66.      At all times relevant hereto, the Individual Defendants were the agents of each other and of First American and were at all times acting within the course and scope of such agency.

67.      Because of their advisory, executive, managerial, and directorial positions with First American, each of the Individual Defendants had access to adverse, non-public information about the Company.

68.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by First American.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

69.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

70.      The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

71.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of First American was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

72.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

73.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of First American, and was at all times acting within the course and scope of such agency.

## FIRST AMERICAN'S CODE OF ETHICS

74.     First American's Code of Ethics provides that it is "intended to guide the Company's employees, officers and directors to support their efforts to comply with the laws and regulations that impact the Company's business" and that "employee[s], officer[s] [and] director[s] are expected to know and abide" by the "rules of ethical conduct" therein.

75.     In a section titled, "Conflicts of Interest," the Code of Ethics states the following, in relevant part:

> As an employee, officer or director of the Company you have a duty of loyalty to the Company, and must therefore avoid any actual, or the appearance of a, conflict of interest with the Company. A "conflict of interest" occurs when your private interest interferes, or would appear to others to interfere, with the interests of the Company. A conflict situation can arise when you take an action or have an interest that may make it difficult to perform your work objectively and effectively. Conflicts of interest also arise when you or a member of your family receive improper personal benefits as a result of your position with the Company.

76.     In a section titled, "Use of Inside Information," the Code of Ethics states the following, in relevant part:

> It is the Company's goal and policy to protect shareholder investments through strict enforcement of the prohibition against insider trading set forth in federal securities laws and regulations. No director, officer or employee may buy or sell, or tip others to buy or sell, Company securities or the publicly-traded securities of any other company, including a competitor, customer or supplier, when in possession of "material non-public information" regarding the Company or the other company, as the case may be. Insider trading is both unethical and illegal and will be dealt with firmly.

77.     In a section titled, "Fair Dealing," the Code of Ethics states the following:

> As an employee, officer or director you must endeavor to deal fairly and in good faith with Company customers, suppliers, competitors and employees. You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged or confidential information, misrepresentation of material facts, or any other unfair dealing practice.

78.     In a section titled, "Confidentiality," the Code of Ethics states the following, in relevant part:

As an employee, officer or director you should maintain the confidentiality of information entrusted to you by the Company, its business partners, suppliers, customers or others, whether the information relates to the Company's business or a third party. Such information must not be disclosed to others, except when disclosure is authorized by the Company or legally mandated. Confidential information includes all non-public information that you learn in the course of performing your duties for the Company, including information that might be of use to competitors or harmful to the Company, or its business partners, suppliers or customers, if disclosed. The obligation to protect confidential information continues even after your relationship with the Company ends.

79.    In a section titled, "Protection and Use of Company Assets," the Code of Ethics

states the following, in relevant part:

Company assets, such as information, materials, supplies, time, intellectual property, expense privileges, software, hardware and facilities, among other property, are valuable resources owned, leased, licensed, or otherwise belonging to the Company. Safeguarding Company assets is the responsibility of all employees, officers and directors. All Company assets should be used for legitimate business purposes only and the personal use of Company assets without permission is prohibited. Limited personal use of assets such as office supplies is permitted, as long as it is occasional and reasonable.

80.    In a section titled, "Fraud," the Code of Ethics states the following:

As an employee, officer or director you should not engage in fraudulent conduct. Fraud is defined as deliberately practiced deception, whether by words, conduct, false or misleading allegations, or by concealment, to secure unfair or unlawful gain. Fraud covers both express and implied representations of fact, and may be written or oral.

81.    In a section titled, "Compliance with Laws, Rules and Regulations," the Code of

Ethics states the following:

The Company's employees, officers and directors are subject to numerous laws, regulations, rules and Company policies/guidelines, only some of which are specifically addressed in this Code. We encourage and expect you to become reasonably informed and to comply with the laws, regulations, rules and Company policies/guidelines applicable to you, whether or not they are addressed in this Code.

82.    The Code of Ethics also provides the following:

The requirements and principles contained in this Code form the cornerstone of our Company's reputation and commitment to ethical business conduct. The Company has provided this Code as a guide and expects that each employee, officer and director will use its principles of ethical conduct as a foundation for behavior. Reference to this Code will help each of us apply our institutional and personal values of honesty, fairness and integrity to everything we do at the Company.

83.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Privacy Breach and the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and aiding and abetting thereof.  Moreover, two of the Individual Defendants violated the Code of Ethics by engaging in insider trading. Also in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

84.     Based in Santa Ana, California, First American, through its subsidiaries, is engaged in the business of providing financial services through its title insurance and services segment and its specialty insurance segment. The title insurance and services segment provides title insurance, closing and/or escrow services and similar or related services domestically and internationally in connection with residential and commercial real estate transactions. The title and insurance services segment also provides products and services that are purportedly designed to mitigate risk in, real estate transactions. Among other things, the Company also maintains, manages, and provides access to title plant data and records.

26

85.     As of the summer of 2020, First American employed approximately 18,400 employees throughout 760 offices in 9 different countries. The Company is the second largest title insurance provider in the United States and holds the nation's largest title plant and property record database. Notably, approximately 91.5% of the Company's total 2019 revenue of $6.2 billion was attributable to the Title Insurance and Services segment.

86.     The businesses operated by the Company's subsidiaries have existed, in some instances, since the late 1800s. However, First American was incorporated in Delaware in January 2008 to serve as the holding company of TFAC financial services businesses following the spin-off of those businesses from TFAC. On June 1, 2010, the separation was consummated, and the Company went public.

87.     In recent years, the Company undertook various automation initiatives in an effort to speed the delivery of its products, increase efficiency, improve customer experience, and decrease risk. To that end, in September and October of 2016, the Company acquired RedVision Systems, Inc. ("RedVision")—then, a national provider of title and real property research which was best known for its proprietary technology, including the TitleVision2 production platform, TitleVision2 and the Nova title research and production software. The Company also acquired TD Services Financial Corporation, a provider of technology services to the mortgage banking industry which specialized in post-closing services and document management.

88.     Title insurance policies insure the interests of owners or lenders against defects in the title to real property. These defects include adverse ownership claims, liens, encumbrances, or other matters affecting title.

89.     When a customer pursues title insurance, First American compiles personal information from various sources throughout the insurance application process during which the

customer will submit their application and settlement or financial statements which contain Personally Identifiable Information. Typically, documents containing Personally Identifiable Information are also submitted by other individuals that are involved in the transaction on behalf of the title customer, such as the real estate agent, lender, escrow or settlement agent, and attorney. In addition, during its title search, First American will obtain documents that may also contain Personally Identifiable Information from proprietary databases. This sensitive, personal information can include data relating to appraisals, credit reports, escrow agent balances, and account numbers. Further, First American's title insurance package may also include data assembled from materials in the public records such as tax assessments and liens.

90.     Thus, in the ordinary course of its business, First American regularly gathers, retains, and transmits the Personally Identifiable Information of millions of purchasers and sellers of real estate in the United States on an annual basis which the Company then stores in FAST. FAST stores tens of millions of documents with Personally Identifiable Information and it is utilized to conduct title insurance and settlement orders.

