Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORMAN HOLLETT, derivatively on behalf of FIRST AMERICAN FINANCIAL CORPORATION, | |
| | Case No.: 2:21-cv-00525-DSF-E |
| Plaintiff, | |
| v. | |
| | DEMAND FOR JURY TRIAL |
| DENNIS J. GILMORE, MARK E. SEATON, SHABNAM JALAKIAN, PARKER S. KENNEDY, JAMES L. DOTI, REGINALD H. GILYARD, MARGARET M. MCCARTHY, MICHAEL D. MCKEE, THOMAS V. MCKERNAN, MARK C. OMAN, MARTHA B. WYRSCH, | |
| Defendants, | |
| and | |
| FIRST AMERICAN FINANCIAL CORPORATION, | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE SECOND AMENDED COMPLAINT**

## **INTRODUCTION**

Plaintiff Norman Hollett ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant First American Financial Corporation ("First American" or the "Company"),[1] files this Verified Shareholder Derivative Second Amended Complaint against Individual Defendants Dennis J. Gilmore ("Gilmore"), Mark E. Seaton ("Seaton"), Shabnam Jalakian ("Jalakian"), Parker S. Kennedy ("Kennedy"), James L. Doti ("Doti"), Reginald H. Gilyard ("Gilyard"), Margaret M. McCarthy ("McCarthy"), Michael D. McKee ("McKee"), Thomas V. McKernan ("McKernan"), Mark C. Oman ("Oman"), Martha B. Wyrsch ("Wyrsch") (collectively, the "Individual Defendants," and together with First American, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of First American, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Gilmore, Seaton, and Jalakian for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding First American, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

---

[1] References herein to First American refer to the Company together with its wholly-owned subsidiaries.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by First American's directors and officers from February 17, 2017 through October 22, 2020, both dates inclusive (the "Relevant Period").

2.      Based in Santa Ana, California, First American is engaged in the business of providing financial services through its title insurance and services segment and its specialty insurance segment. The Company operates through its subsidiaries. The title insurance and services segment provide title insurance, closing and/or escrow services, and similar or related services domestically and internationally in connection with residential and commercial real estate transactions. The Company, among other things, maintains, manages, and provides access to title plant data and records. First American is the second largest title insurance provider in the United States with revenue for the fiscal year ended December 31, 2019, totaling approximately $6.2 billion, most of which was substantially derived from its title insurance and services segment.

3.      In the regular course of providing customers with title insurance, First American compiles highly sensitive and personal information including, but not limited to, names, email addresses, mailing addresses, dates of birth, social security numbers, bank account numbers, lender details, mortgage and tax records, driver's license images, and other highly sensitive, nonpublic, and/or confidential, personal information ("Personally Identifiable Information").

4.      In recent years, the Company began to embark on automation initiatives to speed the delivery of its products, increase efficiency, improve customer experience, and decrease risk. In doing so, the Company collected, stored, and transmitted millions of documents, many of which contained Personally Identifiable Information, on a document repository known as FAST image repository ("FAST"). First American also created and maintained an application ("EaglePro") that enables Company employees to send out documents stored within FAST to external users via email.

Verified Shareholder Derivative Second Amended Complaint

5.     Throughout the Relevant Period, the Individual Defendants touted the Company's focus on its "data and process advantages" by purportedly increasing efficiency, reducing risk, and investing in unique customer-facing technology to streamline the title insurance process for customers. However, since at least December 2016, internal reports and audits at the Company raised questions regarding the Company's data management practices and the efficacy of the Company's program for addressing cybersecurity vulnerabilities. Notably, in 2018, the Board was informed that a random sample of 1,000 documents in FAST showed that 30% of the documents misclassified Personally Identifiable Information and were left with less protection than required. Despite being presented with evidence of the poor state of the Company's vulnerability management and despite Company policies requiring preemptive and remediation efforts to detect, prevent, and address risk vulnerabilities to its data security, the Individual Defendants, in breach of their fiduciary duties, caused the Company to: (1) fail to implement basic security protocols to protect its customers' Personally Identifiable Information from public disclosure, unauthorized access, and related malicious acts; (2) fail to comply with the Company's own information security policies, (3) expose millions of First American customers to an increased risk of cyber-fraud and identity theft; (4) breach the terms of First American's Privacy Policy; and (5) consequently, violate state privacy laws.

6.     While systemic problems with the Company's vulnerability management grew and remained unaddressed, First American was exposing massive amounts of sensitive customer data on its public-facing website (the "Privacy Breach"). From at least October 2014 through May 2019, over 800 million records stored within FAST dating back over a decade were available to anyone with a web browser due to a cybersecurity flaw in the EaglePro system. As noted above and detailed herein, the persistent vulnerabilities with First American's cybersecurity controls, processes and procedures that inevitably led to the data leak were known to the Individual Defendants *years* prior to. Astonishingly, even after

Verified Shareholder Derivative Second Amended Complaint

the cybersecurity defect was detected during a penetration test[2] in December 2018, the Company failed to correct the issue until *after* the Privacy Breach was exposed in an article published on a notorious cybersecurity blog, KrebsOnSecurity.com ("KrebsOnSecurity"), on May 24, 2019 (the "May 2019 Article"). Instead, First American permitted unrestricted access to the Personally Identifiable Information of millions of its customers and subjected those victims to an increased risk of cybercrime, including acts of cyber-fraud and identity theft, for about six additional months.

7.       In breach of their fiduciary duties, the Individual Defendants permitted the Privacy Breach, engaged and caused the Company to engage in the Privacy Breach, and failed to maintain adequate controls.

8.       Moreover, throughout the Relevant Period, several of the Company's annual and quarterly financial reports filed with the SEC on Form 10-Ks and 10-Qs failed to disclose the Company's disastrous vulnerability management practices and the Privacy Breach, and therefore contained serious errors that rendered them unreliable. The Individual Defendants further released letters to Company stockholders touting First American's commitment to "operating efficiency" and safeguarding customer information. In particular, the Individual Defendants falsely represented that the Company utilized its "best efforts to ensure that no unauthorized parties have access to any [personal/private customer] information and that such information would be responsibly handled and protected by First American's "physical, electronic, and procedural safeguards [.]" The Company's SEC filings issued throughout the Relevant Period also asserted, *inter alia*, that First American maintained adequate control over its financial reporting.

9.       The Company's Privacy Breach and the true state of the Company's cybersecurity efforts were initially revealed to the public on May 24, 2019, when KrebsOnSecurity published the May 2019 Article, which reported that the Company had

---

[2] A penetration test is an authorized simulated cyberattack on a computer system, performed to evaluate the security system, including the potential for unauthorized parties to gain access to the system's features and data.

leaked 885 million real estate documents in connection to real estate transactions going back to 2003. The public would later come to know that the initial disclosure merely revealed the tip of the iceberg and that the data leak involved customers' bank numbers, drivers' license photographs, and social security numbers, among other sensitive information.

10.    On this news, the price of the Company's stock fell $3.46 per share, or over 6.2%, from $55.26 per share at the close of trading on May 24, 2019, to $51.80 per share at the close of the next trading day, on May 28, 2019.

11.    In connection to the massive data breach, the SEC opened an investigation on August 7, 2019 to determine whether federal securities laws had been violated with respect to the adequacy of the disclosures that the Company had made at the time of the incident and the adequacy of its disclosure controls. Moreover, the New York State Department of Financial Services (the "NYSDFS") commenced an enforcement action (the "NYSDFS Enforcement Action") against the Company on July 21, 2020.

12.    On October 22, 2020, First American filed its quarterly report with the SEC for the fiscal quarter ended September 30, 2020 on Form 10-Q (the "3Q20 10-Q"), which revealed that the Company had recently received a Wells Notice from the SEC that informed the Company that the SEC's enforcement staff had preliminary determined that it would recommend an enforcement action be filed against First American.

13.    On this news, the price of the Company's stock fell $4.83 per share, or over 9.3%, from $51.58 per share at the close of trading on October 21, 2020, to $46.75 per share at the close of trading on October 22, 2020.

14.    The SEC ultimately issued a cease-and-desist order on June 14, 2021 imposing a civil money penalty on the Company in the amount of $487,616 and finding that the Company "failed to maintain disclosure controls and procedures designed to ensure that all available relevant information concerning the [cybersecurity] vulnerability

[involving the company's 'EaglePro' application] was analyzed for disclosure" in the Company's SEC filings.

15.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the Privacy Breach or the full extent and cause of the Privacy Breach; (3) as a result of the Company's failure to implement basic policies and comply with its own cybersecurity policies and state regulations, First American was subjected to an increased threat of a cybersecurity breakdown; (4) consequently, the Company was subject to an elevated risk of regulatory scrutiny and customer liability; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

16.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

17.     Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

18.     In light of the Individual Defendants' misconduct, which has subjected First American to a civil money penalty imposed by the SEC, to being named as a respondent in the NYSDFS Enforcement Action, to being named as a defendant in federal consumer class action lawsuits and associated arbitration actions, and to being named, along with the Company's Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and Chief Information Security Officer ("CISO") to a federal securities fraud class action

lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

19.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of First American's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

Verified Shareholder Derivative Second Amended Complaint

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

24.     Venue is proper in this District because First American is headquartered in this District. In addition, Defendants have regularly conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

25.     Plaintiff is a current shareholder of First American. Plaintiff has continuously held First American common stock since before the beginning of the Relevant Period.

### Nominal Defendant First American

26.     First American is a Delaware corporation with its principal executive offices at 1 First American Way, Santa Ana, California 92707-5913. First American's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "FAF."

### Defendant Gilmore

27.     Defendant Gilmore has served as the Company's CEO and as a Company director since June 2010. He also serves as a member of the Executive Committee. He previously served in various managerial roles with The First American Corporation ("TFAC") beginning in 1993, including CEO of TFAC's financial services group and TFAC's Chief Operating Officer ("COO"). According to the Company's Schedule 14A filed with the SEC on March 31, 2021 (the "2021 Proxy Statement"), as of March 17, 2021, Defendant Gilmore beneficially owned 427,872 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2021 was $55.27, Defendant Gilmore owned approximately $23.6 million worth of First American stock.

28.     For the fiscal year ended December 31, 2020, Defendant Gilmore received $11,173,959 in compensation from the Company. This included $1,000,000 in salary, $6,627,923 in stock awards, $2,120,400 in non-equity incentive plan compensation, $1,406,274 in change in pension value and nonqualified deferred compensation earnings, and $19,362 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Gilmore received $10,367,225 in compensation from the Company. This included $1,000,000 in salary, $5,120,280 in stock awards, $2,907,000 in non-equity incentive plan compensation, $1,323,541 in change in pension value and nonqualified deferred compensation earnings, and $16,404 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Gilmore received $8,403,146 in compensation from the Company. This included $999,039 in salary, $5,390,730 in stock awards, $2,000,700 in non-equity incentive plan compensation, and $12,677 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Gilmore received $8,330,344 in compensation from the Company. This included $950,000 in salary, $4,348,262 in stock awards, $2,365,200 in non-equity incentive plan compensation, $654,480 in change in pension value and nonqualified deferred compensation earnings, and $12,402 in all other compensation.

29.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Gilmore made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 11/8/2017 | 100,000 | $54.97 | $5,497,000 |

His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

30.     The Company's 2021 Proxy Statement stated the following about Defendant Gilmore:

Verified Shareholder Derivative Second Amended Complaint

Mr. Gilmore has been our chief executive officer and a director since 2010. From 1993 to 2010, he served in various managerial roles with The First American Corporation, including as the chief executive officer of its financial services group and as its chief operating officer. As the Company's chief executive officer, Mr. Gilmore provides our Board of Directors in-depth insight into the Company's businesses, challenges and opportunities, as well as significant experience in the real estate settlement services industry.

**Defendant Seaton**

31.     Defendant Seaton has served as the Company's Executive Vice President and CFO since March 2013. Previously, he served as the Company's Senior Vice President of Finance from 2010 until 2013 and as Director of Investor Relations from 2006 until 2010. According to the 2021 Proxy Statement, as of March 17, 2021, Defendant Seaton beneficially owned 77,301 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2021 was $55.27, Defendant Seaton owned approximately $4.3 million worth of First American stock.

32.     For the fiscal year ended December 31, 2020, Defendant Seaton received $3,649,469 in compensation from the Company. This included $650,000 in salary, $2,174,929 in stock awards, $806,000 in non-equity incentive plan compensation, and $18,540 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Seaton received $3,500,921 in compensation from the Company. This included $650,000 in salary, $1,730,431 in stock awards, $1,105,000 in non-equity incentive plan compensation, and $15,490 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Seaton received $3,160,840 in compensation from the Company. This included $649,038 in salary, $1,739,437 in stock awards, $760,500 in non-equity incentive plan compensation, and $11,865 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Seaton received $2,830,668 in compensation from the Company. This included $599,519 in salary, $1,379,971 in stock awards, $839,500 in non-equity incentive plan compensation, and $11,678 in all other compensation.

33.    During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Seaton made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 8/18/2017 | 7,000 | $48.33 | $338,310.00 |
| 11/8/2017 | 9,981 | $54.87 | $547,657.47 |
| 11/1/2019 | 8,069 | $61.92 | $499,632.48 |

Thus, in total before the fraud was exposed, he sold 25,050 Company shares on inside information, for which he received nearly $1.4 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

34.    The Company's 2021 Proxy Statement stated the following about Defendant Seaton:

> **Mark E. Seaton** has served as our executive vice president, chief financial officer since 2013. From 2010 until 2013, he served as our senior vice president, finance, in which capacity he oversaw the Company's investment management, investor relations, treasury and financial planning activities. Mr. Seaton joined The First American Corporation in 2006 and served as director of investor relations until 2010.

**Defendant Jalakian**

35.    Defendant Jalakian has served as the Company's Senior Vice President and CISO since September 2017. Previously, she served as the Company's Vice President and CISO from September 2015 until August 2017, as the Company's Director of Information Security from February 2012 until August 2015, and as a Senior Manager of Technology Audit from January 2011 until January 2012.

**Defendant Kennedy**

36.    Defendant Kennedy has served as the Company's Chairman of the Board and as a Company director since June 2010. He also serves as the Chair of the Executive

Committee and as a member of the Compensation Committee. Previously, he served as the Company's Executive Chairman from 2010 until he retired in February 2012 and as the Chairman and CEO of the Company's former parent company, TFAC, from 2003 until 2010. He also served as TFAC's President from 1993 until 2004. According to the 2021 Proxy Statement, as of March 17, 2021, Defendant Kennedy beneficially owned 2,657,020 shares of the Company's common stock, which represented 2.4% of the Company's outstanding shares as of that date.  Given that the price per share of the Company's common stock at the close of trading on March 17, 2021 was $55.27, Defendant Kennedy owned approximately $146.9 million worth of First American stock.

37.     For the fiscal year ended December 31, 2020, Defendant Kennedy received $399,988 in compensation from the Company. This included $255,000 in fees earned or paid in cash, $124,988 in stock awards, and $20,000 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Kennedy received $399,999 in compensation from the Company. This included $255,000 in fees earned or paid in cash, $124,999 in stock awards, and $20,000 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Kennedy received $369,978 in compensation from the Company. This included $250,000 in fees earned or paid in cash, $99,978 in stock awards, and $20,000 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Kennedy received $366,487 in compensation from the Company. This included $246,493 in fees earned or paid in cash, $99,994 in stock awards, and $20,000 in all other compensation.

38.     The Company's 2021 Proxy Statement stated the following about Defendant Kennedy:

> Mr. Kennedy has served as chairman of the Board since 2010. Mr. Kennedy served as executive chairman of the Company from 2010 until he resigned from that position in February 2012. From 2003 to 2010, he served as chairman and chief executive officer of The First American Corporation, the Company's prior parent company, and as its president from 1993 to 2004. He served as a director of The First

1
2
3
4
5

American Corporation and, as renamed in 2010, CoreLogic, Inc., from 1987 to 2011, and was CoreLogic, Inc.'s executive chairman from 2010 to 2011. He is a director of the Automobile Club of Southern California. We believe that Mr. Kennedy, who has worked with us in various capacities for over 40 years, has unparalleled executive experience in our industry. He also brings to the Company an incomparable understanding of our history and culture.

6

**Defendant Doti**

7
8
9
10
11
12

39.    Defendant Doti has served as a Company director since June 2010. He also serves as the Chair of the Audit Committee and as a member of the Executive Committee. According to the 2021 Proxy Statement, as of March 17, 2021, Defendant Doti beneficially owned 63,822 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2021 was $55.27, Defendant Doti owned approximately $3.5 million worth of First American stock.

13
14
15
16
17
18
19
20
21
22

40.    For the fiscal year ended December 31, 2020, Defendant Doti received $281,988 in compensation from the Company. This included $157,000 in fees earned or paid in cash and $124,988 in stock awards. For the fiscal year ended December 31, 2019, Defendant Doti received $281,999 in compensation from the Company. This included $157,000 in fees earned or paid in cash and $124,999 in stock awards. For the fiscal year ended December 31, 2018, Defendant Doti received $263,978 in compensation from the Company. This included $164,000 in fees earned or paid in cash and $99,978 in stock awards. For the fiscal year ended December 31, 2017, Defendant Doti received $239,994 in compensation from the Company. This included $140,000 in fees earned or paid in cash and $99,994 in stock awards.