91.     Prior to the beginning of the Relevant Period, First American created and maintained EaglePro, which is a web-based title document delivery system that allows title agents and other Company employees to share documents stored in FAST, including the title package, with external parties in connection to a real estate transaction. After a party to or a participant in a transaction selects documents from Fast to be shared with another participant of a real estate transaction, EaglePro sends an email to the recipient with a link to a website that provides access to the document to the recipient without first requiring the recipient to login or authenticate his or her access.

**Privacy Breach**

92.     The cybersecurity weakness at issue surfaced in October 2014 during a Company update to EaglePro. Each link for each website distributed through EaglePro contained an Image Document ID Number ("ID Number") and each document in FAST was given a sequential ID Number. By changing the ID Number in the Uniform Resource Locator ("URL")[3] by one or more digits, anyone could view the document corresponding to the revised ID Number. Therefore, any document in FAST could be accessed regardless of whether the viewer had authorized access to those documents simply by typing in any ID Number. Notably, the links delivered through EaglePro did not have an expiration date until May 2019, when it was finally corrected.

93.     During a penetration test of the EaglePro's application in December 2018, First American's Cyber Defense Team uncovered the EaglePro cybersecurity weakness described above. On January 11, 2019, the Cyber Defense Team issued a final report of the EaglePro's penetration test which described the cybersecurity weakness and the Cyber Defense Team's investigation of same in detail. Further, the final report also recommended that the application team perform a thorough investigation to determine whether documents containing Personally Identifiable Information had been exposed. Nonetheless, the Company failed to perform said investigation or correct the cybersecurity weakness until after the publication of the May 2019 Article.

94.     On May 28, 2019, the Company issued a press release announcing that it had "shut down external access to a production environment with a reported design defect that created the potential for unauthorized access to customer data."

---

[3] A URL is a reference to a web resource that specifies its location on a computer network and a mechanism for retrieving it. Colloquially, the term URL is simply referred to as a web address.

95.     On May 31, 2019, the Company issued an Incident Update to consumers which admitted that documents containing Personally Identifiable Information may have been exposed.

96.     Thereafter, the Company conducted a forensic investigation of documents that were retained starting from June 2018 which revealed that approximately 350,000 documents were accessed during that time period without authorization by automated "bots" or "scraper" programs which were designed to collect information on the Internet.

97.     Throughout the Relevant Period, the Individual Defendants failed to adequately protect the Personally Identifiable Information of First American customers and then concealed from the public the Privacy Breach without taking steps to correct the cybersecurity weakness until at least May 2019.

98.     Throughout the Relevant Period, First American did not maintain control over its financial statements and operational statements. This caused the Company's annual and quarterly reports, and other statements described herein, throughout the Relevant Period to be materially false and misleading.

### Value of Personally Identifiable Information

99.     Since Personally Identifiable Information can be used to distinguish or trace an individual's identity, it is extremely valuable to cybercriminals who use that information to defraud individuals with compromised personal information. Identity thieves can use Personally Identifiable Information for many illicit purposes including to access additional sensitive information or financial accounts, harm victims by way of embarrassment, blackmail, or harassment (either in-person or on the Internet), or commit other types of fraud such as obtaining

identification cards, tax documents and refunds, or other government benefits. As recently as 2013, cybercrime was estimated to have cost approximately $113 billion.[4]

100.    Cybercriminals may also sell Personally Identifiable Information on the "dark web"[5] to buyers who can use a victim's information to gain access to different parts of a victim's digital life as well as target a victim's family, friends, acquaintances, and colleagues. Further, cybercriminals can also use Personally Identifiable Information to target victims of phishing scams.[6] Phishing scammers cost victims a collective $676 million in 2017 alone.[7]

101.    In 2017, the Federal Bureau of Investigation ("FBI") warned of a "large spike in cyberattacks specifically targeting real estate companies" and indicated that between 2016 and 2017 cyberattacks in the real estate industry had increased approximately 480%.[8] However, First American failed to heed the FBI's forewarnings and neglected to implement elementary cybersecurity standards to protect the Personally Identifiable Information of millions of its customers.

**Related Litigation & Investigations**

***Consumer Class Actions***

102.    Beginning on May 27, 2019, the Company was named as a defendant in a number of Consumer Class Actions in connection to the Privacy Breach, on behalf of classes of consumers

---

[4] https://yle.fi/tvuutiset/uutiset/upics/liitetiedostot/norton_raportti.pdf. Last visited November 11, 2020.

[5] The dark web is an encrypted portion of the Internet that is not indexed by web search engines. Users of the dark web often conduct business anonymously without divulging identifying information. As a result, the dark web infamously hosts marketplaces for selling illegal things.

[6] Phishing is a type of online scam that targets consumers by sending them an email or text message that appears to be from a well-known source and asks the consumer to provide personal identifying information. The scammer then uses that information to invade a victim's existing accounts, open new accounts, or engage in other illicit activity.

[7] https://pdf.ic3.gov/2017_IC3Report.pdf. Last visited November 11, 2020.

[8] *Id.*

whose Personally Identifiable Information was published/exposed on the Company's website, captioned *In Re First American Financial Corporation Cases*, Case Nos. 8:19-cv-01105, 8:19-cv-1180, 8:19-cv-01305, 8:19-cv-01533, seeking, *inter alia*, to recover damages from First American for failing to maintain adequate security measures despite representations and promises that customers' Personally Identifiable Information would be safeguarded.

### SEC Investigation

103.    On or about August 7, 2019, the SEC opened a Matter Under Inquiry, captioned *In the Matter of First American Financial Corporation*, MLA-5054, relating to the Privacy Breach to determine whether federal securities laws had been violated with respect to the adequacy of the disclosures that the Company had made at the time of the incident and the adequacy of its disclosure controls. Thereafter, in September 2020, the SEC issued a Wells Notice to the Company advising First American that the SEC's enforcement staff had made a preliminary determination to recommend that the SEC file an enforcement action against the Company.

### NYSDFS Enforcement Action

104.    On July 21, 2020, the NYSDFS commenced the NYSDFS Enforcement Action against the Company's subsidiary with the filing of a Statement of Charges and Notice of Hearing, captioned *In the Matter of First American Title Insurance Company*, No. 32020-0030-C, seeking to impose a civil monetary penalty for the Company's violation of 23 N.Y.C.R.R. Part 500 arising out of First American's failure to safeguard millions of documents that contained and exposed consumers' Personally Identifiable Information on First American's  website.

### **False and Misleading Statements**

### February 17, 2017 Form 10-K

105.    On February 17, 2017, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed

by Defendants Gilmore, Seaton, Kennedy, Doti, McCarthy, McKee, McKernan, and Oman, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

106.    With respect to the Company's general business plan, the 2016 10-K stated the following, in relevant part:

> In the current market environment, we are focused on growing our core title insurance and settlement services business, ***strengthening our enterprise through data and process advantage***…

(Emphasis added.)

107.    The Risk Factors section of the 2016 10-K stated that the unauthorized data disclosures "***may***" or "***could***" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. (Emphasis added.)