23
24

41.    The Company's 2021 Proxy Statement stated the following about Defendant Doti:

25
26
27
28

Dr. Doti has been a professor of economics at Chapman University since 1974 and served as Chapman University's president from 1991 to 2016. He previously served on the boards of The First American Corporation, Standard Pacific Corp. and Fleetwood Enterprises, Inc. Given his experience as president of Chapman University and his

doctorate in economics from the University of Chicago, Dr. Doti gives our Company insight into the organizational challenges that large companies face and the impact of the economic environment on the Company.

**Defendant Gilyard**

42.     Defendant Gilyard has served as a Company director since May 2017. He also serves as a member of the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, as of March 17, 2021, Defendant Gilyard beneficially owned 7,776 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2021 was $55.27, Defendant Gilyard owned approximately $429,780 worth of First American stock.

43.     For the fiscal year ended December 31, 2020, Defendant Gilyard received $227,988 in compensation from the Company. This included $103,000 in fees earned or paid in cash and $124,988 in stock awards. For the fiscal year ended December 31, 2019, Defendant Gilyard received $227,999 in compensation from the Company. This included $103,000 in fees earned or paid in cash and $124,999 in stock awards. For the fiscal year ended December 31, 2018, Defendant Gilyard received $197,978 in compensation from the Company. This included $98,000 in fees earned or paid in cash and $99,978 in stock awards. For the fiscal year ended December 31, 2017, Defendant Gilyard received $126,381 in compensation from the Company. This included $61,463 in fees earned or paid in cash and $64,918 in stock awards.

44.     The Company's 2021 Proxy Statement stated the following about Defendant Gilyard:

> Mr. Gilyard has been a senior advisor with The Boston Consulting Group, a global management consulting company, since 2012. From 2012 to 2017, he was dean of the Argyros School of Business and Economics at Chapman University. From 1996 to 2012, he held various other positions with The Boston Consulting Group, including as a partner and managing director. He is a director of CBRE Group, Inc. (NYSE: CBRE), a commercial real estate services and investment firm, and Realty Income Corporation (NYSE: O), a real estate investment

14
Verified Shareholder Derivative Second Amended Complaint

trust. He began his career serving in the United States Air Force. With his in-depth understanding of the complexities of large businesses and keen grasp of customer needs across a variety of industry sectors, Mr. Gilyard brings to the Board a unique perspective on how we can make our operations more efficient and serve our customers better.

**Defendant McCarthy**

45.    Defendant McCarthy has served as a Company director since July 2015. She also serves as the Chair of the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, as of March 17, 2021, Defendant McCarthy beneficially owned 18,411 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2021 was $55.27, Defendant McCarthy owned approximately $1.0 million worth of First American stock.

46.    For the fiscal year ended December 31, 2020, Defendant McCarthy received $257,988 in compensation from the Company. This included $133,000 in fees earned or paid in cash and $124,988 in stock awards. For the fiscal year ended December 31, 2019, Defendant McCarthy received $241,122 in compensation from the Company. This included $116,123 in fees earned or paid in cash and $124,999 in stock awards. For the fiscal year ended December 31, 2018, Defendant McCarthy received $204,499 in compensation from the Company. This included $104,521 in fees earned or paid in cash and $99,978 in stock awards. For the fiscal year ended December 31, 2017, Defendant McCarthy received $197,994 in compensation from the Company. This included $98,000 in fees earned or paid in cash and $99,994 in stock awards.

47.    The Company's 2021 Proxy Statement stated the following about Defendant McCarthy:

Ms. McCarthy retired in 2019 as executive vice president of CVS Health Corporation, a health innovation company (NYSE: CVS), supporting the technology integration following the completion of CVS Health's acquisition of Aetna, Inc. in 2018. She served as executive vice president of operations and technology for Aetna, Inc., a

diversified healthcare benefits company, from 2010 until 2018, where she was responsible for innovation, technology, data security, procurement, real estate and service operations. Prior to joining Aetna in 2003, she served in various information technology-related roles, including at CIGNA Healthcare, Catholic Health Initiatives and Andersen Consulting (now Accenture), as well as a consulting partner at Ernst & Young. She is a director of Brighthouse Financial, Inc. (NASDAQ GS: BHF), a life and annuity insurance company; Marriott International, Inc. (NASDAQ: MAR), an operator, franchisor, and licensor of hotel, residential, and timeshare properties worldwide; and American Electric Power (NYSE: AEP), an electrical energy company. Given her extensive experience managing large groups of employees, complex processes and enterprise-critical technology, Ms. McCarthy brings to the Board valuable insights into areas of critical import to the operations of the Company.

**Defendant McKee**

48.     Defendant McKee has served as a Company director since March 2011. He also serves as the Chair of the Compensation Committee. According to the 2021 Proxy Statement, as of March 17, 2021, Defendant McKee beneficially owned 40,778 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2021 was $55.27, Defendant McKee owned nearly $2.3 million worth of First American stock.

49.     For the fiscal year ended December 31, 2020, Defendant McKee received $244,988 in compensation from the Company. This included $120,000 in fees earned or paid in cash and $124,988 in stock awards. For the fiscal year ended December 31, 2019, Defendant McKee received $244,999 in compensation from the Company. This included $120,000 in fees earned or paid in cash and $124,999 in stock awards. For the fiscal year ended December 31, 2018, Defendant McKee received $224,978 in compensation from the Company. This included $125,000 in fees earned or paid in cash and $99,978 in stock awards. For the fiscal year ended December 31, 2017, Defendant McKee received $204,994 in compensation from the Company. This included $105,000 in fees earned or paid in cash and $99,994 in stock awards.

Verified Shareholder Derivative Second Amended Complaint

50.     The Company's 2021 Proxy Statement stated the following about Defendant McKee:

> Mr. McKee has served as a principal of The Contrarian Group, a private equity firm, since 2018. He is the chairman of Realty Income Corporation (NYSE: O), a real estate investment trust, and the Tiger Woods Foundation. He served as a director of HCP, Inc. (NYSE: HCP), a publicly traded real estate investment trust, from 1989 to 2018, as executive chairman of HCP from 2016 to 2018 and, during 2016, he also served as interim chief executive officer and president of HCP. From 2010 to 2016, Mr. McKee was chief executive officer of Bentall Kennedy (U.S.), a registered real estate investment advisor. He also served as the chief executive officer and vice chairman of the board of directors of The Irvine Company, a privately-held real estate development and investment company, and as a partner with the law firm of Latham & Watkins LLP. Mr. McKee brings to the Board significant operating and executive management experience. This experience, combined with Mr. McKee's extensive background in the real estate industry, facilitates the Board's oversight of the Company's operations and enhances its ability to assess strategic opportunities.

**Defendant McKernan**

51.     Defendant McKernan has served as a Company director since March 2011. He also serves as a member of the Audit Committee and as a member of the Executive Committee. According to the 2021 Proxy Statement, as of March 17, 2021, Defendant McKernan beneficially owned 48,068 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2021 was $55.27, Defendant McKernan owned approximately $2.7 million worth of First American stock.

52.     For the fiscal year ended December 31, 2020, Defendant McKernan received $251,988 in compensation from the Company. This included $127,000 in fees earned or paid in cash and $124,988 in stock awards. For the fiscal year ended December 31, 2019, Defendant McKernan received $235,122 in compensation from the Company. This included $110,123 in fees earned or paid in cash and $124,999 in stock awards. For the

fiscal year ended December 31, 2018, Defendant McKernan received $201,978 in compensation from the Company. This included $102,000 in fees earned or paid in cash and $99,978 in stock awards. For the fiscal year ended December 31, 2017, Defendant McKernan received $201,994 in compensation from the Company. This included $102,000 in fees earned or paid in cash and $99,994 in stock awards.

53.     The Company's 2021 Proxy Statement stated the following about Defendant McKernan:

> Mr. McKernan has served as vice-chair of AAA—Auto Club Enterprises and the Automobile Club of Southern California (the "Auto Club") since 2018 and from 2012 to 2018 he served as its chairman. Mr. McKernan served as chief executive officer of the Auto Club from 1991 until his retirement in 2012. Mr. McKernan also serves as a director of Payden & Rygel Investment Group and as a trustee of certain funds associated therewith. Through his operating, information technology and executive management experience, much of it gained in the process of transforming the Auto Club into a leader in the California insurance industry, Mr. McKernan brings to the Company valuable insight into the challenges facing an insurance company that is executing on a strategic growth plan. His extensive experience participating in the management of insurance company investment portfolios also has been of significant value to the Company.

**Defendant Oman**

54.     Defendant Oman has served as a Company director since March 2013. He also serves as a member of the Audit Committee and as a member of the Compensation Committee. According to the 2021 Proxy Statement, as of March 17, 2021, Defendant Oman beneficially owned 38,109 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2021 was $55.27, Defendant Oman owned approximately $2.1 million worth of First American stock.

55.     For the fiscal year ended December 31, 2020, Defendant Oman received $241,988 in compensation from the Company. This included $117,000 in fees earned or

paid in cash and $124,988 in stock awards. For the fiscal year ended December 31, 2019, Defendant Oman received $241,999 in compensation from the Company. This included $117,000 in fees earned or paid in cash and $124,999 in stock awards. For the fiscal year ended December 31, 2018, Defendant Oman received $211,978 in compensation from the Company. This included $112,000 in fees earned or paid in cash and $99,978 in stock awards. For the fiscal year ended December 31, 2017, Defendant Oman received $211,994 in compensation from the Company. This included $112,000 in fees earned or paid in cash and $99,994 in stock awards.

56.     The Company's 2021 Proxy Statement stated the following about Defendant Oman:

> Mr. Oman retired from Wells Fargo & Company in 2011, after serving it or its predecessors since 1979. He held numerous positions at Wells Fargo, including senior executive vice president (home and consumer finance) from 2005 until his retirement and group executive vice president (home and consumer finance) from 2002 to 2005. Mr. Oman also served as a director and the chief executive officer of Wachovia Preferred Funding Corp. from 2009 to 2011 and as a director of American Caresource Holdings, Inc. from 2013 to 2017. He is currently involved with several private ventures and serves on a variety of private-company and non-profit boards. Mr. Oman brings to the Board important insights into the mortgage market and working with large mortgage lenders.

**Defendant Wyrsch**

57.     Defendant Wyrsch has served as a Company director since May 2018. She also serves as a member of the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, as of March 17, 2021, Defendant Wyrsch beneficially owned 5,821 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2021 was $55.27, Defendant Wyrsch owned over $327,548 worth of First American stock.

58.     For the fiscal year ended December 31, 2019, Defendant Wyrsch received $227,988 in compensation from the Company. This included $103,000 in fees earned or

paid in cash and $124,988 in stock awards. For the fiscal year ended December 31, 2019, Defendant Wyrsch received $227,999 in compensation from the Company. This included $103,000 in fees earned or paid in cash and $124,999 in stock awards. For the fiscal year ended December 31, 2018, Defendant Wyrsch received $126,945 in compensation from the Company. This included $61,753 in fees earned or paid in cash and $65,192 in stock awards.

59.    The Company's 2021 Proxy Statement stated the following about Defendant Wyrsch:

> Ms. Wyrsch retired in 2019 as executive vice president and general counsel for Sempra Energy, a leading energy services company, where she oversaw the company's legal affairs and compliance initiatives. Prior to joining Sempra Energy in 2013, Ms. Wyrsch served as the president of Vestas American Wind Technology from 2009 to 2012, where she had direct responsibility for all North American sales, construction, service and maintenance. In addition to her executive leadership roles, she served as a member of the board of directors of Spectra Energy Corporation and SPX Corporation. She currently serves on the board of directors of Spectris plc, a publicly traded company listed on the London Stock Exchange and Quanta Services, Inc. (NYSE: PWR), a specialized contracting services company. From 2019 to 2020 she also served as a director of Noble Energy, Inc. (NYSE: NBL), an energy exploration and production company. As an accomplished director for publicly-traded companies, and with deep experience leading intricate businesses, Ms. Wyrsch provides valuable insight into how we can enhance our operations and ability to serve our customers.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

60.    By reason of their positions as officers, directors, and/or fiduciaries of First American and because of their ability to control the business and corporate affairs of First American, the Individual Defendants owed First American and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage First American in a fair, just, honest, and equitable

manner. The Individual Defendants were and are required to act in furtherance of the best interests of First American and its shareholders so as to benefit all shareholders equally.

61.     Each director and officer of the Company owes to First American and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of First American, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

63.     To discharge their duties, the officers and directors of First American were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of First American, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised First American's Board at all relevant times.

65.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the

dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this second amended complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

66.    To discharge their duties, the officers and directors of First American were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of First American were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to First American's own Code of Ethics and Conduct (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how First American conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of First American and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that First American's operations would comply with all applicable laws and First American's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

67.     Each of the Individual Defendants further owed to First American and the shareholders the duty of loyalty requiring that each favor First American's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

68.     At all times relevant hereto, the Individual Defendants were the agents of each other and of First American and were at all times acting within the course and scope of such agency.

69.     Because of their advisory, executive, managerial, and directorial positions with First American, each of the Individual Defendants had access to adverse, non-public information about the Company.

70.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts

complained of herein, as well as the contents of the various public statements issued by First American.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

71.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

72.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

73.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of First American was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

74.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist

the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

75.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of First American, and was at all times acting within the course and scope of such agency.

## FIRST AMERICAN'S CODE OF ETHICS

76.     First American's Code of Ethics provides that it is "intended to guide the Company's employees, officers and directors to support their efforts to comply with the laws and regulations that impact the Company's business" and that "employee[s], officer[s] [and] director[s] are expected to know and abide" by the "rules of ethical conduct" therein.

77.     In a section titled, "Conflicts of Interest," the Code of Ethics states the following, in relevant part:

As an employee, officer or director of the Company you have a duty of loyalty to the Company, and must therefore avoid any actual, or the appearance of a, conflict of interest with the Company. A "conflict of interest" occurs when your private interest interferes, or would appear to others to interfere, with the interests of the Company. A conflict situation can arise when you take an action or have an interest that may make it difficult to perform your work objectively and effectively. Conflicts of interest also arise when you or a member of your family receive improper personal benefits as a result of your position with the Company.

78.     In a section titled, "Use of Inside Information," the Code of Ethics states the following, in relevant part:

It is the Company's goal and policy to protect shareholder investments through strict enforcement of the prohibition against insider trading set forth in federal securities laws and regulations. No director, officer or employee may buy or sell, or tip others to buy or sell, Company securities or the publicly-traded securities of any other company,

including a competitor, customer or supplier, when in possession of "material non-public information" regarding the Company or the other company, as the case may be. Insider trading is both unethical and illegal and will be dealt with firmly.

79.     In a section titled, "Fair Dealing," the Code of Ethics states the following:

As an employee, officer or director you must endeavor to deal fairly and in good faith with Company customers, suppliers, competitors and employees. You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged or confidential information, misrepresentation of material facts, or any other unfair dealing practice.

80.     In a section titled, "Confidentiality," the Code of Ethics states the following, in relevant part:

As an employee, officer or director you should maintain the confidentiality of information entrusted to you by the Company, its business partners, suppliers, customers or others, whether the information relates to the Company's business or a third party. Such information must not be disclosed to others, except when disclosure is authorized by the Company or legally mandated. Confidential information includes all non-public information that you learn in the course of performing your duties for the Company, including information that might be of use to competitors or harmful to the Company, or its business partners, suppliers or customers, if disclosed. The obligation to protect confidential information continues even after your relationship with the Company ends.

81.     In a section titled, "Protection and Use of Company Assets," the Code of Ethics states the following, in relevant part:

Company assets, such as information, materials, supplies, time, intellectual property, expense privileges, software, hardware and facilities, among other property, are valuable resources owned, leased, licensed, or otherwise belonging to the Company. Safeguarding Company assets is the responsibility of all employees, officers and directors. All Company assets should be used for legitimate business purposes only and the personal use of Company assets without permission is prohibited. Limited personal use of assets such as office supplies is permitted, as long as it is occasional and reasonable.

1

2       82.     In a section titled, "Fraud," the Code of Ethics states the following:

3
        As an employee, officer or director you should not engage in fraudulent
4       conduct. Fraud is defined as deliberately practiced deception, whether
        by words, conduct, false or misleading allegations, or by concealment,
5       to secure unfair or unlawful gain. Fraud covers both express and
6       implied representations of fact, and may be written or oral.

7       83.     In a section titled, "Compliance with Laws, Rules and Regulations," the Code

8   of Ethics states the following:

9
        The Company's employees, officers and directors are subject to
10      numerous laws, regulations, rules and Company policies/guidelines,
        only some of which are specifically addressed in this Code. We
11      encourage and expect you to become reasonably informed and to
12      comply with the laws, regulations, rules and Company
        policies/guidelines applicable to you, whether or not they are addressed
13      in this Code.

14      84.     The Code of Ethics also provides the following:

15
        The requirements and principles contained in this Code form the
16      cornerstone of our Company's reputation and commitment to ethical
        business conduct. The Company has provided this Code as a guide and
17      expects that each employee, officer and director will use its principles
18      of ethical conduct as a foundation for behavior. Reference to this Code
        will help each of us apply our institutional and personal values of
19      honesty, fairness and integrity to everything we do at the Company.