108.    Regarding the Company's internal controls, the 2016 10-K stated, in relevant part:

> Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2016. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control— Integrated Framework (2013)*. ***Based on that assessment under the framework in Internal Control—Integrated Framework (2013), management determined that, as of December 31, 2016, the Company's internal control over financial reporting was effective***.

(Emphasis added.)

### March 31, 2017 Letter to Stockholders

109.    On March 31, 2017, Defendant Gilmore issued a letter to Company stockholders (the "March 2017 Letter"), in which he continually highlighted the Company's "ongoing focus on operating and efficiency" and "increasing "efficiency." Regarding "Capital Management," the March 2017 Letter further stated, in pertinent part, that "[m]uch of this investment was directed to technology, including the continued enhancement of our title production platform and our customer-facing technologies and enterprise systems, all of which will improve our customers' experience and our internal process efficiency."

110.    The March 2017 Letter also touted the Company's proficient technology and document management abilities considering First American's 2016 acquisitions of RedVision and TD Service Financial. The March 2017 Letter stated that the acquisitions "allow[ed] [the Company] to streamline the title process and continue to improve the solutions [First American] offers [its] customers."

111.    Regarding Gilmore's "Vision and Strategy" of the Company, the March 2017 Letter stated that "[o]ur continued focus on operating efficiency coupled with favorable market conditions helped us achieve the highest pretax margin in our title segment's history … As we continue to pursue market share, we remain committed to ensuring that growth never comes at the expense of returns." The March 2017 Letter reiterated Gilmore's vision regarding data and information set forth in the 2016 10-K and stated, "***Strengthen the enterprise through data and process advantage***… These efforts strengthen our control over the key data assets that underlie our products and services and facilitate our efforts to manage risk and drive efficiencies throughout the title and settlement process." (Emphasis added.)

*April 27, 2017 Form 10-Q*

112.    On April 27, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2017 (the "1Q17 10-Q"). The 1Q17 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

113.    The 1Q17 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of March 31, 2017, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, *the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective*, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.
>
> * * *
>
> *There was no change in the Company's internal control over financial reporting during the quarter ended March 31, 2017, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.*

(Emphasis added.)

114.    The Risk Factors section of the 1Q17 10-Q stated that the unauthorized data disclosures "*may*" or "*could*" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. (Emphasis added.)

*July 27, 2017 Form 10-Q*

115.    On July 27, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2017 (the "2Q17 10-Q"). The 2Q17 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

116.    The 2Q17 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of June 30, 2017, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, *the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective*, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.
>
> * * *
>
> *There was no change in the Company's internal control over financial reporting during the quarter ended June 30, 2017, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting*.

(Emphasis added.)

117.    The Risk Factors section of the 2Q17 10-Q stated that the unauthorized data disclosures "*may*" or "*could*" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. (Emphasis added.)

*October 26, 2017 Form 10-Q*

118.    On October 26, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2017 (the "3Q17 10-Q"). The 3Q17 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

119.    The 3Q17 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of September 30, 2017, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, *the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective*, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.
>
> *  *  *
>
> *There was no change in the Company's internal control over financial reporting during the quarter ended September 30, 2017, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.*

(Emphasis added.)

120.    The Risk Factors section of the 3Q17 10-Q stated that the unauthorized data disclosures "*may*" or "*could*" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. (Emphasis added.)

***2017 First American Website***

121.     In 2017, regarding "Privacy Information," the Company's website had stated the following in relevant part:[9]

> In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our subsidiaries we have adopted this Privacy Policy to govern the use and handling of your personal information.

> * * *

> **Types of Information**
> Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:
> - Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
> - Information about your transactions with us, our affiliated companies, or others; and
> - Information we receive from a customer reporting agency.

> **Use of Information**
> We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies and escrow companies.

> * * *

> **Former Customers**

---

[9]http://web.archive.org/web/20171128123534/http://www.firstam.com:80/privacy policy/index.html. Last visited November 11, 2020.

Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

**Confidentiality and Security**
***We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you.*** We will use our best efforts to train and oversee our employees and agents to ***ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards*** that comply with federal regulations to guard your nonpublic personal information.

**Information Obtained Through Our Web Site**
First American Financial Corporation is sensitive to privacy issues on the Internet…

**Fair Information Values**
**Fairness** We consider consumer expectations about their privacy in all our businesses. We only offer products and services that assure a favorable balance between consumer benefits and consumer privacy.

**Public Record** We believe that an open public record creates significant value for society, enhances consumer choice and creates consumer opportunity. We actively support an open public record and emphasize its importance and contribution to our economy.

**Use** ***We believe we should behave responsibly when we use information about a consumer in our business.*** We will obey the laws governing the collection, use and dissemination of data.

**Accuracy** We will take reasonable steps to help assure the accuracy of the data we collect, use and disseminate. Where possible, we will take reasonable steps to correct inaccurate information. When, as with the public record, we cannot correct inaccurate information, we will take all reasonable steps to assist consumers in identifying the source of the erroneous data so that the consumer can secure the required corrections.

**Education** ***We endeavor to educate the users of our products and services, our employees and others in our industry about the importance of consumer privacy.*** We will instruct our employees on our fair information values and on the responsible collection and use of data. We will encourage others in our industry to collect and use information in a responsible manner.

**Security** *We will maintain appropriate facilities and systems to protect against unauthorized access to and corruption of the data we maintain.*

(Emphasis added.)

### February 16, 2018 Form 10-K

122.    On February 16, 2018, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Gilmore, Seaton, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan, Oman, and non-party Virginia M. Ueberroth, and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

123.    With respect to the Company's general business plan, the 2017 10-K stated the following, in relevant part:

> In the current market environment, we are focused on growing our core title insurance and settlement services business, ***strengthening our enterprise through data and process advantage***…

(Emphasis added.)

124.    With respect to First American's title insurance operations, the 2017 10-K also touted the Company's increasing automation of certain underwriting functions as a method to "***enhance efficiency and reduce risk***." (Emphasis added.)

125.    The Risk Factors section of the 2017 10-K stated that the unauthorized data disclosures "***may***" or "***could***" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals.

(Emphasis added.)

126.    Regarding the Company's internal controls, the 2017 10-K stated, in relevant part:

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2017. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control—Integrated Framework (2013). ***Based on that assessment under the framework in Internal Control—Integrated Framework (2013), management determined that, as of December 31, 2017, the Company's internal control over financial reporting was effective***.

(Emphasis added.)

***March 30, 2018 Letter to Stockholders***

127.    On March 30, 2018, Defendant Gilmore issued a letter to Company stockholders (the "March 2018 Letter"), in which he continually represented that the Company had been focused on enhancing its information and technology business.

128.    Regarding "Capital Management Activities," the March 2018 Letter stated, in relevant part, "***Invest in our core business—Much of First American's $137 million in capital expenditures in 2017 was directed to the development and improvement of our technology***." (Emphasis added.)

129.    Regarding "Vision and Strategy," the March 2018 Letter stated, in relevant part, "***Manage and actively invest in complementary businesses that support or expand the core***—… we enhanced the customer experience for our home warranty customers by ***upgrading the digital interface to streamline the claims, payment and contract renewal processes***. (Emphasis added.)