20

21      85.     In violation of the Code of Ethics, the Individual Defendants conducted little,

22  if any, oversight of the Company's vulnerability management, the Company's engagement

23  in the Privacy Breach, and the Individual Defendants' scheme to issue materially false and

24  misleading statements to the public and to facilitate and disguise the Individual

25  Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement,

26  abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange

27  Act, and aiding and abetting thereof.  Moreover, two of the Individual Defendants violated

28  the Code of Ethics by engaging in insider trading. Also in violation of the Code of Ethics,

the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

86.     First American, through its subsidiaries, provides financial services through its title insurance and services segment and its specialty insurance segment. The title insurance and services segment provides title insurance, closing and/or escrow services and similar or related services domestically and internationally in connection with residential and commercial real estate transactions. The title and insurance services segment also provides products and services that are purportedly designed to mitigate risk in, real estate transactions. Among other things, the Company also maintains, manages, and provides access to title plant data and records.

87.     As of the summer of 2020, First American employed approximately 18,400 employees throughout 760 offices in 9 different countries. The Company is the second largest title insurance provider in the United States and holds the nation's largest title plant and property record database. Notably, approximately 91.5% of the Company's total 2019 revenue of $6.2 billion was attributable to its title insurance and services segment.

88.     The businesses operated by the Company's subsidiaries have existed, in some instances, since the late 1800s. However, First American was incorporated in Delaware in January 2008 to serve as the holding company of TFAC financial services businesses following the spin-off of those businesses from TFAC. On June 1, 2010, the separation was consummated, and the Company went public.

89.     Title insurance policies insure the interests of owners or lenders against defects in the title to real property. These defects include adverse ownership claims, liens, encumbrances, or other matters affecting title.

90.     When a customer pursues title insurance, First American compiles personal information on the customer from various sources, including through the customer's application and financial statements, which contain Personally Identifiable Information. Typically, documents containing Personally Identifiable Information are also submitted by other individuals that are involved in the transaction on behalf of the title customer, such as the real estate agent, lender, escrow or settlement agent, and attorney. In addition, during its title search, First American will obtain documents that may also contain Personally Identifiable Information from proprietary databases. This sensitive, personal information can include data relating to appraisals, credit reports, escrow agent balances, and account numbers. Further, First American's title insurance package may also include data assembled from materials in the public records such as tax assessments and liens.

91.     Thus, in the ordinary course of its business, First American regularly gathers, retains, and transmits the Personally Identifiable Information of millions of purchasers and sellers of real estate in the United States on an annual basis which the Company then stores in FAST. FAST stores tens of millions of documents with Personally Identifiable Information and it is utilized to conduct title insurance and settlement orders.

92.     In recent years, the Company undertook various automation initiatives to speed the delivery of its products, increase efficiency, improve customer experience, and decrease risk. To that end, in September and October of 2016, the Company acquired RedVision Systems, Inc.—then, a national provider of title and real property research which was best known for its proprietary technology, including the TitleVision2 production platform, TitleVision2, and the Nova title research and production software. The Company also acquired TD Services Financial Corporation, a provider of technology services to the mortgage banking industry which specialized in post-closing services and document management.

93.     Prior to the beginning of the Relevant Period, First American created and maintained EaglePro, which is a web-based title document delivery system that allows title

agents and other Company employees to share documents stored in FAST, including the title package, with external parties in connection to a real estate transaction. After a party to or a participant in a transaction selects documents from FAST to be shared with another participant of a real estate transaction, EaglePro sends an email to the recipient with a link to a website that provides access to the document to the recipient without first requiring the recipient to login or authenticate his or her access.

94.     In hosting such valuable information, as detailed below, the Company had represented its commitment to ensuring the safety of customer Personally Identifiable Information. For instance, the 2016 10-K (defined below) stated that First American is "focused on growing our core title insurance and settlement services business, *strengthening our enterprise through data and process advantages*. . ." (Emphasis added.) Moreover, in a 2017 letter to investors, Defendant Gilmore assured investors that the Company had been investing in its technology systems including "*the continued enhancement of our title production platform and our customer-facing technologies and enterprise systems*, all of which will improve our customers' experience and our internal process efficiency" and also stated that "*[t]hese efforts strengthen our control over the key data assets that underlie our products and services and facilitate our efforts to manage risk and drive efficiencies throughout the title and settlement process*." (Emphasis added.)

95.     Pursuant to cybersecurity regulations implemented by New York State Governor Andrew M. Cuomo as of March 1, 2017, banks, insurance companies, and other financial institutions regulated by NYSDFS, including First American, were required to establish and maintain a cybersecurity program designed to protect consumers' private data. Specifically, New York's cybersecurity regulations obligated First American to, *inter alia*: (1) designate a Chief Information Security Officer who was required to submit a written report to the Board annually; (2) maintain a cybersecurity program that is based on a risk assessment and is designed to: (a) "identify and assess internal and external cybersecurity risks that may threaten the security or integrity of nonpublic information

stored on the covered entity's information systems;" (b) "use defensive infrastructure and the implementation of policies and procedures to protect the covered entity's information systems, and the nonpublic information stored on those information systems, from unauthorized access, use or other malicious acts;" (c) "detect cybersecurity events;" (d) "respond to identified or detected cybersecurity events to mitigate any negative effects;" (e) "recover from cybersecurity events and restore normal operations and services;" and (f) "fulfill applicable regulatory reporting obligations"; (3) conduct periodic risk assessments as necessary in light of changes to the Company's "information systems, nonpublic information or business operations" which consider "particular risks" of the Company's business operations and the "availability and effectiveness of controls" that it uses; and (4) implement controls, including encryption or compensating controls, to protect nonpublic information held or transmitted by the Company. *See* 23 NYCRR Part 500.

### **Ongoing and Unremediated Cybersecurity Vulnerabilities at the Company**

96.     Defendants understood the threat presented by a weak cybersecurity program. Since at least 2017, the Company frequently acknowledged cybersecurity vulnerabilities and vulnerability management as among its own main risks. However, these issues were largely left to fester and contributed to the Company's failure to address the Privacy Breach in the period between the discovery of the issue by Company employees in December 2018 and the publication of the May 2019 Article.

97.     According to the NYSDFS's Second Amended Statement of Charges and Notice of Hearing filed on June 17, 2021 (the "Second Amended Charges"), which made minor revisions to amended charges filed by the NYSDFS in its regulatory action on March 10, 2021, First American failed to adhere to its vulnerability management policy, which required it to: (1) scan all information assets for vulnerabilities; (2) resolve critical and high risk vulnerabilities within 15 days; (3) resolve medium risk vulnerabilities within 45 days; (4) resolve low risk vulnerabilities within 90 days; and (5) assign an Accountable Remediation Owner to provide a remediation plan and time estimate for remediation for

all vulnerabilities that cannot be timely remediated. In fact, according to NYSDFS's Second Amended Charges, as of October 3, 2018, nearly 27,000 critical and high risk vulnerabilities were left unresolved for more than 90 days and roughly 40% of which had not been remediated for at least three years from when they had been identified.

98.     The Individual Defendants knew of the Company's noncompliance with its vulnerability management policy due to the many tests and audits that revealed flaws in the Company's vulnerability management and by the Company's repeated failure to address these issues despite their being identified as among the Company's top risks. Instead, the Individual Defendants took no action to improve the Company's practices. According to the Second Amended Charges, the Company conducted an information security audit in 2017 which revealed major issues regarding First American's vulnerability management, including the Company's failure to designate responsibility for the comprehensive monitoring and implementation of vulnerability remediation. The 2017 information security audit was followed by various tests and audits that further revealed the Company's lapses in vulnerability management. In early 2018, a test performed on a random sampling of 1,000 documents in FAST identified 30% of the documents in the sample as improperly tagged as not containing nonpublic information, leading to the implication that hundreds of millions of documents in FAST were likely also improperly tagged as not containing Personally Identifiable Information. Although this result was *brought to the Board's attention* in a presentation by senior members of the Company's IT and information security management teams in April 2018, the Company failed to timely remediate this issue or provide particularized and detailed risk warnings to investors. An internal audit of the Company's Vulnerability Management Program prepared in 2018 (the "2018 Audit Report") for the Company's executive management team and Board turned up significant shortcomings and concluded that the program needed "[m]ajor [i]mprovement" since the program was "unlikely to provide reasonable assurance that risks are being managed and objectives are being met." The 2018 Audit Report also determined

that "remediation of known vulnerabilities is not completed timely," employee Accountable Remediation Owners had not been timely remediating vulnerabilities, and the Company had no system in place to facilitate timely remediation. Further, the 2018 Audit Report discovered major issues with the Company's remediation management governance, including the Company's failure to document waivers when vulnerabilities were not remediated in accordance with First American's procedures, unfinished scanning for vulnerabilities, inadequate reporting to senior management and the Board, a lack of analysis of vulnerabilities, and a lack of prioritization of vulnerability remediation.

99.     Although, according to the Second Amended Charges, the minutes for the Board and Audit Committee meetings "do not reflect any discussion of the serious and persistent failures permeating [the Company's] vulnerability management program," the Board's and the Audit Committee's collective failure to address issues with the Company's vulnerability management practices is not attributable to a lack of awareness of the problem. Indeed, deficiencies in vulnerability management and ostensible solutions were brought to the attention of the Board and the Audit Committee on several occasions. For instance, as recounted by the Second Amended Charges:

(1) the Company's management reported to the Audit Committee in December 2016 that they conducted a self-assessment of their vulnerability and patching program in the second quarter of 2016, and that they planned to re-engineer the process of vulnerability scanning and patching;

(2) a November 2017 presentation to the Audit Committee included a timeline showing that the project to "Improve Vulnerability Management" would be completed in 2018, at which point the Company would "Scan & Remediate Vulnerabilities in all enterprise infrastructure";

(3) in December 2017, a report to the Audit Committee identified "failure to patch systems" as a top risk and claimed that this would be addressed by the new

Verified Shareholder Derivative Second Amended Complaint

vulnerability management program to be completed in the fourth quarter of 2017 and a new patching process to be completed in the second quarter of 2018;

(4) in December 2018, a timeline presented to the Audit Committee showed that the Vulnerability Remediation Management Program Maturation would reach "V2.0" in the first quarter of 2019, that additional scans would be implemented in the third quarter of 2019, and that the last aspects of the program, including "Operational support"—would be completed in the third and fourth quarters of 2019;

(5) in response to the 2018 Audit Report's negative findings on vulnerability management, the Company's information security management stated that the Vulnerability Remediation Management program established in 2017 would be fully implemented by December 31, 2019, and that this would "close the bulk of the open vulnerabilities"; and

(6) in a March 6, 2019 presentation to the Board, Defendant Jalakian noted that vulnerabilities were ranked as the Company's second-highest cybersecurity risk and that the Information Security Department was "[s]tepping up pace of vulnerability remediation." Defendant Jalakian claimed that vulnerabilities were being addressed by a "full program" and an "enhanced patch management strategy." A timeline in the presentation showed that vulnerability remediation management would be fully mature by the end of 2019.

100. Defendant Jalakian's presentations to the Board and Audit Committee recycled claims about programmatic improvements and continually extended timelines for implementation, yet the Individual Defendants ignored these red flags and allowed the number of unremediated vulnerabilities to continue to grow. The Individual Defendants' knowledge of the Company's disastrous vulnerability management practices is further evident by the close contact between Defendant Jalakian and the Board and Audit Committee. After its review of internal records and interview of the Company's CISO, Defendant Jalakian, and the Company's former Senior Director, Information Security,

Verified Shareholder Derivative Second Amended Complaint

NYSDFS concluded that "First American's CISO and senior personnel were *fully aware* of the disastrous state of First American's vulnerability management." (Emphasis added.) As Defendant Jalakian admitted on April 19, 2018, during a panel discussion in the Center for Digital Transformation conference at the University of California-Irvine entitled "Cybersecurity: Is There Such A Thing?" she frequently discussed the Company's cybersecurity issues with the Individual Defendants. Specifically, Defendant Jalakian stated that she "personally meet[s] with the board quarterly with the audit committee, also quarterly." Defendant Jalakian continued, stating that she "meet[s] with [First American's] CEO monthly, or more often as the need may arise" and that she "speak[s] to [First American's] shareholders regularly." Defendant Jalakian also stated "there are a lot of frequent touch points, which is the lay of the land today." Consequently, the Individual Defendants were aware of the Company's deficiencies, which went unremediated and which were also unrevealed to investors.

101.   As a result of the Individual Defendants' abdication of their duty to ensure the Company maintains proper vulnerability management practices and other sound cybersecurity practices, the Second Amended Charges reveal that by November 11, 2019, the Company had over 320,000 high or critical unremediated vulnerabilities. An additional 131,000 high or critical vulnerabilities requiring remediation were identified by December 2, 2019.

**Privacy Breach and Defendants' Lackluster Response**

102.   The cybersecurity flaw giving rise to the Privacy Breach was introduced in October 2014 during a Company update to EaglePro. Following the October 2014 update, the links distributed through EaglePro were all identical except for a portion of the Uniform Resource Locator ("URL")[3] that referred to and named the corresponding document's Image Document ID Number ("ID Number"). The documents in FAST were not subject to

---

[3] A URL is a reference to a web resource that specifies its location on a computer network and a mechanism for retrieving it. Colloquially, the term URL is simply referred to as a web address.

Verified Shareholder Derivative Second Amended Complaint

password protection or other access controls and were given sequential ID Numbers. Thus, by changing the ID Number in the URL by one or more digits, anyone who received a link from EaglePro to a document in the FAST repository, or who was able to ascertain the composition of the URL through other means, could view any document in FAST, dating back through 2003, regardless of whether the viewer was intended or authorized to have access to the document. Notably, the links delivered through EaglePro did not have an expiration date until May 2019, when the flaw was finally corrected. Thus, more than 850 million documents containing sensitive personal and financial information were available to anyone with the URL address for any single document provided by EaglePro.

103.   During a penetration test of the EaglePro's application in December 2018, First American's Cyber Defense Team uncovered the EaglePro cybersecurity flaw described above. On January 11, 2019, the Cyber Defense Team issued a final report of the EaglePro's penetration test which described the cybersecurity flaw and the Cyber Defense Team's investigation of same in detail. The report showed that more than 5,000 documents exposed by EaglePro had been indexed by Google for purposes related to its search engine, and it stated the following warning: "using standard Internet search methods *we were able to bypass authentication to retrieve documents that were found using Google searches*." Further, the report also recommended that the application team perform a thorough investigation to determine whether documents containing Personally Identifiable Information had been exposed. Nonetheless, the Company failed to perform said investigation or correct the cybersecurity flaw until after the publication of the May 2019 Article.

104.   On May 26, 2019, Forbes published an article titled, "Understanding the First American Financial Data Leak: How Did It Happen And What Does It Mean?" which depicted the potential ramifications of the Privacy Breach, stating that "[t]he trouble with a data exposure like the one at First American is that it's hard to pinpoint exactly how many people are actually affected" and that in the "worst case scenario" "every last one of those

files was captured, saved, and could be used in the future to target individuals and companies."

105.   On May 28, 2019, the Company issued a press release announcing that it had "shut down external access to a production environment with a reported design defect that created the potential for unauthorized access to customer data."

106.   On May 31, 2019, the Company issued an Incident Update to consumers which admitted that documents containing Personally Identifiable Information may have been exposed.

107.   On June 1, 2019, the Company's Vice President of Information Security sent an email which discussed the issues with the Company's controls pertaining to Personally Identifiable Information in EaglePro and also conceded that the Company's manual process for designating Personally Identifiable Information—i.e., while uploading documents, title agents would include "SEC" to the name of each file that needed to be protected (otherwise, it would not be protected)—was "highly prone to error."

108.   After the May 2019 Article was published, the Company conducted a forensic investigation of documents that were retained starting from June 2018. The investigation revealed that, during the eleven-month time period investigated, approximately 350,000 documents were accessed without authorization by automated "bots" or "scraper" programs designed to collect information on the Internet.

109.   Throughout the Relevant Period, the Individual Defendants failed to adequately protect the Personally Identifiable Information of First American customers and then concealed the Privacy Breach from the public without taking steps to correct the cybersecurity flaw until at least May 2019.

110.   Despite the tremendous gravity of the Privacy Breach, the Company's executive management rejected internal recommendations to improve the security of EaglePro *even after the Privacy Breach occurred*. Specifically, in June 2019, the Company's management defied the information security team's recommendations to

Verified Shareholder Derivative Second Amended Complaint

improve security. These recommendations were: (1) to modify EaglePro to limit access to authenticated users, and (2) to add two technical controls to protect Personally Identifiable Information, which would have disallowed transmission of tagged Personally Identifiable Information documents in EaglePro through unsecured links and conducted a comprehensive scan of FAST for documents that were not manually tagged to verify whether those documents contained Personally Identifiable Information. This disregard for the safety and security of customer's Personally Identifiable Information permeates the Company's culture and extends to the Individual Defendants themselves. In response to NYSDFS's inquiry regarding the reason that no additional controls were implemented to protect Personally Identifiable Information, Defendant Jalakian disclaimed responsibility, explaining that the information security department was not responsible for adopting such controls.

111.   Also, in violation of New York's cybersecurity regulations, the Company failed to timely encrypt documents containing Personally Identifiable Information. Specifically, the Company did not encrypt the tens of millions of documents tagged as containing Personally Identifiable Information until about December 2018, which was many months after the cybersecurity regulations went into effect. Further, the Company failed to encrypt the remainder of the documents in FAST until mid-2019 despite the Individual Defendants' knowledge since at least April 2018 that millions of those documents likely contained Personally Identifiable Information.