130.    In a section titled "Looking Ahead," the March 2018 Letter stated, in relevant part, "Importantly, I am excited about the innovation underway within the company that will enable us to meet the dynamic needs and expectations of our customers. ***Many of these initiatives leverage***

*our unique data, technology and banking assets, giving us a distinct competitive advantage*." (Emphasis added.)

### March 30, 2018 Proxy Statement

131.    On March 30, 2018, the Company filed its Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Gilmore, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan, and Oman solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

132.    With respect to the Company's Code of Ethics, the 2018 Proxy Statement stated that it applies "to all employees, officers and directors."

133.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

134.    The 2018 Proxy Statement also called for, among other things: (1) the election of two directors; (2) shareholder approval, on an advisory basis, of the Company's executive compensation; and (3) the ratification of the Company's independent auditors.

135.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including linking incentive award opportunities that provided "a strong alignment between the interests of executive officers and long-term stockholders[]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

136.    The 2018 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the Privacy Breach; (2) as a result of the Company's increased reliance on advanced technologies to automate various processes and improve efficiency, First American was subjected to an increased threat of a cybersecurity breakdown; and (3) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *April 26, 2018 Form 10-Q*

137.    On April 26, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2018 (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

138.    The 1Q18 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of March 31, 2018, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, *the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective*, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.
>
> * * *
>
> *There was no change in the Company's internal control over financial reporting during the quarter ended March 31, 2018, that has materially affected, or is*

> ***reasonably likely to materially affect, the Company's internal control over financial reporting***.

(Emphasis added.)

139.    The Risk Factors section of the 1Q18 10-Q stated that the unauthorized data disclosures "***may***" or "***could***" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. (Emphasis added.)

140.    The 1Q18 10-Q touted the Company's increased automation of various processes as a method to "***increase efficiency, improve quality and decrease risk***." (Emphasis added.)

### July 26, 2018 Form 10-Q

141.    On July 26, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

142.    The 2Q18 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of June 30, 2018, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, ***the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective***, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.

* * *

44

> *There was no change in the Company's internal control over financial reporting during the quarter ended June 30, 2018, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.*

(Emphasis added.)

143.    The Risk Factors section of the 2Q18 10-Q stated that the unauthorized data disclosures "*may*" or "*could*" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. (Emphasis added.)

144.    The 2Q18 10-Q touted the Company's increased automation of various processes as a method to "*increase efficiency, improve quality and decrease risk*." (Emphasis added.)

### October 25, 2018 Form 10-Q

145.    On October 25, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

146.    The 3Q18 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of September 30, 2018, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, *the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective*, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.

* * *

> ***There was no change in the Company's internal control over financial reporting during the quarter ended September 30, 2018, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting***.

(Emphasis added.)

147.    The Risk Factors section of the 3Q18 10-Q stated that the unauthorized data disclosures "***may***" or "***could***" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. (Emphasis added.)

148.    The 3Q18 10-Q touted the Company's increased automation of various processes as a method to "***increase efficiency, improve quality and decrease risk***." (Emphasis added.)

### *2018 First American Website*

149.    In 2018, regarding "Privacy Information," the Company's website had stated the following in relevant part:[10]

> In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our subsidiaries we have adopted this Privacy Policy to govern the use and handling of your personal information.

* * *

> **Types of Information**
> Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:

---

[10] http://web.archive.org/web/20181003145825/http://www.firstam.com/privacy-policy/index.html. Last visited November 11, 2020.

- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
- Information about your transactions with us, our affiliated companies, or others; and
- Information we receive from a customer reporting agency.

**Use of Information**

We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies and escrow companies.

\* \* \*

**Former Customers**

Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

**Confidentiality and Security**

*We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you.* We will use our best efforts to train and oversee our employees and agents to *ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards* that comply with federal regulations to guard your nonpublic personal information.

**Information Obtained Through Our Web Site**

First American Financial Corporation is sensitive to privacy issues on the Internet…

**Fair Information Values**

**Fairness** We consider consumer expectations about their privacy in all our businesses. We only offer products and services that assure a favorable balance between consumer benefits and consumer privacy.

**Public Record** We believe that an open public record creates significant value for society, enhances consumer choice and creates consumer opportunity. We actively support an open public record and emphasize its importance and contribution to our economy.

**Use** *We believe we should behave responsibly when we  use information about a consumer in our business.* We will obey the laws governing the collection, use and dissemination of data.

**Accuracy** We will take reasonable steps to help assure the accuracy of the data we collect, use and disseminate. Where possible, we will take reasonable steps to correct inaccurate information. When, as with the public record, we cannot correct inaccurate information, we will take all reasonable steps to assist consumers in identifying the source of the erroneous data so that the consumer can secure the required corrections.

**Education** *We endeavor to educate the users of our products and services, our employees and others in our industry about the importance of consumer privacy.* We will instruct our employees on our fair information values and on the responsible collection and use of data. We will encourage others in our industry to  collect  and  use information in a responsible manner.

**Security** *We will maintain appropriate facilities and systems to protect against unauthorized access to and corruption of the data we maintain.*

(Emphasis added.)

150.    Also in 2018, the Company's website had stated the following in relevant part:[11]

Post-Closing Document Management
Let us store your records in our secure facility that is monitored 24-hours a day. And, of course, you always have online access to your and your customers' documents, any time, day or night.

\* \* \*

Secure Document Storage

*We offer secure, reliable, and affordable records storage solutions for your needs of any size to help you manage active mortgage collateral files*.

---

[11]http://web.archive.org/web/20180226110454/https://www.firstam.com/mortgagesolutions/solutions/cleanfile-solutions/document-management.html. Last visited November 11, 2020.

- Imaged Documents Reviewed for Deficiencies (capture critical data elements, report missing documents & interfile trailing documents)
- State-of-the-art Document Tracking System
- Online Access for Document Viewing, Shipping Request Fulfillment & Client-specific Inventory Reports
- ***Secure Facility Monitored 24-hours a day***

(Emphasis added.)

151.    Also in 2018, the Company's website had stated the following in relevant part:

***Secure access to files which provides our clients with detailed information concerning their REO property closing status***

(Emphasis added.)

***February 20, 2019 Form 10-K***

152.    On February 20, 2019, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Gilmore, Seaton, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan, Oman, and Wyrsch, and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

153.    With respect to the Company's general business plan, the 2018 10-K stated the following, in relevant part:

In the current market environment, we are focused on growing our core title insurance and settlement services business, ***strengthening our enterprise through data and process advantage***…

(Emphasis added.)

154. With respect to First American's title insurance operations, the 2018 10-K also touted the Company's increasing automation of certain underwriting functions as a method to "*enhance efficiency and reduce risk*." (Emphasis added.)

155. The Risk Factors section of the 2018 10-K stated that the unauthorized data disclosures "*may*" or "*could*" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. (Emphasis added.)

156. Regarding the Company's internal controls, the 2018 10-K stated, in relevant part:

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2018. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control—Integrated Framework (2013). ***Based on that assessment under the framework in Internal Control—Integrated Framework (2013), management determined that, as of December 31, 2018, the Company's internal control over financial reporting was effective***.

(Emphasis added.)