112.   A former First American employee identified in the Securities Class Action as "FE1" worked for the Company as a security engineer at the Company's headquarters in Santa Ana, California from July 2016 to November 2020 and reported to Cyber Defense Manager Christina Carson.

113.   FE1 was aware of the vulnerability in EaglePro upon his colleague, Senior Information Security Engineer John Rehagen, finding and documenting that during a December 2018 penetration test it was discovered that sensitive information was accessible

Verified Shareholder Derivative Second Amended Complaint

outside of the network. FE1 described the EaglePro vulnerability as a high severity incident and stated that it should have taken priority for remediation.

114.   First American's former director of information security from July 2018 to September 2020 who reported directly to Defendant Jalakian at the time of the Privacy Breach is identified in the Securities Class Action as "FE2." FE2 stated, First American did not start addressing the Privacy Breach until May 24, 2019, when the May 2019 Article was published.

115.   Throughout the Relevant Period, First American did not maintain control over its financial statements and operational statements. This caused the Company's annual and quarterly reports, and other statements described herein, throughout the Relevant Period to be materially false and misleading.

### *Value of Personally Identifiable Information*

116.   Since Personally Identifiable Information can be used to distinguish or trace an individual's identity, it is extremely valuable to cybercriminals who use that information to defraud individuals with compromised personal information. Identity thieves can use Personally Identifiable Information for many illicit purposes, including: to access additional sensitive information or financial accounts; harm victims by way of embarrassment, blackmail, or harassment (either in-person or on the Internet); or commit other types of fraud, such as obtaining identification cards, tax documents and refunds, or other government benefits. As recently as 2013, cybercrime was estimated to have cost approximately $113 billion.[4]

117.   Cybercriminals may also sell Personally Identifiable Information on the "dark web"[5] to buyers who can use a victim's information to gain access to different parts of a

---

[4] https://yle.fi/tvuutiset/uutiset/upics/liitetiedostot/norton_raportti.pdf. Last visited August 9, 2021.

[5] The dark web is an encrypted portion of the Internet that is not indexed by web search engines. Users of the dark web often conduct business anonymously without divulging identifying information. As a result, the dark web infamously hosts marketplaces for selling illegal things.

victim's digital life as well as target a victim's family, friends, acquaintances, and colleagues. Further, cybercriminals can also use Personally Identifiable Information to target victims with phishing scams.[6] Phishing scammers cost victims a collective $29.7 million in 2017 alone.[7]

118.   In 2017, the Federal Bureau of Investigation ("FBI") noted that the real estate sector was "heavily targeted" by cyberattacks that were often directed at victims during real estate transactions.[8] However, First American failed to heed the FBI's forewarnings and neglected to implement elementary cybersecurity standards to protect the Personally Identifiable Information of millions of its customers. Rather, Defendants concealed the true vulnerabilities permeating First American's information security and delayed disclosure of the ultimate data leak. Critically, consumers depend on the Company to protect their Personally Identifiable Information and other sensitive data according (at the very least) to its own assurances and legal obligations. First American relies heavily on its financial services and segments that collect such data and information, thus, the Individual Defendants should have known about the security and management issues facing the Company.

### Related Litigation & Investigations

### *Consumer Class Actions*

119.   Beginning on May 27, 2019, the Company was named as a defendant in a number of Consumer Class Actions in connection to the Privacy Breach, on behalf of classes of consumers whose Personally Identifiable Information was published/exposed on the Company's website, captioned *In Re First American Financial Corporation Cases*, Case Nos. 8:19-cv-01105, 8:19-cv-1180, 8:19-cv-01305, 8:19-cv-01533, seeking, *inter*

---

[6] Phishing is a type of online scam that targets consumers by sending them an email or text message that appears to be from a well-known source and asks the consumer to provide personal identifying information. The scammer then uses that information to invade a victim's existing accounts, open new accounts, or engage in other illicit activity.
[7] https://pdf.ic3.gov/2017_IC3Report.pdf. Last visited November 11, 2020.
[8] *Id.*

Verified Shareholder Derivative Second Amended Complaint

*alia*, to recover damages from First American for failing to maintain adequate security measures despite representations and promises that customers' Personally Identifiable Information would be safeguarded.

120.   On August 11, 2020, the District Court entered an order granting defendant's motion to compel arbitration.

121.   On November 17, 2020, the District Court denied reconsideration but granted a motion to dismiss all plaintiffs and claims pursuant to FRCP 41(a)(2).

122.   On December 17, 2020, at least three of the plaintiffs in the Consumer Class Actions filed a notice of appeal with the United States Court of Appeals for the Ninth Circuit.

123.   On July 16 and 19, 2021, the Ninth Circuit issued orders dismissing the appeals for lack of jurisdiction.

### SEC Investigation

124.   On or about August 7, 2019, the SEC opened a Matter Under Inquiry, captioned *In the Matter of First American Financial Corporation*, MLA-5054, relating to the Privacy Breach to determine whether federal securities laws had been violated with respect to the adequacy of the disclosures that the Company had made at the time of the incident and the adequacy of its disclosure controls. Thereafter, in September 2020, the SEC issued a Wells Notice to the Company advising First American that the SEC's enforcement staff had made a preliminary determination to recommend that the SEC file an enforcement action against the Company.

125.   On June 14, 2021, the SEC issued an order instituting cease-and-desist proceedings pursuant to Section 21C of the Exchange Act, making findings, and imposing a cease-and-desist order. The order stated that First American had violated Exchange Act Rule 13a-15(a), and it required that First American to cease and desist from committing or causing any violations and any future violations of Exchange Act Rule 13a-15. The order further required that First American pay a civil money penalty of $487,616.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*NYSDFS Enforcement Action*

126.   On July 21, 2020, the NYSDFS commenced the NYSDFS Enforcement Action against the Company's subsidiary with the filing of a Statement of Charges and Notice of Hearing, captioned *In the Matter of First American Title Insurance Company*, No. 32020-0030-C, seeking to impose a civil monetary penalty for the Company's violation of 23 N.Y.C.R.R. Part 500 arising out of First American's failure to safeguard millions of documents that contained and exposed consumers' Personally Identifiable Information on First American's website.

127.   On March 10, 2021, the NYSDFS filed an Amended Statement of Charges and Notice of Hearing which added allegations pertaining to the Company's lackluster vulnerability management program and various charges for violation of the state's cybersecurity regulations. On June 17, 2021, the NYSDFS filed the Second Amended Charges, which made minor revisions to the amended charges.

**False and Misleading Statements**

***February 17, 2017 Form 10-K***

128.   On February 17, 2017, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants Gilmore, Seaton, Kennedy, Doti, McCarthy, McKee, McKernan, and Oman, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

129.   The Risk Factors section of the 2016 10-K stated that unauthorized data disclosures "may" or "could" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's

website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Specifically, the 2016 10-K stated:

> ***The Company uses computer systems to receive, process, store and transmit business information, including highly sensitive non-public personal information as well as data from suppliers and other information upon which its business relies. It also uses these systems to manage substantial cash, investment assets, bank deposits, trust assets and escrow account balances on behalf of the Company and its customers, among other activities***. Many of the Company's products, services and solutions involving the use of real property related data are fully reliant on its systems and are only available electronically. Accordingly, for a variety of reasons, the ***integrity of the Company's computer systems and the protection of the information that resides on those systems are critically important to its successful operation***. The Company's core computer systems are primarily located in two data centers. The Company recently took over management of its primary data center and the secondary data center is maintained and managed by a third party.
>
> The Company's computer systems and systems used by its agents, suppliers and customers ***have been subject to, and are likely to continue to be the target of, computer viruses, cyber attacks, phishing attacks and other malicious activity***. These attacks have increased in frequency and sophistication in recent years, and could expose the Company to system-related damage, failures, interruptions, and other negative events. ***Further, certain other potential causes of system damage or other negative system-related events are wholly or partially beyond the Company's control***, such as natural disasters, vendor failures to satisfy service level requirements and power or telecommunications failures. ***These incidents, regardless of their underlying causes, could disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers***.

(Emphasis added.)

130.   Regarding the Company's internal controls, the 2016 10-K stated, in relevant part:

> Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2016. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control—Integrated Framework (2013)*. ***Based on that assessment under the framework in Internal Control—Integrated Framework (2013), management determined that, as of December 31, 2016, the Company's internal control over financial reporting was effective***.

(Emphasis added.)

### *April 27, 2017 Form 10-Q*

131.   On April 27, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2017 (the "1Q17 10-Q"). The 1Q17 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

132.   The 1Q17 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of March 31, 2017, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, ***the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective***, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.

\* \* \*

1

2

3

> *There was no change in the Company's internal control over*
> *financial reporting during the quarter ended March 31, 2017, that*
> *has materially affected, or is reasonably likely to materially affect, the*
> *Company's internal control over financial reporting.*

4

5

(Emphasis added.)

6

7

8

9

10

11

    133.   The Risk Factors section of the 1Q17 10-Q stated that unauthorized data disclosures "may" or "could" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Specifically, the 1Q17 10-Q stated:

12

13

14

15

16

17

18

19

20

21

22

> *The Company uses computer systems to receive, process, store and*
> *transmit business information, including highly sensitive non-public*
> *personal information as well as data from suppliers and other*
> *information upon which its business relies. It also uses these systems*
> *to manage substantial cash, investment assets, bank deposits, trust*
> *assets and escrow account balances on behalf of the Company and its*
> *customers, among other activities.* Many of the Company's products,
> services and solutions involving the use of real property related data are
> fully reliant on its systems and are only available
> electronically. Accordingly, for a variety of reasons, the *integrity of*
> *the Company's computer systems and the protection of the*
> *information that resides on those systems are critically important to*
> *its successful operation.* The Company's core computer systems are
> primarily located in two data centers. The Company manages its
> primary data center and the secondary data center is maintained and
> managed by a third party.

23

24

25

26

27

28

> The Company's computer systems and systems used by its agents,
> suppliers and customers *have been subject to, and are likely to*
> *continue to be the target of, computer viruses, cyber attacks, phishing*
> *attacks and other malicious activity.* These attacks have increased in
> frequency and sophistication in recent years, and could expose the
> Company to system-related damage, failures, interruptions, and other
> negative events. *Further, certain other potential causes of system*
> *damage or other negative system-related events are wholly or partially*

*beyond the Company's control*, such as natural disasters, vendor failures to satisfy service level requirements and power or telecommunications failures. *These incidents, regardless of their underlying causes, could disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers*.

(Emphasis added.)

### May 3, 2017 Florida Legal Eagle

134.   On or about May 3, 2017, Defendant Jalakian stated the following in a feature article titled "Executive Spotlight: Shabnam Jalakian" that was published in Florida Legal Eagle, Volume VII, Defendant Jalakian stated the following:

*First American has established a formal information security program, led by the Corporate Information Security office, to continuously oversee and strengthen our security and privacy practices. This is accomplished by implementing fundamentally sound security policies as well as repeatable processes, best-of-breed technology solutions, and regular awareness training*. The objective of information security is to support the business and maximize stakeholder benefit while protecting the information assets of both the Company and its customers from all relevant threats.

(Emphasis added.)

135.   Moreover, Defendant Jalakian also represented that First American was "serious" about "the protection of information [consumers] entrust in [the Company's] care," and urged First American's underwriters "to be security evangelists for [the Company's] customers and borrowers who may not have the same level of security protections at their disposal" purportedly in comparison with the Company's customers.

136.   Upon information and belief, the foregoing statements and article were circulated and republished in the following publications: Agency Today, Agency Connect,

Agent Angle, Florida Legal Eagle, The Pronghorn Press, Illinois Hot Topics, Vermont Spotlight, and Big Sky Review.

137.   The statements referenced in ¶¶134-135 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Defendant Jalakian failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the Privacy Breach or the full extent and cause of the Privacy Breach; (3) that First American did not implement "best-of-breed technology solutions" to protect sensitive Personally Identifiable Information; (4) that the Company failed to timely encrypt the relevant documents containing Personally Identifiable Information; (5) that First American lacked adequate controls or a system that was not "highly prone to error" to properly classify or protect Personally Identifiable Information; (6) that First American's Corporate Information Security Office did not "continuously oversee and strengthen … security and privacy practices;" and (7) that neither First American, Defendant Jalakian, nor First American's Corporate Information Security Office adopted and implemented basic policies and procedures that were widely used and necessary to "protect[] the information assets of both First American and its customers from all relevant threats."

### *May 17, 2017 Barclays Americas Select Conference*

138.   On May 17, 2017, during the Barclays Americas Select Conference, Defendant Seaton stated that the Company:

> [S]pend[s] about $130 million a year in capital expenditures. And that's about as much as we could spend responsibly. ***So we spend that in technology, in customer-facing technology to make it easier for our customers to do business with us. We spend capital on building our databases, to make our business more efficient***. That's our #1 priority is to continue to build our business organically.

(Emphasis added.)

139.   The statement referenced in ¶138 was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Defendant Seaton failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the Privacy Breach or the full extent and cause of the Privacy Breach; and (3) the Company's technology program did not strengthen its relationships with its customers and, in fact, compromised those relationships by exposing the customers' Personally Identifiable Information.

### *July 27, 2017 Form 10-Q*

140.   On July 27, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2017 (the "2Q17 10-Q"). The 2Q17 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

141.   The 2Q17 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of June 30, 2017, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, ***the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective***, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.
>
> * * *
>
> ***There was no change in the Company's internal control over financial reporting during the quarter ended June 30, 2017, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting***.

(Emphasis added.)

142.   The Risk Factors section of the 2Q17 10-Q stated that unauthorized data disclosures "may" or "could" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Specifically, the 2Q17 10-Q stated:

> *The Company uses computer systems to receive, process, store and transmit business information, including highly sensitive non-public personal information as well as data from suppliers and other information upon which its business relies. It also uses these systems to manage substantial cash, investment assets, bank deposits, trust assets and escrow account balances on behalf of the Company and its customers, among other activities*. Many of the Company's products, services and solutions involving the use of real property related data are fully reliant on its systems and are only available electronically. Accordingly, for a variety of reasons, the *integrity of the Company's computer systems and the protection of the information that resides on those systems are critically important to its successful operation*. The Company's core computer systems are primarily located in two data centers. The Company manages its primary data center and the secondary data center is maintained and managed by a third party.
>
> The Company's computer systems and systems used by its agents, suppliers and customers *have been subject to, and are likely to continue to be the target of, computer viruses, cyber attacks, phishing attacks and other malicious activity*. These attacks have increased in frequency and sophistication in recent years, and could expose the Company to system-related damage, failures, interruptions, and other negative events. *Further, certain other potential causes of system damage or other negative system-related events are wholly or partially beyond the Company's control*, such as natural disasters, vendor failures to satisfy service level requirements and power or telecommunications failures. *These incidents, regardless of their underlying causes, could disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring*

*or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers*.

(Emphasis added.)

### October 26, 2017 Form 10-Q

143.   On October 26, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2017 (the "3Q17 10-Q"). The 3Q17 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

144.   The 3Q17 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of September 30, 2017, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, *the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective*, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.
>
> * * *
>
> *There was no change in the Company's internal control over financial reporting during the quarter ended September 30, 2017, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting*.

(Emphasis added.)

145.   The Risk Factors section of the 3Q17 10-Q stated that unauthorized data disclosures "may" or "could" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's

Verified Shareholder Derivative Second Amended Complaint

website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Specifically, the 3Q17 10-Q stated:

> ***The Company uses computer systems to receive, process, store and transmit business information, including highly sensitive non-public personal information as well as data from suppliers and other information upon which its business relies. It also uses these systems to manage substantial cash, investment assets, bank deposits, trust assets and escrow account balances on behalf of the Company and its customers, among other activities***. Many of the Company's products, services and solutions involving the use of real property related data are fully reliant on its systems and are only available electronically. Accordingly, for a variety of reasons, the ***integrity of the Company's computer systems and the protection of the information that resides on those systems are critically important to its successful operation***. The Company's core computer systems are primarily located in a data center it manages and secondarily in a disaster recovery data center maintained by a third party. The Company is currently engaged in a multi-year process of transitioning to third party cloud-based hosting of its computer systems.
>
> The Company's computer systems and systems used by its agents, suppliers and customers ***have been subject to, and are likely to continue to be the target of, computer viruses, cyber attacks, phishing attacks and other malicious activity***. These attacks have increased in frequency and sophistication in recent years. ***Further, certain other potential causes of system damage or other negative system-related events are wholly or partially beyond the Company's control***, such as natural disasters, vendor failures to satisfy service level requirements and power or telecommunications failures. ***These incidents, regardless of their underlying causes, could expose the Company to system-related damage, failures, interruptions, and other negative events or could otherwise disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers***.

(Emphasis added.)

---

*2017 First American Website*

146.   In 2017, regarding "Privacy Information," the Company's website stated the following in relevant part.[9]

**We Are Committed to Safeguarding Customer Information**

In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our subsidiaries we have adopted this Privacy Policy to govern the use and handling of your personal information.

\* \* \*

**Types of Information**
Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:
- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
- Information about your transactions with us, our affiliated companies, or others; and
- Information we receive from a customer reporting agency.