### *March 29, 2019 Letter to Stockholders*

157. On March 29, 2019, Defendant Gilmore issued a letter to Company stockholders (the "March 2019 Letter"), in which he again continually represented that the Company had been developing and enhancing its information and technology systems. Defendant Gilmore's March 2019 Letter provided "examples of some of the industry-leading moves [the Company] is making to meet those customer expectations:

*eClosing*—In 2018, we rolled out electronic "*eClosing*" solutions that lets consumers sign many documents online in advance of the final closing, and we are actively developing other innovative methods for creating a more complete digital closing experience.

* * *

Automated Data Extraction—Through the use of optical character recognition and artificial intelligence, we're significantly reducing manual data entry, which increases our efficiency and enables us to
more rapidly expand our content.

*Blockchain*—In November, we announced the launch of a First American-developed system using blockchain technology. Designed to increase efficiency and reduce risk, we're pleased that Old Republic Title Insurance Group was the first to join us in utilizing the system.

158.    In a section titled "Looking Ahead," the 2019 March Letter stated that:

We'll continue streamlining and automating our processes, while enhancing the customer experience. And while our data leadership, technology and industry expertise will propel our efforts, it is ultimately our dedicated employees who drive these efforts to differentiate us in the marketplace and provide a competitive advantage.

### March 29, 2019 Proxy Statement

159.    On March 29, 2019, the Company filed its Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Gilmore, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan, Oman, and Wyrsch solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[12]

160.    With respect to the Company's Code of Ethics, the 2019 Proxy Statement stated that it applies "to all employees, officers and directors."

161.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and

---

[12] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

162. The 2019 Proxy Statement also called for, among other things: (1) the election of three directors; (2) shareholder approval, on an advisory basis, of the Company's executive compensation; and (3) the ratification of the Company's independent auditors.

163. The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including linking incentive award opportunities that provided "a strong alignment between the interests of executive officers and long-term stockholders[]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

164. The 2019 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the Privacy Breach; (2) as a result of the Company's increased reliance on advanced technologies to automate various processes and improve efficiency, First American was subjected to an increased threat of a cybersecurity breakdown; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *April 25, 2019 Form 10-Q*

165. On April 25, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants

Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

166.    The 1Q19 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of March 31, 2019, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, ***the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective***, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.
>
> \* \* \*
>
> ***There was no change in the Company's internal control over financial reporting during the quarter ended March 31, 2019, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.***

(Emphasis added.)

167.    The Risk Factors section of the 1Q19 10-Q stated that the unauthorized data disclosures "***may***" or "***could***" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. (Emphasis added.)

168.    The 1Q19 10-Q touted the Company's increased automation of various processes as a method to "***speed the delivery of its products, increase efficiency, improve quality, improve the customer experience and decrease risk***." Further, with respect to the Company's increased automation of various processes, including the tasks required to build and update title plants and

to search and examine title, and other, records, the 1Q19 10-Q stated that "*these initiatives are* …

*designed to decrease risk*…" (Emphasis added.)

### 2019 First American Website

169.    In 2019, regarding "Privacy Information," the Company's website had stated the

following in relevant part:[13]

> In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our subsidiaries we have adopted this Privacy Policy to govern the use and handling of your personal information.
>
> * * *
>
> **Types of Information**
> Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:
> - Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
> - Information about your transactions with us, our affiliated companies, or others; and
> - Information we receive from a consumer reporting agency.
>
> **Use of Information**
> We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies and escrow companies.

---

[13]http://web.archive.org/web/20190525235150/https://www.firstam.com/privacy-policy/index.html. Last visited November 11, 2020.

\* \* \*

**Former Customers**

Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

**Confidentiality and Security**

*We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you.* We will use our best efforts to train and oversee our employees and agents to *ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards* that comply with federal regulations to guard your nonpublic personal information.

**Information Obtained Through Our Web Site**

First American Financial Corporation is sensitive to privacy issues on the Internet…

**Fair Information Values**

**Fairness** We consider consumer expectations about their privacy in all our businesses. We only offer products and services that assure a favorable balance between consumer benefits and consumer privacy.

**Public Record** We believe that an open public record creates significant value for society, enhances consumer choice and creates consumer opportunity. We actively support an open public record and emphasize its importance and contribution to our economy.

**Use** *We believe we should behave responsibly when we  use information about a consumer in our business.* We will obey the laws governing the collection, use and dissemination of data.

**Accuracy** We will take reasonable steps to help assure the accuracy of the data we collect, use and disseminate. Where possible, we will take reasonable steps to correct inaccurate information. When, as with the public record, we cannot correct inaccurate information, we will take all reasonable steps to assist consumers in identifying the source of the erroneous data so that the consumer can secure the required corrections.

**Education** *We endeavor to educate the users of our products and services, our employees and others in our industry about the importance of consumer privacy.* We will instruct our employees on our fair information values and on the

responsible collection and use of data. We will encourage others in our industry to collect and use information in a responsible manner.

**Security** *We will maintain appropriate facilities and systems to protect against unauthorized access to and corruption of the data we maintain.*

(Emphasis added.)

170.    The statements referenced in ¶¶105-130, 137-158, and 165-169 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the Privacy Breach; (2) as a result of the Company's increased reliance on advanced technologies to automate various processes and improve efficiency, First American was subjected to an increased threat of a cybersecurity breakdown; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge as False and Misleading Statements Continue

*May 24, 2019 KrebsOnSecurity Article*

171.    On May 24, 2019, KrebsOnSecurity, a nationally recognized cybersecurity blog, published the May 2019 Article titled, "First American Financial Corp. Leaked Hundreds of Millions of Title Insurance Records." The May 2019 Article reported that First American had "leaked hundreds of millions of documents related to mortgage deals going back to 2003." The May 2019 Article continued to provide details of the Privacy Breach and stated the following, in relevant part:

> The digitized records — including bank account numbers and statements, mortgage and tax records, Social Security numbers, wire transaction receipts, and drivers license images — were available without authentication to anyone with a Web browser.

Earlier this week, KrebsOnSecurity was contacted by a real estate developer in Washington state who said he'd had little luck getting a response from the company about what he found, which was that a portion of its Web site (firstam.com) was leaking tens if not hundreds of millions of records. He said anyone who knew the URL for a valid document at the Web site could view other documents just by modifying a single digit in the link.

And this would potentially include anyone who's ever been sent a document link via email by First American.

KrebsOnSecurity confirmed the real estate developer's findings, which indicate that First American's Web site exposed approximately 885 million files, the earliest dating back more than 16 years. No authentication was required to read the documents.

Many of the exposed files are records of wire transactions with bank account numbers and other information from home or property buyers and sellers. Ben Shoval, the developer who notified KrebsOnSecurity about the data exposure, said that's because First American is one of the most widely-used companies for real estate title insurance and for closing real estate deals — where both parties to the sale meet in a room and sign stacks of legal documents.

* * *

Shoval shared a document link he'd been given by First American from a recent transaction, which referenced a record number that was nine digits long and dated April 2019. Modifying the document number in his link by numbers in either direction yielded other peoples' records before or after the same date and time, indicating the document numbers may have been issued sequentially.