**Use of Information**
We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed

---

[9]http://web.archive.org/web/20171128123534/http://www.firstam.com:80/privacy policy/index.html. Last visited November 11, 2020.

Verified Shareholder Derivative Second Amended Complaint

above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies and escrow companies.

\* \* \*

**Former Customers**
Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

**Confidentiality and Security**
***We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you.*** We will use our best efforts to train and oversee our employees and agents to ***ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards*** that comply with federal regulations to guard your nonpublic personal information.

**Information Obtained Through Our Web Site**
First American Financial Corporation is sensitive to privacy issues on the Internet…

**Fair Information Values**
**Fairness** We consider consumer expectations about their privacy in all our businesses. We only offer products and services that assure a favorable balance between consumer benefits and consumer privacy.

**Public Record** We believe that an open public record creates significant value for society, enhances consumer choice and creates consumer opportunity. We actively support an open public record and emphasize its importance and contribution to our economy.

Verified Shareholder Derivative Second Amended Complaint

**Use** *We believe we should behave responsibly when we use information about a consumer in our business.* We will obey the laws governing the collection, use and dissemination of data.

**Accuracy** We will take reasonable steps to help assure the accuracy of the data we collect, use and disseminate. Where possible, we will take reasonable steps to correct inaccurate information. When, as with the public record, we cannot correct inaccurate information, we will take all reasonable steps to assist consumers in identifying the source of the erroneous data so that the consumer can secure the required corrections.

**Education** *We endeavor to educate the users of our products and services, our employees and others in our industry about the importance of consumer privacy.* We will instruct our employees on our fair information values and on the responsible collection and use of data. We will encourage others in our industry to collect and use information in a responsible manner.

**Security** *We will maintain appropriate facilities and systems to protect against unauthorized access to and corruption of the data we maintain.*

(Emphasis added.)

147.    The statements referenced in ¶146 were materially false and misleading and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the Privacy Breach or the full extent and cause of the Privacy Breach; (3) the Company did not use best efforts to ensure that no unauthorized parties had access to any customer information; and (4) the Company did not maintain appropriate systems to protect against unauthorized access of the data it maintained.

### February 16, 2018 Form 10-K

148.    On February 16, 2018, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-

K was signed by Defendants Gilmore, Seaton, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan, Oman, and non-party Virginia M. Ueberroth, and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

149.   The Risk Factors section of the 2017 10-K stated that unauthorized data disclosures "may" or "could" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Specifically, the 2017 10-K stated:

> ***The Company uses computer systems to receive, process, store and transmit business information, including highly sensitive non-public personal information as well as data from suppliers and other information upon which its business relies. It also uses these systems to manage substantial cash, investment assets, bank deposits, trust assets and escrow account balances on behalf of the Company and its customers, among other activities***. Many of the Company's products, services and solutions involving the use of real property related data are fully reliant on its systems and are only available electronically. Accordingly, for a variety of reasons, the ***integrity of the Company's computer systems and the protection of the information that resides on those systems are critically important to its successful operation***. The Company's core computer systems are primarily located in a data center it manages and secondarily in a disaster recovery data center maintained by a third party. The Company is currently engaged in a multi-year process of transitioning to third party cloud-based hosting of its computer systems.
>
> The Company's computer systems and systems used by its agents, suppliers and customers ***have been subject to, and are likely to continue to be the target of, computer viruses, cyber attacks, phishing attacks and other malicious activity***. These attacks have increased in

frequency and sophistication in recent years. *Further, certain other potential causes of system damage or other negative system-related events are wholly or partially beyond the Company's control*, such as natural disasters, vendor failures to satisfy service level requirements and power or telecommunications failures. *These incidents, regardless of their underlying causes, could expose the Company to system-related damage, failures, interruptions, and other negative events or could otherwise disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers*.

Certain laws and contracts the Company has entered into require it to notify various parties, including consumers or customers, *in the event of certain actual or potential data breaches or systems failures*. These notifications can result, among other things, in the loss of customers, lawsuits, adverse publicity, diversion of management's time and energy, the attention of regulatory authorities, fines and disruptions in sales. Further, the Company's financial institution customers have obligations to safeguard their computer systems and sensitive information and it may be bound contractually and/or by regulation to comply with the same requirements. *If the Company fails to comply with applicable regulations and contractual requirements, it could be exposed to lawsuits, governmental proceedings or the imposition of fines, among other consequences*.

(Emphasis added.)

150.   Regarding the Company's internal controls, the 2017 10-K stated, in relevant part:

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2017. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control—Integrated Framework (2013). *Based on that assessment under the framework in Internal Control—Integrated Framework (2013), management determined that, as of December 31, 2017, the Company's internal control over financial reporting was effective.*

(Emphasis added.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### March 30, 2018 Proxy Statement

151.   On March 30, 2018, the Company filed its Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Gilmore, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan, and Oman solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

152.   With respect to the Company's Code of Ethics, the 2018 Proxy Statement stated that it applies "to all employees, officers and directors."

153.   The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

154.   The 2018 Proxy Statement called for, among other things: (1) the election of two directors; (2) shareholder approval, on an advisory basis, of the Company's executive compensation; and (3) the ratification of the Company's independent auditors.

155.   The Individual Defendants caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that it stated that the Individual Defendants purportedly employed "pay-for-performance" elements, including linking incentive award opportunities that provided "a strong alignment between the interests of executive officers and long-term stockholders[]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

156.   The 2018 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the Privacy Breach or the full extent and cause of the Privacy Breach; (3) as a result of the Company's failure to implement basic policies and comply with its own cybersecurity policies and state

regulations, First American was subjected to an increased threat of a cybersecurity breakdown; (4) consequently, the Company was subject to an elevated risk of regulatory scrutiny and customer liability; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *April 19, 2018 Panel Discussion*

157.   On April 19, 2018, Defendant Jalakian spoke on a panel titled: "Cybersecurity: Is There Such A Thing?" at the Center for Digital Transformation at University of California Irvine. Defendant Jalakian stated the following, in pertinent part:

> So, the strategy that works for us, we... Again, technical tools, we employ a number of them. We spend millions of dollars a year on technical security, but I think what is really critical is identifying key business processes in a company. So, where does your money come from? Where do you collect data from? So, really understanding the business from the perspective of people who do the work and bring the money and the data in. And then figuring out what are the crown jewels that need the most amount of security. Again, in our case we collect a lot of publicly available data. Okay. *So the security we apply to that layer of data is clearly different than the layer of security we apply to information that belongs to our customers. That belongs to the lenders that we deal with*.

(Emphasis added.)

158.   The statement referenced in ¶157 was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the Privacy Breach or the full extent and cause of the Privacy Breach; (3) Defendant Jalakian did not "understand[] the business from the perspective of people who do the work and bring the money and the data in;" and (4) First American failed to provide any added layer of protection to customer Personally Identifiable Information.

*April 26, 2018 Form 10-Q*

159.   On April 26, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2018 (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

160.   The 1Q18 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of March 31, 2018, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, *the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective*, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.
>
> * * *
>
> *There was no change in the Company's internal control over financial reporting during the quarter ended March 31, 2018, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting*.

(Emphasis added.)

161.   The Risk Factors section of the 1Q18 10-Q stated that unauthorized data disclosures "may" or "could" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Specifically, the 1Q18 10-Q stated:

Verified Shareholder Derivative Second Amended Complaint

*The Company uses computer systems and other technologies (collectively referred to as "systems"), some of which it owns and manages and some of which are owned and/or managed by third parties, including providers of distributed computing infrastructure platforms commonly known as the "cloud." The Company and its agents, suppliers and customers use these systems to receive, process, store and transmit business information, including highly sensitive non-public personal information as well as data from suppliers and other information upon which the Company's business relies. The Company also uses these systems to manage substantial cash, investment assets, bank deposits, trust assets and escrow account balances on behalf of itself and its customers, among other activities.* Many of the Company's products, services and solutions involving the use of real property related data are fully reliant on these systems and are only available electronically. Accordingly, for a variety of reasons, the *integrity of these systems and the protection of the information that resides thereon are critically important to the Company's successful operation*.

These systems *have been subject to, and are likely to continue to be the target of, computer viruses, cyber attacks, phishing attacks and other malicious activity*. These attacks have increased in frequency and sophistication in recent years. *Further, certain other potential causes of system damage or other negative system-related events are wholly or partially beyond the Company's control*, such as natural disasters, vendor failures to satisfy service level requirements and power or telecommunications failures. *These incidents, regardless of their underlying causes, could expose the Company to system-related damages, failures, interruptions, and other negative events or could otherwise disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers*.

Certain laws and contracts the Company has entered into require it to notify various parties, including consumers or customers, *in the event of certain actual or potential data breaches or systems failures*. These notifications can result, among other things, in the loss of customers, lawsuits, adverse publicity, diversion of management's time and energy, the attention of regulatory authorities, fines and disruptions in sales. Further, the Company's financial institution customers have

Verified Shareholder Derivative Second Amended Complaint

obligations to safeguard their systems and sensitive information and the Company may be bound contractually and/or by regulation to comply with the same requirements. ***If the Company fails to comply with applicable regulations and contractual requirements, it could be exposed to lawsuits, governmental proceedings or the imposition of fines, among other consequences***.

(Emphasis added.)

### July 26, 2018 Form 10-Q

162.    On July 26, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

163.    The 2Q18 10-Q stated the following regarding the Company's controls and procedures:

The Company's chief executive officer and chief financial officer have concluded that, as of June 30, 2018, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, ***the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective***, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.

* * *

***There was no change in the Company's internal control over financial reporting during the quarter ended June 30, 2018, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.***

(Emphasis added.)

164.    The Risk Factors section of the 2Q18 10-Q stated that unauthorized data disclosures "may" or "could" cause, among other things, business disruption and harm to

the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Specifically, the 2Q18 10-Q stated:

> *The Company uses computer systems and other technologies (collectively referred to as "systems"), some of which it owns and manages and some of which are owned and/or managed by third parties, including providers of distributed computing infrastructure platforms commonly known as the "cloud." The Company and its agents, suppliers, service providers, and customers use these systems to receive, process, store and transmit business information, including highly sensitive non-public personal information as well as data from suppliers and other information upon which the Company's business relies*. *The Company also uses these systems to manage substantial cash, investment assets, bank deposits, trust assets and escrow account balances on behalf of itself and its customers, among other activities*. Many of the Company's products, services and solutions involving the use of real property related data are fully reliant on these systems and are only available electronically. Accordingly, for a variety of reasons, the *integrity of these systems and the protection of the information that resides thereon are critically important to the Company's successful operation*.

> These systems *have been subject to, and are likely to continue to be the target of, computer viruses, cyber attacks, phishing attacks and other malicious activity*. These attacks have increased in frequency and sophistication in recent years. *Further, certain other potential causes of system damage or other negative system-related events are wholly or partially beyond the Company's control*, such as natural disasters, vendor failures to satisfy service level requirements and power or telecommunications failures. *These incidents, regardless of their underlying causes, could expose the Company to system-related damages, failures, interruptions, and other negative events or could otherwise disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers*.

Certain laws and contracts the Company has entered into require it to notify various parties, including consumers or customers, ***in the event of certain actual or potential data breaches or systems failures***.  These notifications can result, among other things, in the loss of customers, lawsuits, adverse publicity, diversion of management's time and energy, the attention of regulatory authorities, fines and disruptions in sales. Further, the Company's financial institution customers have obligations to safeguard their systems and sensitive information and the Company may be bound contractually and/or by regulation to comply with the same requirements. ***If the Company fails to comply with applicable regulations and contractual requirements, it could be exposed to lawsuits, governmental proceedings or the imposition of fines, among other consequences***.

(Emphasis added.)

### October 25, 2018 Form 10-Q

165.   On October 25, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

166.   The 3Q18 10-Q stated the following regarding the Company's controls and procedures:

The Company's chief executive officer and chief financial officer have concluded that, as of September 30, 2018, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, ***the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective***, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.

* * *

63

Verified Shareholder Derivative Second Amended Complaint

*There was no change in the Company's internal control over financial reporting during the quarter ended September 30, 2018, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.*

(Emphasis added.)

167.   The Risk Factors section of the 3Q18 10-Q stated that unauthorized data disclosures "may" or "could" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Specifically, the 3Q18 10-Q stated:

*The Company uses computer systems and other technologies (collectively referred to as "systems"), some of which it owns and manages and some of which are owned and/or managed by third parties, including providers of distributed computing infrastructure platforms commonly known as the "cloud." The Company and its agents, suppliers, service providers, and customers use these systems to receive, process, store and transmit business information, including highly sensitive non-public personal information as well as data from suppliers and other information upon which the Company's business relies. The Company also uses these systems to manage substantial cash, investment assets, bank deposits, trust assets and escrow account balances on behalf of itself and its customers, among other activities.* Many of the Company's products, services and solutions involving the use of real property related data are fully reliant on these systems and are only available electronically. Accordingly, for a variety of reasons, the *integrity of these systems and the protection of the information that resides thereon are critically important to the Company's successful operation.*

These systems *have been subject to, and are likely to continue to be the target of, computer viruses, cyber attacks, phishing attacks and other malicious activity*. These attacks have increased in frequency and sophistication in recent years. *Further, certain other potential causes*

*of system damage or other negative system-related events are wholly or partially beyond the Company's control*, such as natural disasters, vendor failures to satisfy service level requirements and power or telecommunications failures. *These incidents, regardless of their underlying causes, could expose the Company to system-related damages, failures, interruptions, and other negative events or could otherwise disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers*.

Certain laws and contracts the Company has entered into require it to notify various parties, including consumers or customers, *in the event of certain actual or potential data breaches or systems failures*. These notifications can result, among other things, in the loss of customers, lawsuits, adverse publicity, diversion of management's time and energy, the attention of regulatory authorities, fines and disruptions in sales. Further, the Company's financial institution customers have obligations to safeguard their systems and sensitive information and the Company may be bound contractually and/or by regulation to comply with the same requirements. *If the Company fails to comply with applicable regulations and contractual requirements, it could be exposed to lawsuits, governmental proceedings or the imposition of fines, among other consequences*.

(Emphasis added.)

### 2018 First American Website

168.   In 2018, regarding "Privacy Information," the Company's website stated the following in relevant part:[10]

In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us.

---

[10]http://web.archive.org/web/20181003145825/http://www.firstam.com/privacy-policy/index.html. Last visited November 11, 2020.

Verified Shareholder Derivative Second Amended Complaint

Therefore, together with our subsidiaries we have adopted this Privacy Policy to govern the use and handling of your personal information.

\* \* \*

**Types of Information**

Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:

- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
- Information about your transactions with us, our affiliated companies, or others; and
- Information we receive from a customer reporting agency.

**Use of Information**

We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies and escrow companies.

\* \* \*

**Former Customers**

Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

**Confidentiality and Security**

Verified Shareholder Derivative Second Amended Complaint

*We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you.* We will use our best efforts to train and oversee our employees and agents to *ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards* that comply with federal regulations to guard your nonpublic personal information.

**Information Obtained Through Our Web Site**
First American Financial Corporation is sensitive to privacy issues on the Internet…

**Fair Information Values**
**Fairness** We consider consumer expectations about their privacy in all our businesses. We only offer products and services that assure a favorable balance between consumer benefits and consumer privacy.

**Public Record** We believe that an open public record creates significant value for society, enhances consumer choice and creates consumer opportunity. We actively support an open public record and emphasize its importance and contribution to our economy.

**Use** *We believe we should behave responsibly when we use information about a consumer in our business.* We will obey the laws governing the collection, use and dissemination of data.

**Accuracy** We will take reasonable steps to help assure the accuracy of the data we collect, use and disseminate. Where possible, we will take reasonable steps to correct inaccurate information. When, as with the public record, we cannot correct inaccurate information, we will take all reasonable steps to assist consumers in identifying the source of the erroneous data so that the consumer can secure the required corrections.

**Education** *We endeavor to educate the users of our products and services, our employees and others in our industry about the importance of consumer privacy.* We will instruct our employees on our fair information values and on the responsible collection and use of

data. We will encourage others in our industry to collect and use information in a responsible manner.

**Security** *We will maintain appropriate facilities and systems to protect against unauthorized access to and corruption of the data we maintain.*

(Emphasis added.)

169.   Also in 2018, the Company's website stated the following in relevant part:[11]

Post-Closing Document Management
Let us store your records in our secure facility that is monitored 24-hours a day. And, of course, you always have online access to your and your customers' documents, any time, day or night.

\* \* \*

Secure Document Storage

*We offer secure, reliable, and affordable records storage solutions for your needs of any size to help you manage active mortgage collateral files.*

- Imaged Documents Reviewed for Deficiencies (capture critical data elements, report missing documents & interfile trailing documents)
- State-of-the-art Document Tracking System
- Online Access for Document Viewing, Shipping Request Fulfillment & Client-specific Inventory Reports
- *Secure Facility Monitored 24-hours a day[.]*

(Emphasis added.)

---

[11] http://web.archive.org/web/20180226110454/https://www.firstam.com/mortgagesolutions/solutions/cleanfile-solutions/document-management.html. Last visited November 11, 2020.

170.  Also in 2018, the Company's website stated the following in relevant part: ***"Secure access to files which provides our clients with detailed information concerning their REO property closing status."*** (Emphasis added.)