I should emphasize that these documents were merely available from First American's Web site; I do not have any information on whether this fact was known to fraudsters previously, nor do I have any information to suggest the documents were somehow mass-harvested *(although a low-and-slow or distributed indexing of this data would not have been difficult for even a novice attacker)*.

Nevertheless, the information exposed by First American would be a virtual gold mine for phishers and scammers involved in so-called Business Email Compromise (BEC) scams, which often impersonate real estate agents, closing agencies, title and escrow firms in a bid to trick property buyers into wiring funds to fraudsters. According to the FBI, BEC scams are the most costly form of cybercrime today. Armed with a single link to a First American document, BEC scammers would have an endless supply of very convincing phishing templates to use. A database like this also would give fraudsters a constant feed of new information about upcoming real estate financial transactions — *including the email addresses, names and phone numbers of the closing agents and buyers*.

57

(Emphasis added.)

172. On this news, the price of the Company's stock fell $3.46 per share, or over 6.2%, from $55.26 per share at the close of trading on May 24, 2019, to $51.80 per share at the close of trading the next trading day, on May 28, 2019.

### *July 25, 2019 Form 10-Q*

173. On July 25, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

174. The 2Q19 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of June 30, 2019, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, *the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective*, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.
>
> * * *
>
> *There was no change in the Company's internal control over financial reporting during the quarter ended June 30, 2019, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.*

(Emphasis added.)

175. The Risk Factors section of the 2Q19 10-Q stated that the unauthorized data disclosures "*may*" or "*could*" cause, among other things, business disruption and harm to the

Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Instead, the 2Q19 10-Q merely stated that only "32 consumers" had been affected by the Privacy Breach. (Emphasis added.)

176.    The 2Q19 10-Q touted the Company's increased automation of various processes as a method to "*speed the delivery of its products, increase efficiency, improve quality, improve the customer experience and decrease risk*." Further, with respect to the Company's increased automation of various processes, including the tasks required to build and update title plants and to search and examine title, and other, records, the 2Q19 10-Q stated that "*these initiatives are* … *designed to decrease risk*…" (Emphasis added.)

### October 24, 2019 Form 10-Q

177.    On October 24, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

178.    The 3Q19 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of September 30, 2019, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, *the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective*, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.

* * *

> *There was no change in the Company's internal control over financial reporting during the quarter ended September 30, 2019, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.*

(Emphasis added.)

179.    The Risk Factors section of the 3Q19 10-Q stated that the unauthorized data disclosures "*may*" or "*could*" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Instead, the 3Q19 10-Q merely stated that only "32 consumers" had been affected by the Privacy Breach. (Emphasis added.)

180.    The 3Q19 10-Q touted the Company's increased automation of various processes as a method to "*speed the delivery of its products, increase efficiency, improve quality, improve the customer experience and decrease risk*." Further, with respect to the Company's increased automation of various processes, including the tasks required to build and update title plants and to search and examine title, and other, records, the 3Q19 10-Q stated that "*these initiatives are … designed to decrease risk…*" (Emphasis added.)

### February 18, 2020 Form 10-K

181.    On February 18, 2020, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendants Gilmore, Seaton, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan, Oman, and Wyrsch, and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes

to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

182.    With respect to the Company's general business plan, the 2019 10-K stated the following, in relevant part:

> In the current market environment, we are focused on growing our core title insurance and settlement services business, ***strengthening our enterprise through data and process advantage***…

(Emphasis added.)

183.    With respect to First American's title insurance operations, the 2019 10-K also touted the Company's increasing automation of certain underwriting functions as a method to "***enhance efficiency and reduce risk***."

184.    Regarding the Company's internal controls, the 2019 10-K stated, in relevant part:

> Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2019. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control—Integrated Framework (2013). ***Based on that assessment under the framework in Internal Control—Integrated Framework (2013), management determined that, as of December 31, 2019, the Company's internal control over financial reporting was effective***.

(Emphasis added.)

185.    The Risk Factors section of the 2019 10-K stated that the unauthorized data disclosures "***may***" or "***could***" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Instead, the 2019 10-K merely stated that only "32 consumers" had been affected by the Privacy Breach. (Emphasis added.)

*March 31, 2020 Proxy Statement*

186.    On March 31, 2020, the Company filed the 2020 Proxy Statement. Defendants Gilmore, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan, Oman, and Wyrsch solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions. [14]

187.    With respect to the Company's Code of Ethics, the 2020 Proxy Statement stated that it applies "to all employees, officers and directors."

188.    The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

189.    The 2020 Proxy Statement also called for, among other things: (1) the election of three directors; (2) shareholder approval, on an advisory basis, of the Company's executive compensation; (3) shareholder approval of the Company's 2020 Incentive Compensation Plan to allow the Company to continue to utilize equity-based awards of up to approximately 4,300,000 shares (the "2020 Incentive Plan Proposal"); and (4) the ratification of the Company's independent auditors.

190.    The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including linking incentive award opportunities that provided "a strong

---

[14] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

alignment between the interests of executive officers and long-term stockholders[]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

191.    The 2020 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the Privacy Breach; (2) as a result of the Company's increased reliance on advanced technologies to automate various processes and improve efficiency, First American was subjected to an increased threat of a cybersecurity breakdown; and (3) the Company failed to maintain internal controls. . As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

192.    The misrepresentations and omissions set forth herein were material to shareholders in voting on, among other things, the 2020 Incentive Plan Proposal who would not have, among other things, approved the 2020 Incentive Plan Proposal had they been fully informed about the Privacy Breach.

### *April 29, 2020 Form 10-Q*

193.    On April 29, 2020, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2020 (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

194.   The 1Q20 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of March 31, 2020, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, ***the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective***, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.
>
> * * *
>
> ***There was no change in the Company's internal control over financial reporting during the quarter ended March 31, 2020, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting***.

(Emphasis added.)

195.   The Risk Factors section of the 1Q20 10-Q stated that the unauthorized data disclosures "***may***" or "***could***" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Instead, the 1Q20 10-Q merely stated that only "32 consumers" had been affected by the Privacy Breach. (Emphasis added.)

196.   The 1Q20 10-Q touted the Company's increased automation of various processes as a method to "***speed the delivery of its products, increase efficiency, improve quality, improve the customer experience and decrease risk***." Further, with respect to the Company's increased automation of various processes, including the tasks required to build and update title plants and to search and examine title, and other, records, the 1Q20 10-Q stated that "***these initiatives are*** … ***designed to decrease risk***…" (Emphasis added.)

*July 23, 2020 Form 10-Q*

197.    On July 23, 2020, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2020 (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

198.    The 2Q20 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of June 30, 2020, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, *the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective*, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.
>
> *   *   *
>
> *There was no change in the Company's internal control over financial reporting during the quarter ended June 30, 2020, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.*

(Emphasis added.)

199.    The Risk Factors section of the 2Q20 10-Q stated that the unauthorized data disclosures "*may*" or "*could*" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Instead, the 2Q20 10-Q merely stated that only "32 consumers" had been affected by the Privacy Breach. (Emphasis added.)