171.   The statements referenced in ¶¶168-170 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, it failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the Privacy Breach or the full extent and cause of the Privacy Breach; (3) the Company did not use best efforts to ensure that no unauthorized parties had access to any customer information; (4) the Company did not maintain appropriate facilities and systems to protect against unauthorized access to the data it maintained; and (5) access to documents with detailed information was not secured.

### February 20, 2019 Form 10-K

172.   On February 20, 2019, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Gilmore, Seaton, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan, Oman, and Wyrsch, and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

173.   The Risk Factors section of the 2018 10-K stated that unauthorized data disclosures "may" or "could" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Specifically, the 2018 10-K stated:

***The Company uses computer systems and other technologies (collectively referred to as "systems"), some of which it owns and manages and some of which are owned and/or managed by third***

*parties, including providers of distributed computing infrastructure platforms commonly known as the "cloud." The Company and its agents, suppliers, service providers, and customers use these systems to receive, process, store and transmit business information, including highly sensitive non-public personal information as well as data from suppliers and other information upon which the Company's business relies.  The Company also uses these systems to manage substantial cash, investment assets, bank deposits, trust assets and escrow account balances on behalf of itself and its customers, among other activities*. Many of the Company's products, services and solutions involving the use of real property related data are fully reliant on these systems and are only available electronically. Accordingly, for a variety of reasons, the *integrity of these systems and the protection of the information that resides thereon are critically important to the Company's successful operation*.

These systems *have been subject to, and are likely to continue to be the target of, computer viruses, cyber attacks, phishing attacks and other malicious activity*. These attacks have increased in frequency and sophistication in recent years. *Further, certain other potential causes of system damage or other negative system-related events are wholly or partially beyond the Company's control*, such as natural disasters, vendor failures to satisfy service level requirements and power or telecommunications failures. *These incidents, regardless of their underlying causes, could expose the Company to system-related damages, failures, interruptions, and other negative events or could otherwise disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers*.

Certain laws and contracts the Company has entered into require it to notify various parties, including consumers or customers, *in the event of certain actual or potential data breaches or systems failures*.  These notifications can result, among other things, in the loss of customers, lawsuits, adverse publicity, diversion of management's time and energy, the attention of regulatory authorities, fines and disruptions in sales. Further, the Company's financial institution customers have obligations to safeguard their systems and sensitive information and the Company may be bound contractually and/or by regulation to comply

with the same requirements. ***If the Company fails to comply with applicable regulations and contractual requirements, it could be exposed to lawsuits, governmental proceedings or the imposition of fines, among other consequences***.

(Emphasis added.)

174.   Regarding the Company's internal controls, the 2018 10-K stated, in relevant part:

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2018. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control—Integrated Framework (2013). ***Based on that assessment under the framework in Internal Control—Integrated Framework (2013), management determined that, as of December 31, 2018, the Company's internal control over financial reporting was effective***.

(Emphasis added.)

***March 29, 2019 Proxy Statement***

175.   On March 29, 2019, the Company filed its Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Gilmore, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan, Oman, and Wyrsch solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[12]

176.   With respect to the Company's Code of Ethics, the 2019 Proxy Statement stated that it applies "to all employees, officers and directors."

177.   The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the

---

[12] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

178. The 2019 Proxy Statement also called for, among other things: (1) the election of three directors; (2) shareholder approval, on an advisory basis, of the Company's executive compensation; and (3) the ratification of the Company's independent auditors.

179. The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that it stated that the Individual Defendants purportedly employed "pay-for-performance" elements, including linking incentive award opportunities that provided "a strong alignment between the interests of executive officers and long-term stockholders[]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

180. The 2019 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the Privacy Breach or the full extent and cause of the Privacy Breach; (3) as a result of the Company's failure to implement basic policies and comply with its own cybersecurity policies and state regulations, First American was subjected to an increased threat of a cybersecurity breakdown; (4) consequently, the Company was subject to an elevated risk of regulatory scrutiny and customer liability; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### April 25, 2019 Form 10-Q

181. On April 25, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications

signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

182.   The 1Q19 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of March 31, 2019, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, *the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective*, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.
>
> *   *   *
>
> *There was no change in the Company's internal control over financial reporting during the quarter ended March 31, 2019, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting*.

(Emphasis added.)

183.   The Risk Factors section of the 2018 10-K stated that unauthorized data disclosures "may" or "could" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Specifically, the 2018 10-K stated:

> *Company uses computer systems and other technologies (collectively referred to as "systems"), some of which it owns and manages and some of which are owned and/or managed by third parties, including providers of distributed computing infrastructure platforms commonly known as the "cloud." The Company and its agents, suppliers, service providers, and customers use these systems to*

*receive, process, store and transmit business information, including highly sensitive non-public personal information as well as data from suppliers and other information upon which the Company's business relies. The Company also uses these systems to manage substantial cash, investment assets, bank deposits, trust assets and escrow account balances on behalf of itself and its customers, among other activities*. Many of the Company's products, services and solutions involving the use of real property related data are fully reliant on these systems and are only available electronically. Accordingly, for a variety of reasons, the ***integrity of these systems and the protection of the information that resides thereon are critically important to the Company's successful operation***.

These systems ***have been subject to, and are likely to continue to be the target of, computer viruses, cyber attacks, phishing attacks and other malicious activity***. These attacks have increased in frequency and sophistication in recent years. ***Further, certain other potential causes of system damage or other negative system-related events are wholly or partially beyond the Company's control***, such as natural disasters, vendor failures to satisfy service level requirements and power or telecommunications failures. ***These incidents, regardless of their underlying causes, could expose the Company to system-related damages, failures, interruptions, and other negative events or could otherwise disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers***.

Certain laws and contracts the Company has entered into require it to notify various parties, including consumers or customers, ***in the event of certain actual or potential data breaches or systems failures***. These notifications can result, among other things, in the loss of customers, lawsuits, adverse publicity, diversion of management's time and energy, the attention of regulatory authorities, fines and disruptions in sales. Further, the Company's financial institution customers have obligations to safeguard their systems and sensitive information and the Company may be bound contractually and/or by regulation to comply with the same requirements. ***If the Company fails to comply with applicable regulations and contractual requirements, it could be exposed to lawsuits, governmental proceedings or the imposition of fines, among other consequences***.

(Emphasis added.)

***2019 First American Website***

184.   In 2019, regarding "Privacy Information," the Company's website stated the following in relevant part:[13]

> In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our subsidiaries we have adopted this Privacy Policy to govern the use and handling of your personal information.

> * * *

> **Types of Information**
> Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:
> - Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
> - Information about your transactions with us, our affiliated companies, or others; and
> - Information we receive from a consumer reporting agency.

> **Use of Information**
> We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated

---

[13] http://web.archive.org/web/20190525235150/https://www.firstam.com/privacy-policy/index.html. Last visited November 11, 2020.

Verified Shareholder Derivative Second Amended Complaint

companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies and escrow companies.

\* \* \*

**Former Customers**
Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

**Confidentiality and Security**
*We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you.* We will use our best efforts to train and oversee our employees and agents to *ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards* that comply with federal regulations to guard your nonpublic personal information.

**Information Obtained Through Our Web Site**
First American Financial Corporation is sensitive to privacy issues on the Internet…

**Fair Information Values**
**Fairness** We consider consumer expectations about their privacy in all our businesses. We only offer products and services that assure a favorable balance between consumer benefits and consumer privacy.

**Public Record** We believe that an open public record creates significant value for society, enhances consumer choice and creates consumer opportunity. We actively support an open public record and emphasize its importance and contribution to our economy.

**Use** *We believe we should behave responsibly when we use information about a consumer in our business.* We will obey the laws governing the collection, use and dissemination of data.

**Accuracy** We will take reasonable steps to help assure the accuracy of the data we collect, use and disseminate. Where possible, we will take reasonable steps to correct inaccurate information. When, as with the public record, we cannot correct inaccurate information, we will take all reasonable steps to assist consumers in identifying the source of the erroneous data so that the consumer can secure the required corrections.

**Education** *We endeavor to educate the users of our products and services, our employees and others in our industry about the importance of consumer privacy.* We will instruct our employees on our fair information values and on the responsible collection and use of data. We will encourage others in our industry to collect and use information in a responsible manner.

**Security** *We will maintain appropriate facilities and systems to protect against unauthorized access to and corruption of the data we maintain.*

(Emphasis added.)

185.   The statements referenced in ¶184 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, it failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the Privacy Breach or the full extent and cause of the Privacy Breach; (3) the Company did not use best efforts to ensure that no unauthorized parties had access to any customer information; and (4) the Company did not maintain appropriate facilities and systems to protect against unauthorized access to the data it maintained.

186.   The statements made on Forms 10-Q and 10-K that are referenced in ¶¶129-130, 132-133, 141-142, 144-145, 149-150, 160-161, 163-164, 166-167, 173-174, and 182-183 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the Privacy Breach or the full extent and cause of

the Privacy Breach; (3) as a result of the Company's failure to implement basic policies and comply with its own cybersecurity policies and state regulations, First American was subjected to an increased threat of a cybersecurity breakdown; (4) consequently, the Company was subject to an elevated risk of regulatory scrutiny and customer liability; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**<u>The Truth Begins to Emerge as False and Misleading Statements Continue</u>**

***May 24, 2019 KrebsOnSecurity Article***

187.   On May 24, 2019, KrebsOnSecurity, a nationally recognized cybersecurity blog, published the May 2019 Article titled, "First American Financial Corp. Leaked Hundreds of Millions of Title Insurance Records." The May 2019 Article reported that First American had "leaked hundreds of millions of documents related to mortgage deals going back to 2003." The May 2019 Article continued to provide details of the Privacy Breach and stated the following, in relevant part.

> The digitized records — including bank account numbers and statements, mortgage and tax records, Social Security numbers, wire transaction receipts, and drivers license images — were available without authentication to anyone with a Web browser.

> Earlier this week, KrebsOnSecurity was contacted by a real estate developer in Washington state who said he'd had little luck getting a response from the company about what he found, which was that a portion of its Web site (firstam.com) was leaking tens if not hundreds of millions of records. He said anyone who knew the URL for a valid document at the Web site could view other documents just by modifying a single digit in the link.

> And this would potentially include anyone who's ever been sent a document link via email by First American.

> KrebsOnSecurity confirmed the real estate developer's findings, which indicate that First American's Web site exposed approximately 885

million files, the earliest dating back more than 16 years. No authentication was required to read the documents.

Many of the exposed files are records of wire transactions with bank account numbers and other information from home or property buyers and sellers. Ben Shoval, the developer who notified KrebsOnSecurity about the data exposure, said that's because First American is one of the most widely-used companies for real estate title insurance and for closing real estate deals — where both parties to the sale meet in a room and sign stacks of legal documents.

* * *

Shoval shared a document link he'd been given by First American from a recent transaction, which referenced a record number that was nine digits long and dated April 2019. Modifying the document number in his link by numbers in either direction yielded other peoples' records before or after the same date and time, indicating the document numbers may have been issued sequentially.

I should emphasize that these documents were merely available from First American's Web site; I do not have any information on whether this fact was known to fraudsters previously, nor do I have any information to suggest the documents were somehow mass-harvested **(*although a low-and-slow or distributed indexing of this data would not have been difficult for even a novice attacker*)**.

Nevertheless, the information exposed by First American would be a virtual gold mine for phishers and scammers involved in so-called Business Email Compromise (BEC) scams, which often impersonate real estate agents, closing agencies, title and escrow firms in a bid to trick property buyers into wiring funds to fraudsters. According to the FBI, BEC scams are the most costly form of cybercrime today.
Armed with a single link to a First American document, BEC scammers would have an endless supply of very convincing phishing templates to use. A database like this also would give fraudsters a constant feed of new information about upcoming real estate financial transactions — ***including the email addresses, names and phone numbers of the closing agents and buyers***.

(Emphasis added.)

188.   On this news, the price of the Company's stock fell $3.46 per share, or over 6.2%, from $55.26 per share at the close of trading on May 24, 2019, to $51.80 per share at the close of trading the next trading day, on May 28, 2019.

### May 28, 2019 Form 8-K

189.   On May 28, 2019, the Company filed a current report on Form 8-K with the SEC titled, "First American Financial Comments On Its Ongoing Investigation Into Reported Information Security Incident." The current report stated the following, in relevant part:

> SANTA ANA, Calif., May 28, 2019 – First American Financial Corporation advises that *it shut down external access to a production environment with a reported design defect that created the potential for unauthorized access to customer data. The company is working diligently to address the defect and restore external access*. An outside forensic firm has been retained to aid in assessing the extent to which any customer information may have been compromised. *Though the ongoing investigation is in its early stages, at this time there is no indication that any large-scale unauthorized access to sensitive customer information occurred*. The company plans to provide updates on its investigation exclusively on its website at https://www.firstam.com/incidentupdate.

(Emphasis added.)

190.   The statement referenced in ¶189 was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the full extent and cause of the Privacy Breach; (3) the cause of the data breach was not a "design defect," but instead was First American's failure to adopt and implement basic security standards to protect its customers' Personally Identifiable Information from unauthorized access and other malicious acts; (4) First American did not merely "create[] the potential for unauthorized access to customer data" but actually had permitted unauthorized access to

its customers' Personally Identifiable Information; (5) First American was not "working diligently" to address the Privacy Breach, rather, in violation of the Company's purported security protocols, it knowingly allowed Personally Identifiable Information to be misclassified for many years and also caused its customers' Personally Identifiable Information to be exposed for several months after the Privacy Breach was discovered during a penetration test in December 2019; and (6) there was an "indication that a[] large-scale unauthorized access to sensitive customer information [had] occurred."

191.   Thereafter, an analyst at Stephens reported that, based upon the Company's current report, "[t]he Company has taken the necessary steps to fix the glitch."

192.   Moreover, on May 28, 2019, Barclays issued an analyst report titled, "Thoughts on Data Issues After a Talk with Management." The report further conveyed that the Company's management "indicated that as soon as the journalist [Krebs] informed them of the weakness, the database was shut down before the article was published, and the issues have since been fixed."

193.   The statement referenced in ¶192 was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the full extent and cause of the Privacy Breach; (3) the underlying cybersecurity problems that caused the data breach had not been "fixed;" and (4) Personally Identifiable Information remained exposed as of May 28.

194.   Just a few days later, however, on May 31, 2019, an Incident Update to the Company's customers revealed that documents with Personally Identifiable Information possibly remained unprotected.

### *July 25, 2019 Form 10-Q and Earnings Call*

195.   On July 25, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-

Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

196.   The 2Q19 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of June 30, 2019, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, *the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective*, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.
>
> * * *
>
> *There was no change in the Company's internal control over financial reporting during the quarter ended June 30, 2019, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting*.

(Emphasis added.)

197.   The Risk Factors section of the 2Q19 10-Q stated that unauthorized data disclosures "may" or "could" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Specifically, the 2Q19 10-Q stated:

> *The Company uses computer systems and other technologies (collectively referred to as "systems"), some of which it owns and manages and some of which are owned and/or managed by third parties, including providers of distributed computing infrastructure*

*platforms commonly known as the "cloud." The Company and its agents, suppliers, service providers, and customers use these systems to receive, process, store and transmit business information, including highly sensitive non-public personal information as well as data from suppliers and other information upon which the Company's business relies. The Company also uses these systems to manage substantial cash, investment assets, bank deposits, trust assets and escrow account balances on behalf of itself and its customers, among other activities*. Many of the Company's products, services and solutions involving the use of real property related data are fully reliant on these systems and are only available electronically. Accordingly, for a variety of reasons, the *integrity of these systems and the protection of the information that resides thereon are critically important to the Company's successful operation*.

These systems *have been subject to, and are likely to continue to be the target of, computer viruses, cyber attacks, phishing attacks and other malicious activity*. These attacks have increased in frequency and sophistication in recent years. *Further, certain other potential causes of system damage or other negative system-related events are wholly or partially beyond the Company's control*, such as natural disasters, vendor failures to satisfy service level requirements and power or telecommunications failures. *These incidents, regardless of their underlying causes, could expose the Company to system-related damages, failures, interruptions, and other negative events or could otherwise disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers*.

In fact, during the third quarter of 2019, the Company concluded an investigation regarding *potential unauthorized access to non-public personal information as a result of a vulnerability in one of the Company's applications*. The investigation identified imaged documents containing non-public personal information *pertaining to 32 consumers* that likely were accessed without authorization. These *32 consumers* have been notified and offered complimentary credit monitoring services. This incident triggered numerous federal and state governmental inquiries as well as private lawsuits against the Company. While the incident is not expected to have a material impact

on the Company's business, it may increase the risk associated with any future incidents, particularly the risk of damage to the Company's reputation.

Certain laws and contracts the Company has entered into require it to notify various parties, including consumers or customers, ***in the event of certain actual or potential data breaches or systems failures***. These notifications can result, among other things, in the loss of customers, lawsuits, adverse publicity, diversion of management's time and energy, the attention of regulatory authorities, fines and disruptions in sales. Further, the Company's financial institution customers have obligations to safeguard their systems and sensitive information and the Company may be bound contractually and/or by regulation to comply with the same requirements. ***If the Company fails to comply with applicable regulations and contractual requirements, it could be exposed to lawsuits, governmental proceedings or the imposition of fines, among other consequences***.