200.    The 2Q20 10-Q touted the Company's increased automation of various processes as a method to "*speed the delivery of its products, increase efficiency, improve quality, improve the customer experience and decrease risk*." Further, with respect to the Company's increased automation of various processes, including the tasks required to build and update title plants and to search and examine title, and other, records, the 2Q20 10-Q stated that "*these initiatives are* … *designed to decrease risk*…" (Emphasis added.)

*2020 First American Website*

201.    In 2020, the Company's "Privacy Notice," posted on the Company's website had stated the following in relevant part:[15]

**First American Fair Information Values**

We collect, use, and share your personal information consistent with First American's Fair Information Values:

**Fairness** We consider your expectations of privacy in all of our business operations, and strive to offer our Applications, Websites, and Products in a way that ensures a favorable balance between the benefits we offer and your privacy.

**Public Record** We believe that an open public record creates significant value for society, enhances your choice, and creates opportunity. We actively support an open public record and emphasize its importance and contribution to our economy.

**Use** *We believe we should behave responsibly when we use your personal information.* We will obey the applicable laws governing the collection, use, storage, and sharing of your personal information.

**Accuracy** We will take reasonable steps to help assure the accuracy of the personal information we collect, use, store, and share from and about you. Where possible, we will take reasonable steps to correct inaccurate information. When, as with the public record, we cannot correct the inaccurate information, we will take all

---

[15]https://www.firstam.com/privacy-policy/index.html#:~:text=We%20do%20not%20sell%20your%20personal%20information%20to%20third%20parties,Right%20of%20Non%2DDiscrimination.&text=Accordingly%2C%20First%20American%20will%20not,your%20rights%20under%20the%20CCPA. Last visited on November 11, 2020.

reasonable steps to assist you in identifying the source of the erroneous information so that you can secure the required corrections.

**Education** *We endeavor to educate the users of our Applications, Websites, and Products, our employees and others in our industry about the importance of your privacy.* We will instruct our employees on our Fair Information Values and on the responsible collection, use, storage, and sharing of your personal information. We will encourage others in our industry to collect, use, store, and share your personal information in a responsible manner.

**Security** *We will maintain commercially reasonable technical, organizational, and physical safeguards to protect your personal information.*

(Emphasis added.)

202.    The statements referenced in ¶¶173-185 and 193-201 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the full extent of the Privacy Breach; (2) as a result of the Company's increased reliance on advanced technologies to automate various processes and improve efficiency, First American was subjected to an increased threat of a cybersecurity breakdown; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Fully Emerges

203.    The full truth emerged on October 22, 2020, when First American filed the 3Q20 10-Q, which revealed that the Company had recently received a Wells Notice from the SEC. Specifically, the 3Q20 10-Q stated:

Currently, governmental agencies are examining or investigating certain of the Company's operations.  These exams and investigations include two investigations initiated in connection with the information security incident that occurred during the second quarter of 2019, one being conducted by the Securities and Exchange Commission ("SEC") enforcement staff and the other by the New York Department of Financial Services. The SEC enforcement staff is questioning the adequacy of disclosures the Company made at the time of the incident and the adequacy of its

disclosure controls. In September 2020, the Company received a Wells Notice informing the Company that the enforcement staff has made a preliminary determination to recommend a filing of an enforcement action by the SEC against the Company.

204.    On this news, the price of the Company's stock fell $4.83 per share, or over 9.3%, from $51.58 per share at the close of trading on October 21, 2020, to $46.75 per share at the close of trading on October 22, 2020.

205.    Although the full extent of the fallout from the Privacy Breach remains to be seen, *Reuters* reported that "penalties could be significant" since the NYSDFS considers each instance of exposed personal information a separate violation of 23 N.Y.C.R.R. Part 500, with each violation carrying a maximum $1,000 penalty.

## DAMAGES TO FIRST AMERICAN

206.    As a direct and proximate result of the Individual Defendants' conduct, First American will lose and expend many millions of dollars.

207.    Such expenditures include, but are not limited to, costs associated with and/or legal fees associated with the NYSDFS Enforcement Action, the Consumer Class Actions, and the Securities Class Action filed against the Company, its CEO and its CFO, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

208.    Such expenditures include, but are not limited to costs associated with the costs of defending investigations of the Privacy Breach and for fines paid in connection thereto, including those associated with the SEC's investigation.

209.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

210.    As a direct and proximate result of the Individual Defendants' conduct, First American has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

211.    Plaintiff brings this action derivatively and for the benefit of First American to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of First American, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, as well as the aiding and abetting thereof.

212.    First American is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

213.    Plaintiff is, and has been at all relevant times, a shareholder of First American. Plaintiff will adequately and fairly represent the interests of First American in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

214.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

215.    A pre-suit demand on the Board of First American is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following nine individuals: Defendants Gilmore, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan, Oman, Wyrsch (the

"Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors that were on the Board at the time of the filing of this complaint.

216.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, while one of them engaged in insider sales based on material non-public information, all of which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

217.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the fraud perpetrated by the Individual Defendants, one of the Directors sold Company stock at artificially inflated prices based on inside information. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

218.    Demand is also excused as to the Directors because they were fully aware of the Privacy Breach during the Relevant Period, as evidenced by, among other things, the fact that, among the Company's Cyber Defense Team distributed a final report of the EaglePro penetration test on January 11, 2019. Nonetheless, the Directors caused the Company to disseminate the false and misleading statements described herein. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

219.    Additional reasons that demand on Defendant Gilmore is futile follow. Defendant Gilmore has served as the Company's CEO and as a Company director since June 2010. He also serves as a member of the Executive Committee. He previously served in various managerial roles with the TFAC beginning in 1993, including CEO of TFAC's financial services group and TFAC's COO. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Gilmore with his principal occupation, and he receives handsome compensation, including $10,367,225 during 2019 for his services. Defendant Gilmore was ultimately responsible for many of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale, which yielded nearly $5.5 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. Moreover, Defendant Gilmore is a defendant in the Securities Class Action. For these reasons, Defendant Gilmore breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

220.    Additional reasons that demand on Defendant Kennedy is futile follow. Defendant Kennedy has served as the Company's Chairman of the Board and as a Company director since 2010. Previously, he served as the Company's executive chairman from 2010 until he retired in February 2012 and as TFAC's chairman and CEO from 2003 until 2010. He also served as the TFAC's President from 1993 until 2004. Defendant Kennedy has received and continues to receive

compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Kennedy signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Kennedy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

221.    Additional reasons that demand on Defendant Doti is futile follow. Defendant Doti has served as a Company director since 2010. He also serves as the Chair of the Audit Committee and as a member of the Executive Committee. Defendant Doti has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Doti signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Doti breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

222.    Additional reasons that demand on Defendant Gilyard is futile follow. Defendant Gilyard has served as a Company director since 2017. He also serves as a member of the Nominating and Corporate Governance Committee. Defendant Gilyard has received and continues to receive compensation for his role as a director as described above. As a trusted Company

director, he conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Gilyard signed, and thus personally made the false and misleading statements in the 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Gilyard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

223.    Additional reasons that demand on Defendant McCarthy is futile follow. Defendant McCarthy has served as a Company director since 2015. She also serves as the Chair of the Nominating and Corporate Governance Committee. Defendant McCarthy has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant McCarthy signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant McCarthy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