(Emphasis added.)

198.   The statement referenced in ¶¶196-197 was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the full extent of the Privacy Breach; (3) the access to the Company customers' Personally Identifiable Information was not theoretical; (4) the Company had experienced a data breach, and not "potential unauthorized access;" and (5) the Company's admission that over 350,000 documents were accessed during the data breach contradicts its claim that only 32 consumers were affected.

199.   Also on July 25, 2019, the Company held an earnings call in connection to the release of its financial results for the fiscal period ended June 30, 2019. During the call, Defendant Gilmore stated the following, in relevant part:

As we previously announced, we have completed our investigation into the consumer impact of our recent information security incident. ***Though the investigation identified only 32 impacted consumers, we***

***take seriously our responsibility to keep our customers' information secure*** and we regret the concerns this incident caused.

(Emphasis added.)

200.   The statement referenced in ¶199 was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the full extent of the Privacy Breach; (3) the Company's admission that over 350,000 documents were accessed during the data breach contradicts its claim that only 32 consumers were affected; and (4) the Company was still not taking "seriously [its] responsibility to keep [its] customers' information secure."

### September 19, 2019 Barclays Global Financial Services Conference

201.   On September 19, 2019, during a presentation at Barclays Global Financial Services Conference, Ellis Flannery, an analyst at Barclays at the time, asked Defendant Seaton "is there anything else on the security incident?" to which Defendant Seaton provided the following tone-deaf, lackluster response that misrepresented the Company's cybersecurity practices:

> Well, the thing with the information security incidents, I would say from our customer's perspective, it's really kind of old news, which is really good for us. ***So sort of business as usual from the customer's perspective***. And that was really important for us. We -- ***the regulatory inquiries are just ongoing, and we don't really have a timetable on when, but we think it'll be fairly immaterial, just like the nature of what actually happened***. And so, we continue to work through the regulators. We've answered all their questions. We're being very open, honest about it. And we're really, right now, trying to -- ***we already felt like we had strong information security, but we're taking it to another level internally***. So, I don't really have a timeline because these things just take a while. So, it's more of a long-term issue.

(Emphasis added.)

202.   The statement referenced in ¶201 was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Defendant Seaton failed to disclose, *inter alia*: (1) the full extent of the Privacy Breach; (2) the data breach was not "immaterial"; (3) First American did not have "strong information security"; and (4) First American was not "taking it to another level internally" particularly in light of the fact that not even two months after Defendant Seaton's statement, First American's records showed more than 320,000 high and critical vulnerabilities were unremediated, and an additional 131,000 high or critical vulnerabilities requiring remediation were found the next month.

### *October 24, 2019 Form 10-Q*

203.   On October 24, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

204.   The 3Q19 10-Q stated the following regarding the Company's controls and procedures:

> The Company's chief executive officer and chief financial officer have concluded that, as of September 30, 2019, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, ***the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective***, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.
>
> * * *
>
> ***There was no change in the Company's internal control over financial reporting during the quarter ended September 30, 2019,***

*that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting*.

(Emphasis added.)

205.   The Risk Factors section of the 3Q19 10-Q stated that unauthorized data disclosures "may" or "could" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. Specifically, the 3Q19 10-Q stated:

> *The Company uses computer systems and other technologies (collectively referred to as "systems"), some of which it owns and manages and some of which are owned and/or managed by third parties, including providers of distributed computing infrastructure platforms commonly known as the "cloud." The Company and its agents, suppliers, service providers, and customers use these systems to receive, process, store and transmit business information, including highly sensitive non-public personal information as well as data from suppliers and other information upon which the Company's business relies.  The Company also uses these systems to manage substantial cash, investment assets, bank deposits, trust assets and escrow account balances on behalf of itself and its customers, among other activities*.  Many of the Company's products, services and solutions involving the use of real property related data are fully reliant on these systems and are only available electronically.  Accordingly, for a variety of reasons, the *integrity of these systems and the protection of the information that resides thereon are critically important to the Company's successful operation*.
>
> These systems *have been subject to, and are likely to continue to be the target of, computer viruses, cyber attacks, phishing attacks and other malicious activity*.  These attacks have increased in frequency and sophistication in recent years.  *Further, certain other potential causes of system damage or other negative system-related events are wholly or partially beyond the Company's control*, such as natural disasters, vendor failures to satisfy service level requirements and

power or telecommunications failures. ***These incidents, regardless of their underlying causes, could expose the Company to system-related damages, failures, interruptions, and other negative events or could otherwise disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers***.

In fact, during the third quarter of 2019, the Company concluded an investigation regarding ***potential unauthorized access to non-public personal information as a result of a vulnerability in one of the Company's applications***. The investigation identified imaged documents containing non-public personal information ***pertaining to 32 consumers*** that likely were accessed without authorization. These ***32 consumers*** were notified and offered complimentary credit monitoring services. This incident triggered numerous federal and state governmental inquiries as well as private lawsuits against the Company.  While the incident is not expected to have a material impact on the Company's business, it may increase the risk associated with any future incidents, particularly the risk of damage to the Company's reputation.

Certain laws and contracts the Company has entered into require it to notify various parties, including consumers or customers, ***in the event of certain actual or potential data breaches or systems failures***.  These notifications can result, among other things, in the loss of customers, lawsuits, adverse publicity, diversion of management's time and energy, the attention of regulatory authorities, fines and disruptions in sales. Further, the Company's financial institution customers have obligations to safeguard their systems and sensitive information and the Company may be bound contractually and/or by regulation to comply with the same requirements. ***If the Company fails to comply with applicable regulations and contractual requirements, it could be exposed to lawsuits, governmental proceedings or the imposition of fines, among other consequences***.

(Emphasis added.)

*February 18, 2020 Form 10-K*

206.   On February 18, 2020, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendants Gilmore, Seaton, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan, Oman, and Wyrsch, and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

207.   Regarding the Company's internal controls, the 2019 10-K stated, in relevant part:

> Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2019. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control—Integrated Framework (2013). ***Based on that assessment under the framework in Internal Control—Integrated Framework (2013), management determined that, as of December 31, 2019, the Company's internal control over financial reporting was effective***.

(Emphasis added.)

208.   The Risk Factors section of the 2019 10-K stated that unauthorized data disclosures "may" or "could" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals, as was known by the Company in December 2018. Specifically, the 2019 10-K stated:

> ***The Company uses computer systems and other technologies (collectively referred to as "systems"), some of which it owns and manages and some of which are owned and/or managed by third parties, including providers of distributed computing infrastructure platforms commonly known as the "cloud." The Company and its agents, suppliers, service providers, and customers use these systems***

*to receive, process, store and transmit business information, including non-public personal information as well as data from suppliers and other information upon which the Company's business relies. The Company also uses these systems to manage substantial cash, investment assets, bank deposits, trust assets and escrow account balances on behalf of itself and its customers, among other activities*. Many of the Company's products, services and solutions involving the use of real property related data are fully reliant on these systems and are only available electronically. Accordingly, for a variety of reasons, the *integrity of these systems and the protection of the information that resides thereon are critically important to the Company's successful operation*.

These systems *have been subject to, and are likely to continue to be the target of, computer viruses, cyberattacks, phishing attacks and other malicious activity*. These attacks have increased in frequency and sophistication. *Further, certain other potential causes of system damage or other negative system-related events are wholly or partially beyond the Company's control*, such as natural disasters, vendor failures to satisfy service level requirements and power or telecommunications failures. *These incidents, regardless of their underlying causes, could expose the Company to system-related damages, failures, interruptions, cyberattacks and other negative events or could otherwise disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers*.

\* \* \*

During the third quarter of 2019, the Company concluded an investigation regarding *potential unauthorized access to non-public personal information as a result of a vulnerability in one of the Company's applications*. The investigation identified imaged documents containing non-public personal information *pertaining to 32 consumers* that likely were accessed without authorization. These *32 consumers* were notified and offered complimentary credit monitoring services. This incident triggered numerous federal and state governmental inquiries as well as private lawsuits against the Company. While the incident is not expected to have a material impact

on the Company's business, it increases the risk associated with any future incidents, particularly the risk of damage to the Company's reputation.

Certain laws and contracts the Company has entered into require it to notify various parties, including consumers or customers, ***in the event of certain actual or potential data breaches or systems failures***, including those of our service providers.  These notifications can result, among other things, in the loss of customers, lawsuits, adverse publicity, diversion of management's time and energy, the attention of regulatory authorities, fines and disruptions in sales. Further, the Company's financial institution customers have obligations to safeguard their systems and sensitive information and the Company may be bound contractually and/or by regulation to comply with the same requirements. ***If the Company or its service providers fail to comply with applicable regulations and contractual requirements, the Company could be exposed to lawsuits, governmental proceedings or the imposition of fines, among other consequences***.

(Emphasis added.)

209.   The statements referenced in ¶¶203-204 and 206-207 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, it failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the full extent of the Privacy Breach; and (3) the Company's admission that over 350,000 documents were accessed during the data breach contradicts its claim that only 32 consumers were affected.

### *March 31, 2020 Proxy Statement*

210.   On March 31, 2020, the Company filed its Schedule 14A with the SEC on (the "2020 Proxy Statement"). Defendants Gilmore, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan, Oman, and Wyrsch solicited the 2020 Proxy Statement filed pursuant

to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[14]

211.   With respect to the Company's Code of Ethics, the 2020 Proxy Statement stated that it applies "to all employees, officers and directors."

212.   The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

213.   The 2020 Proxy Statement also called for, among other things: (1) the election of three directors; (2) shareholder approval, on an advisory basis, of the Company's executive compensation; (3) shareholder approval of the Company's 2020 Incentive Compensation Plan to allow the Company to continue to utilize equity-based awards of up to approximately 4,300,000 shares (the "2020 Incentive Plan Proposal"); and (4) the ratification of the Company's independent auditors.

214.   The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that it stated that the Individual Defendants purportedly employed "pay-for-performance" elements, including linking incentive award opportunities that provided "a strong alignment between the interests of executive officers and long-term stockholders[]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

215.   The 2020 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading.

---

[14] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Verified Shareholder Derivative Second Amended Complaint

Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the Privacy Breach or the full extent and cause of the Privacy Breach; (3) as a result of the Company's failure to implement basic policies and comply with its own cybersecurity policies and state regulations, First American was subjected to an increased threat of a cybersecurity breakdown; (4) consequently, the Company was subject to an elevated risk of regulatory scrutiny and customer liability; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

216.   The misrepresentations and omissions set forth herein were material to shareholders in voting on, among other things, the 2020 Incentive Plan Proposal who would not have, among other things, approved the 2020 Incentive Plan Proposal had they been fully informed about the Privacy Breach.

### April 29, 2020 Form 10-Q

217.   On April 29, 2020, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2020 (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

218.   The 1Q20 10-Q stated the following regarding the Company's controls and procedures:

The Company's chief executive officer and chief financial officer have concluded that, as of March 31, 2020, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, **the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective**,

1
2

based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.

3

\* \* \*

4
5
6
7

***There was no change in the Company's internal control over financial reporting during the quarter ended March 31, 2020, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.***

8

(Emphasis added.)

9
10
11
12
13
14
15

219.   The Risk Factors section of the 1Q20 10-Q stated that unauthorized data disclosures "may" or "could" cause, among other things, business disruption and harm to the Company's reputation rather than alerting investors of the fact that First American's website had exposed hundreds of millions of documents dated at least as far back as 2003 with Personally Identifiable Information related to mortgage deals. (Emphasis added.) Instead, the 1Q20 10-Q merely stated that only "32 consumers" had been affected by the Privacy Breach.

16
17
18
19
20
21
22
23
24
25
26
27

***The Company uses computer systems and other technologies (collectively referred to as "systems"), some of which it owns and manages and some of which are owned and/or managed by third parties, including providers of distributed computing infrastructure platforms commonly known as the "cloud." The Company and its agents, suppliers, service providers, and customers use these systems to receive, process, store and transmit business information, including non-public personal information as well as data from suppliers and other information upon which the Company's business relies. The Company also uses these systems to manage substantial cash, investment assets, bank deposits, trust assets and escrow account balances on behalf of itself and its customers, among other activities***. Many of the Company's products, services and solutions involving the use of real property related data are fully reliant on these systems and are only available electronically. Accordingly, for a variety of reasons, the ***integrity of these systems and the protection of the information that resides thereon are critically important to the Company's successful operation***.

28

---

94

Verified Shareholder Derivative Second Amended Complaint

*These systems have been subject to, and are likely to continue to be the target of, computer viruses, cyberattacks, phishing attacks and other malicious activity.* These attacks have increased in frequency and sophistication, particularly as a result of the coronavirus pandemic. The Company's employees working remotely are more susceptible to social engineering attacks, intrusions and other malicious activity, and this risk has increased given that a substantial number of the Company's employees are working from home as a result of the coronavirus pandemic. *Further, certain other potential causes of system damage or other negative system-related events are wholly or partially beyond the Company's control*, such as natural disasters, vendor failures to satisfy service level requirements and power or telecommunications failures. *These incidents, regardless of their underlying causes, could expose the Company to system-related damages, failures, interruptions, cyberattacks and other negative events or could otherwise disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers*.

* * *

During the third quarter of 2019, the Company concluded an investigation regarding *potential unauthorized access to non-public personal information as a result of a vulnerability in one of the Company's applications*. The investigation identified imaged documents containing non-public personal information *pertaining to 32 consumers* that likely were accessed without authorization. These *32 consumers* were notified and offered complimentary credit monitoring services. This incident triggered numerous federal and state governmental inquiries as well as private lawsuits against the Company. While the incident is not expected to have a material impact on the Company's business, it increases the risk associated with any future incidents, particularly the risk of damage to the Company's reputation.

Certain laws and contracts the Company has entered into require it to notify various parties, including consumers or customers, *in the event of certain actual or potential data breaches or systems failures*, including those of the Company's service providers. These

95

Verified Shareholder Derivative Second Amended Complaint

notifications can result, among other things, in the loss of customers, lawsuits, adverse publicity, diversion of management's time and energy, the attention of regulatory authorities, fines and disruptions in sales. Further, the Company's financial institution customers have obligations to safeguard their systems and sensitive information and the Company may be bound contractually and/or by regulation to comply with the same requirements. ***If the Company or its service providers fail to comply with applicable regulations and contractual requirements, the Company could be exposed to lawsuits, governmental proceedings or the imposition of fines, among other consequences***.

(Emphasis added.)

### *July 23, 2020 Form 10-Q and Earnings Call*

220.   On July 23, 2020, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2020 (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendants Gilmore and Seaton and contained SOX certifications signed by Defendants Gilmore and Seaton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

221.   The 2Q20 10-Q stated the following regarding the Company's controls and procedures:

The Company's chief executive officer and chief financial officer have concluded that, as of June 30, 2020, the end of the quarterly period covered by this Quarterly Report on Form 10-Q, ***the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, were effective***, based on the evaluation of these controls and procedures required by Rule 13a-15(b) thereunder.

\* \* \*

***There was no change in the Company's internal control over financial reporting during the quarter ended June 30, 2020, that has***

1
2

*materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.*

3

(Emphasis added.)

4

222.   The Risk Factors section of the 2Q20 10-Q stated that unauthorized data

5

disclosures "may" or "could" cause, among other things, business disruption and harm to

6

the Company's reputation rather than alerting investors of the fact that First American's

7

website had exposed hundreds of millions of documents dated at least as far back as 2003

8

with Personally Identifiable Information related to mortgage deals. Specifically, the 2Q20

9

10-Q stated:

10
11
12
13
14
15
16
17
18

*The Company uses computer systems and other technologies (collectively referred to as "systems"), some of which it owns and manages and some of which are owned and/or managed by third parties, including providers of distributed computing infrastructure platforms commonly known as the "cloud." The Company and its agents, suppliers, service providers, and customers use these systems to receive, process, store and transmit business information, including highly sensitive non-public personal information as well as data from suppliers and other information upon which the Company's business relies.  The Company also uses these systems to manage substantial cash, investment assets, bank deposits, trust assets and escrow account balances on behalf of itself and its customers, among other activities.*  Many of the Company's products, services and solutions involving the use of real property related data are fully reliant on these systems and are only available

19
20
21
22

electronically. Accordingly, for a variety of reasons, the *integrity of these systems and the protection of the information that resides thereon are critically important to the Company's successful operation.*

23
24
25
26
27
28

These systems *have been subject to, and are likely to continue to be the target of, computer viruses, cyber attacks, phishing attacks and other malicious activity.* These attacks have increased in frequency and sophistication in recent years. *Further, certain other potential causes of system damage or other negative system-related events are wholly or partially beyond the Company's control*, such as natural disasters, vendor failures to satisfy service level requirements and power or telecommunications failures. *These incidents, regardless of*

*their underlying causes, could expose the Company to system-related damages, failures, interruptions, and other negative events or could otherwise disrupt the Company's business and could also result in the loss or unauthorized release, gathering, monitoring or destruction of confidential, proprietary and other information pertaining to the Company, its customers, employees, agents or suppliers.*

In fact, during the third quarter of 2019, the Company concluded an investigation regarding *potential unauthorized access to non-public personal information as a result of a vulnerability in one of the Company's applications*. The investigation identified imaged documents containing non-public personal information *pertaining to 32 consumers* that likely were accessed without authorization. These *32 consumers* were notified and offered complimentary credit monitoring services. This incident triggered numerous federal and state governmental inquiries as well as private lawsuits against the Company.  While the incident is not expected to have a material impact on the Company's business, it may increase the risk associated with any future incidents, particularly the risk of damage to the Company's reputation.