224.    Additional reasons that demand on Defendant McKee is futile follow. Defendant McKee has served as a Company director since 2011. He also serves as the Chair of the Compensation Committee. Defendant McKee has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if

any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McKee signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant McKee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

225.   Additional reasons that demand on Defendant McKernan is futile follow. Defendant McKernan has served as a Company director since 2011. He also serves as a member of the Audit Committee and as a member of the Executive Committee. Defendant McKernan has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McKernan signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant McKernan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

226.   Additional reasons that demand on Defendant Oman is futile follow. Defendant Oman has served as a Company director since 2013. He also serves as a member of the Audit Committee and as a member of the Compensation Committee. Defendant Oman has received and continues to receive compensation for his role as a director as described above. As a trusted

74

Company director, he conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Oman signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Oman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

227.    Additional reasons that demand on Defendant Wyrsch is futile follow. Defendant Wyrsch has served as a Company director since 2018. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Wyrsch has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Wyrsch signed, and thus personally made the false and misleading statements in the 2018 and 2019 10-Ks. For these reasons, Defendant Wyrsch breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

228.    Additional reasons that demand on the Board is futile follow.

229.    As described above, one of the Directors directly engaged in insider trading, in violation of federal law and the Company's Code of Ethics. Defendant Gilmore received proceeds of nearly $5.5 million as a result of his insider transaction executed during the Relevant Period,

when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to him, and excused.

230.    The Directors have extensive, longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Gilmore, Seaton, Kennedy, and Doti, all served in senior positions or as directors to TFAC for many years; Defendant Gilmore served in senior roles at TFAC from 1993 until 2010, including as the CEO of its financial services group and as its COO; Defendant Seaton joined TFAC in 2006 and served as director of investor relations until 2010; Defendant Kennedy served as TFAC's chairman and CEO from 2003 until 2010, and also served as TFAC's president from 1993 to 2004. Defendant Kennedy also served as a director of TFAC's. Defendant Doti served as a director of TFAC from 1993 until 2010. Additionally, Defendants Doti and Gilyard both held senior leadership positions at Chapman University ("Chapman") during the same time period; Defendant Doti served as President of Chapman from 1991 until 2016, and Defendant Gilyard served as Dean of the Argyros School of Business and Economics at Chapman from 2012 until 2017. Defendant Gilyard has served on the Board of Realty Income Corporation ("Realty"), a real estate investment trust since July 2018, where Defendant McKee has served as the Chairman since February 2012. Defendants Gilyard and McKee also serve on Realty's Nominating and Corporate Governance Committee together.  Defendants Kennedy and McKernan serve on the Board of Automobile Club of Southern California, where Defendant McKernan served as CEO from 1991 until he retired in 2012. Lastly, Defendants Gilmore, Kennedy, Doti, McKee, and McKernan have each served together on the Company's Board for nearly a decade. These conflicts of interest precluded the Directors from

adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

231.   Defendants Doti, McKernan, and Oman (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the Company's financial reporting process, and the Company's internal controls over financial reporting. The Audit Committee Defendants failed to ensure the quality and integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

232.   In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Privacy Breach and the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a) of the Exchange Act, and for contribution under Sections 10(b) and 21D of the Exchange Act. In violation of the Code of Ethics, the Directors failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

233.    First American has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for First American any part of the damages First American suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

234.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

235.    The acts complained of herein constitute violations of fiduciary duties owed by First American's officers and directors, and these acts are incapable of ratification.

236.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of First American. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of First American, there would be no directors' and officers' insurance protection.

Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

237.    If there is no directors' and officers' liability insurance, then the Directors will not cause First American to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

238.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

239.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

240.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

241.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

242.    Under the direction and watch of the Directors, the 2018, 2019, and 2020 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*: (1) the Privacy Breach; (2) as a result of the Company's increased reliance on advanced technologies to automate various processes and improve efficiency, First American was subjected to an increased threat of a cybersecurity breakdown; and (3) the Company failed to maintain internal controls. . As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

243.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

244.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them and their engagement in or tolerance of the Privacy Breach and causing the Company to issue false and misleading statements and/or omissions of material fact.

245.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained

in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, advisory approval of executive compensation, ratification of the Company's independent auditor, and the approval of the 2020 Incentive Plan Proposal.

246.     The false and misleading elements of the Proxy Statements led to the re-election of Defendants Gilmore, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan, and Oman which allowed them to continue breaching their fiduciary duties to First American.

247.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

248.     Plaintiff on behalf of First American has no adequate remedy at law.

**<u>SECOND CLAIM</u>**

**Against the Individual Defendants for Breach of Fiduciary Duties**

249.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

250.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of First American's business and affairs.

251.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

252.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of First American.

253.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

254.    In further breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in the Privacy Breach.

255.    In breach of their fiduciary duties owed to First American, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*: (1) the Privacy Breach; (2) as a result of the Company's increased reliance on advanced technologies to automate various processes and improve efficiency, First American was subjected to an increased threat of a cybersecurity breakdown; and (3) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

256.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

257.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of First American's securities and disguising insider sales.

258.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of First American's securities and disguising insider sales.

259.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

260.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, First American has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

261.    Plaintiff on behalf of First American has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

262.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

263.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, First American.

264.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or

received bonuses, stock options, or similar compensation from First American that was tied to the performance or artificially inflated valuation of First American, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

265.    Plaintiff, as a shareholder and a representative of First American, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

266.    Plaintiff on behalf of First American has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

267.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

268.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence First American, for which they are legally responsible.

269.    As a direct and proximate result of the Individual Defendants' abuse of control, First American has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, First American has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

270.    Plaintiff on behalf of First American has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

271.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

272.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of First American in a manner consistent with the operations of a publicly-held corporation.

273.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, First American has sustained and will continue to sustain significant damages.

274.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

275.    Plaintiff on behalf of First American has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

276.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

277.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

278.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

279.    Plaintiff on behalf of First American has no adequate remedy at law.

### SEVENTH CLAIM

**Against Defendants Gilmore and Seaton for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

280.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

281.    First American, along with Defendants Gilmore and Seaton are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Gilmore and Seaton's willful and/or reckless violations of their obligations as officers and/or directors of First American.

282.    Defendants Gilmore and Seaton, because of their positions of control and authority as officers and/or directors of First American, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of First American, including the wrongful acts complained of herein and in the Securities Class Action.

283.    Accordingly, Defendants Gilmore and Seaton are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

284.    As such, First American is entitled to receive all appropriate contribution or indemnification from Defendants Gilmore and Seaton.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of First American, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to First American;

(c)     Determining and awarding to First American the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing First American and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect First American and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of First American to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding First American restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: November 25, 2020                Respectfully submitted,

                                        **FARNAN LLP**

                                        /s/ Brian E. Farnan
                                        Brian E. Farnan (Bar No. 4089)
                                        Michael J. Farnan (Bar No. 5165)
                                        919 N. Market St., 12th Floor
                                        Wilmington, DE 19801
                                        Telephone: (302) 777-0300
                                        Facsimile: (302) 777-0301
                                        Email: bfarnan@farnanlaw.com
                                                mfarnan@farnanlaw.com

Of Counsel:

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net