Certain laws and contracts the Company has entered into require it to notify various parties, including consumers or customers, *in the event of certain actual or potential data breaches or systems failures*.  These notifications can result, among other things, in the loss of customers, lawsuits, adverse publicity, diversion of management's time and energy, the attention of regulatory authorities, fines and disruptions in sales. Further, the Company's financial institution customers have obligations to safeguard their systems and sensitive information and the Company may be bound contractually and/or by regulation to comply with the same requirements. *If the Company fails to comply with applicable regulations and contractual requirements, it could be exposed to lawsuits, governmental proceedings or the imposition of fines, among other consequences*.

(Emphasis added.)

223.   Also on July 23, 2020, the Company held an earning call in connection to the release of the Company's financial results for the fiscal period ended June 30, 2020. During the call, Defendant Seaton stated the following, in relevant part:

It has now been a little over a year since the information security incident, and we wanted to take the opportunity to provide you with an update. In March, the Nebraska Department of Insurance, the primary regulator of our Title Insurance Company, led an examination of our information security program as of June 30, 2019 in our response to the information security incident. The resulting report concluded that ***our IT general controls environment is suitably designed and is operating effectively, and that we adequately and appropriately detected, analyzed, contained, eradicated and recovered from a security incident, and that we are in compliance with New York's cyber security requirements for financial services companies***.

224.    The statements referenced in ¶¶218-219 and 221-223 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the full extent of the Privacy Breach; (3) First American's "IT general controls environment" was neither "suitably designed" nor "operating effectively," particularly in light of the fact that Defendant Jalakian acknowledged that the Company had more than 100,000 unremediated critical and high vulnerabilities, a figure that would only increase to 450,000 by the end of the year; (4) due to the foregoing, First American had not "recovered" from the Privacy Breach (5) the Company had failed to "adequately and appropriately detect[], analyze[], contain[], [and] eradicate[]" the data breach, and even after the Privacy Breach was discovered in December 2019, the Company still failed to protect its customers' Personally Identifiable Information from unauthorized access and other malicious acts; and (6) the Company failed to comply with the State of New York's applicable cyber security regulations.

***2020 First American Website***

225.   In 2020, the Company's "Privacy Notice," posted on the Company's website stated the following in relevant part:[15]

**First American Fair Information Values**

We collect, use, and share your personal information consistent with First American's Fair Information Values:

**Fairness** We consider your expectations of privacy in all of our business operations, and strive to offer our Applications, Websites, and Products in a way that ensures a favorable balance between the benefits we offer and your privacy.

**Public Record** We believe that an open public record creates significant value for society, enhances your choice, and creates opportunity. We actively support an open public record and emphasize its importance and contribution to our economy.

**Use** *We believe we should behave responsibly when we use your personal information.* We will obey the applicable laws governing the collection, use, storage, and sharing of your personal information.

**Accuracy** We will take reasonable steps to help assure the accuracy of the personal information we collect, use, store, and share from and about you. Where possible, we will take reasonable steps to correct inaccurate information. When, as with the public record, we cannot correct the inaccurate information, we will take all reasonable steps to assist you in identifying the source of the erroneous information so that you can secure the required corrections.

**Education** *We endeavor to educate the users of our Applications, Websites, and Products, our employees and others in our industry about the importance of your privacy.* We will instruct our employees

---

[15]https://www.firstam.com/privacy-policy/index.html#:~:text=We%20do%20not%20sell%20your%20personal%20information%20to%20third%20parties,Right%20of%20Non%2DDiscrimination.&text=Accordingly%2C%20First%20American%20will%20not,your%20rights%20under%20the%20CCPA. Last visited on November 11, 2020.

Verified Shareholder Derivative Second Amended Complaint

on our Fair Information Values and on the responsible collection, use, storage, and sharing of your personal information. We will encourage others in our industry to collect, use, store, and share your personal information in a responsible manner.

**Security** *We will maintain commercially reasonable technical, organizational, and physical safeguards to protect your personal information.*

(Emphasis added.)

226.   The statements referenced in ¶225 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants' failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the Privacy Breach or the full extent and cause of the Privacy Breach; and (3) personal information was not safeguarded by commercially reasonable technical safeguards.

227.   As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Fully Emerges

228.   The full truth emerged on October 22, 2020, when First American filed the 3Q20 10-Q, which revealed that the Company had recently received a Wells Notice from the SEC. Specifically, the 3Q20 10-Q stated:

Currently, governmental agencies are examining or investigating certain of the Company's operations.  These exams and investigations include two investigations initiated in connection with the information security incident that occurred during the second quarter of 2019, one being conducted by the Securities and Exchange Commission ("SEC") enforcement staff and the other by the New York Department of Financial Services. The SEC enforcement staff is questioning the adequacy of disclosures the Company made at the time of the incident and the adequacy of its disclosure controls. In September 2020, the Company received a Wells Notice informing the Company that the enforcement staff has made a preliminary determination to recommend a filing of an enforcement action by the SEC against the Company.

229.   On this news, the price of the Company's stock fell $4.83 per share, or over 9.3%, from $51.58 per share at the close of trading on October 21, 2020, to $46.75 per share at the close of trading on October 22, 2020.

230.   Although the full extent of the fallout from the Privacy Breach remains to be seen, *Reuters* reported that "penalties could be significant" since the NYSDFS considers each instance of exposed personal information a separate violation of 23 N.Y.C.R.R. Part 500, with each violation carrying a maximum $1,000 penalty.

## DAMAGES TO FIRST AMERICAN

231.   As a direct and proximate result of the Individual Defendants' conduct, First American will lose and expend many millions of dollars.

232.   Such expenditures include, but are not limited to, the costs, legal fees, arbitration fees, and/or other fees associated with the NYSDFS Enforcement Action, the Consumer Class Actions, and the Securities Class Action filed against the Company, its CEO and its CFO, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

233.   Such expenditures include, but are not limited to, costs associated with defending investigations of the Privacy Breach and for fines paid in connection thereto, including the costs associated with defending the investigation by the SEC and the penalty of $487,616 imposed as a result of the SEC's investigation and findings.

234.   Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

235.   As a direct and proximate result of the Individual Defendants' conduct, First American has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

236.   Plaintiff brings this action derivatively and for the benefit of First American to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of First American, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, as well as the aiding and abetting thereof.

237.   First American is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

238.   Plaintiff is, and has been at all relevant times, a shareholder of First American. Plaintiff will adequately and fairly represent the interests of First American in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

239.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

240.   A pre-suit demand on the Board of First American is futile and, therefore, excused.  At the time of filing of this second amended complaint, the Board consists of the following ten individuals: Defendants Gilmore, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan, Oman, and Wyrsch (the "Director-Defendants"), and non-party Jean C. LaTorre (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time of the filing of this second amended complaint.

241.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, while one of them engaged in insider sales based on material non-public information, all of which renders the Director-

Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

242.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the fraud perpetrated by the Individual Defendants, one of the Director-Defendants sold Company stock at artificially inflated prices based on inside information. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

243.   Demand is also excused as to the Director-Defendants because they were fully aware of the Privacy Breach during the Relevant Period, as evidenced by, among other things, the fact that, among the Company's Cyber Defense Team distributed a final report of the EaglePro penetration test on January 11, 2019. Nonetheless, the Director-Defendants caused the Company to disseminate the false and misleading statements described herein. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

244.   Additional reasons that demand on Defendant Gilmore is futile follow. Defendant Gilmore has served as the Company's CEO and as a Company director since June 2010. He also serves as a member of the Executive Committee. He previously served in various managerial roles with the TFAC beginning in 1993, including CEO of TFAC's financial services group and TFAC's COO. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Gilmore with his principal occupation, and he receives handsome compensation, including $10,367,225 during 2019 for his services. Defendant Gilmore was ultimately responsible for many of the false and misleading statements and omissions that were made, including those contained in the

Company's SEC filings referenced herein, many of which he either personally made or signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale, which yielded nearly $5.5 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. Moreover, Defendant Gilmore is a defendant in the Securities Class Action. For these reasons, Defendant Gilmore breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

245.   Additional reasons that demand on Defendant Kennedy is futile follow. Defendant Kennedy has served as the Company's Chairman of the Board and as a Company director since June 2010. He also serves as the Chair of the Executive Committee and as a member of the Compensation Committee. Previously, he served as the Company's Executive Chairman from 2010 until he retired in February 2012 and as the Chairman and CEO of the Company's former parent company, TFAC, from 2003 until 2010. He also served as TFAC's President from 1993 until 2004. Defendant Kennedy has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Kennedy signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Kennedy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

246.    Additional reasons that demand on Defendant Doti is futile follow. Defendant Doti has served as a Company director since 2010. He also serves as the Chair of the Audit Committee and as a member of the Executive Committee. Defendant Doti has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Doti signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Doti breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

247.    Additional reasons that demand on Defendant Gilyard is futile follow. Defendant Gilyard has served as a Company director since 2017. He also serves as a member of the Nominating and Corporate Governance Committee. Defendant Gilyard has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Gilyard signed, and thus personally made the false and misleading statements in the 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Gilyard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

248.    Additional reasons that demand on Defendant McCarthy is futile follow. Defendant McCarthy has served as a Company director since 2015. She also serves as the Chair of the Nominating and Corporate Governance Committee. Defendant McCarthy has

received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant McCarthy signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant McCarthy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

249.   Additional reasons that demand on Defendant McKee is futile follow. Defendant McKee has served as a Company director since 2011. He also serves as the Chair of the Compensation Committee. Defendant McKee has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McKee signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant McKee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

250.   Additional reasons that demand on Defendant McKernan is futile follow. Defendant McKernan has served as a Company director since 2011. He also serves as a member of the Audit Committee and as a member of the Executive Committee. Defendant McKernan has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of

Verified Shareholder Derivative Second Amended Complaint

the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McKernan signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant McKernan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

251. Additional reasons that demand on Defendant Oman is futile follow. Defendant Oman has served as a Company director since 2013. He also serves as a member of the Audit Committee and as a member of the Compensation Committee. Defendant Oman has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Oman signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Oman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

252. Additional reasons that demand on Defendant Wyrsch is futile follow. Defendant Wyrsch has served as a Company director since 2018. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Wyrsch has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Privacy Breach and the scheme to cause the Company to make false and misleading statements,

consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Wyrsch signed, and thus personally made the false and misleading statements in the 2018 and 2019 10-Ks. For these reasons, Defendant Wyrsch breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

253.    Additional reasons that demand on the Board is futile follow.

254.    As described above, one of the Director-Defendants directly engaged in insider trading, in violation of federal law and the Company's Code of Ethics. Defendant Gilmore received proceeds of nearly $5.5 million as a result of his insider transaction executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to him, and excused.

255.    The Director-Defendants have extensive, longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Gilmore, Seaton, Kennedy, and Doti, all served in senior positions or as directors to TFAC for many years; Defendant Gilmore served in senior roles at TFAC from 1993 until 2010, including as the CEO of its financial services group and as its COO; Defendant Seaton joined TFAC in 2006 and served as director of investor relations until 2010; Defendant Kennedy served as TFAC's chairman and CEO from 2003 until 2010, and also served as TFAC's president from 1993 to 2004. Defendant Kennedy also served as a director of TFAC's. Defendant Doti served as a director of TFAC from 1993 until 2010. Additionally, Defendants Doti and Gilyard both held senior leadership positions at Chapman University ("Chapman") during the same time period; Defendant Doti served as President of Chapman from 1991 until 2016, and Defendant Gilyard served as Dean of the Argyros School of Business and Economics at Chapman from 2012 until 2017. Defendant

Gilyard has served on the Board of Realty Income Corporation ("Realty"), a real estate investment trust since July 2018, where Defendant McKee has served as the Chairman since February 2012. Defendants Gilyard and McKee also serve on Realty's Nominating and Corporate Governance Committee together. Defendants Kennedy and McKernan serve on the Board of Automobile Club of Southern California, where Defendant McKernan served as CEO from 1991 until he retired in 2012. Lastly, Defendants Gilmore, Kennedy, Doti, McKee, and McKernan have each served together on the Company's Board for nearly a decade. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

256.   Defendants Doti, McKernan, and Oman (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the Company's financial reporting process, and the Company's internal controls over financial reporting. The Audit Committee Defendants failed to ensure the quality and integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Additionally, the Audit Committee Defendants were repeatedly presented with information pertaining to the poor state of the Company's vulnerability management, and they failed to take action. Moreover, the Privacy Breach evidences that the Audit Committee Defendants failed to fulfill their responsibilities to ensure legal and regulatory compliance, as well as internal auditing functions. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

Verified Shareholder Derivative Second Amended Complaint

257.  In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's vulnerability management program and the implementation of policies that could have prevented or mitigated the Privacy Breach or cured the flaw in EaglePro upon its discovery by the Company in December 2018. The Director-Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a) of the Exchange Act, and for contribution under Sections 10(b) and 21D of the Exchange Act. In violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

258.  First American has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for First American any part of the damages First American suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

259.  The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested

judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

260.   The acts complained of herein constitute violations of fiduciary duties owed by First American's officers and directors, and these acts are incapable of ratification.

261.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of First American. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Director-Defendants were to sue themselves or certain of the officers of First American, there would be no directors' and officers' insurance protection.  Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director-Defendants is futile and, therefore, excused.

262.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause First American to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

263.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

264.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

265.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

266.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

267.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

268.   Under the direction and watch of the Director-Defendants, the 2018, 2019, and 2020 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the Privacy Breach

or the full extent and cause of the Privacy Breach; (3) as a result of the Company's failure to implement basic policies and comply with its own cybersecurity policies and state regulations, First American was subjected to an increased threat of a cybersecurity breakdown; (4) consequently, the Company was subject to an elevated risk of regulatory scrutiny and customer liability; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

269.  The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

270.  Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them and their engagement in or tolerance of the Privacy Breach and causing the Company to issue false and misleading statements and/or omissions of material fact.

271.  In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, advisory approval of executive compensation, ratification of the Company's independent auditor, and the approval of the 2020 Incentive Plan Proposal.

272.  The false and misleading elements of the Proxy Statements led to the re-election of Defendants Gilmore, Kennedy, Doti, Gilyard, McCarthy, McKee, McKernan,

and Oman which allowed them to continue breaching their fiduciary duties to First American.

273.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

274.    Plaintiff on behalf of First American has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

275.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

276.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of First American's business and affairs.

277.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

278.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of First American.

279.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

280.    In further breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in the Privacy Breach.

281.    In breach of their fiduciary duties owed to First American, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*: (1) the deficiencies in the Company's vulnerability management program; (2) the Privacy Breach

or the full extent and cause of the Privacy Breach; (3) as a result of the Company's failure to implement basic policies and comply with its own cybersecurity policies and state regulations, First American was subjected to an increased threat of a cybersecurity breakdown; (4) consequently, the Company was subject to an elevated risk of regulatory scrutiny and customer liability; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

282.   The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

283.   In breach of their fiduciary duties, two of the Individual Defendants made lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

284.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of First American's securities and disguising insider sales.

285.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail

to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of First American's securities and disguising insider sales.

286.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

287.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, First American has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

288.   Plaintiff on behalf of First American has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

289.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

290.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, First American.

291.   The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from First American that was tied to the performance or artificially inflated valuation of First American, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

292.   Plaintiff, as a shareholder and a representative of First American, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including

117

Verified Shareholder Derivative Second Amended Complaint

any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

293.   Plaintiff on behalf of First American has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

294.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

295.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence First American, for which they are legally responsible.

296.   As a direct and proximate result of the Individual Defendants' abuse of control, First American has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, First American has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

297.   Plaintiff on behalf of First American has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

298.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

299.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of First American in a manner consistent with the operations of a publicly-held corporation.

300.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, First American has sustained and will continue to sustain significant damages.

301.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

302.   Plaintiff on behalf of First American has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

303.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

304.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

305.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

306.   Plaintiff on behalf of First American has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Gilmore, Seaton, and Jalakian for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

307.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

308.   First American, along with Defendants Gilmore, Seaton, and Jalakian are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's

liability will be in whole or in part due to Defendants Gilmore, Seaton, and Jalakian's willful and/or reckless violations of their obligations as officers and/or directors of First American.

309.   Defendants Gilmore, Seaton, and Jalakian, because of their positions of control and authority as officers and/or directors of First American, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of First American, including the wrongful acts complained of herein and in the Securities Class Action.

310.   Accordingly, Defendants Gilmore, Seaton, and Jalakian are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

311.   As such, First American is entitled to receive all appropriate contribution or indemnification from Defendants Gilmore, Seaton, and Jalakian.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of First American, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to First American;

(c)   Determining and awarding to First American the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing First American and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect First American and its shareholders from a

repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of First American to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding First American restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: August 9, 2021                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897

Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Second Amended Complaint

## VERIFICATION

I, Norman Hollett, am a plaintiff in the within action. I have reviewed the allegations made in this Second Amended Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of July, 2021.

8/3/2021

DocuSigned by:

*Norman Hollett*

C3C1CAF307A9499...

Norman Hollett